## Murr Ehf.
## Consulting Agreement

This Consulting Agreement (this "Agreement") dated as of May 1st, 2013 (the "Effective Date"), between Steven Barlow, an individual (the "Consultant") and Murr Ehf., an Icelandic corporation (the "Company").

WHEREAS, the Company wishes to retain Consultant to provide the Company with certain consulting services and Consultant is willing to provide such consulting services, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

1. **Retention of the Consultant**. The Company hereby retains and engages the Consultant, and the Consultant hereby accepts such engagement, in each case subject to the terms and conditions of this Agreement.

2. **Term and Termination**. The Term of this Agreement shall commence upon the Effective Date and continue until terminated by written consent of the parties. Either of the parties may terminate the Consultant's provision of the Services (as defined below) at will, for cause or without cause, at any time. However, the termination of the Services shall not affect the other provisions hereof.

3. **Capacity and Performance**. The Consultant shall serve in perpetuity (subject to his voluntary resignation therefrom) on the Company's Board of Directors as an Executive Director (providing professional advice and ongoing support consistent with that of an Executive Director of the Company), and perform the following services for the Company at the Consultant's discretion (the "Services"):

   3.1. Define the goals and objectives for the Company's financing and leading the Company's efforts for obtaining financing.

   3.2. Structure the Company's organization, identify an alternative domicile and institute formal procedures for the Company's organization and operation.

   3.3. Work with company management on business goals, hiring plans (including a CEO after the next round of investments), and instituting accounting practices and policies.

   3.4. Increase the Company's sales in a role of International Business Development by, in part, engaging and establishing relationships with potential customers.

   3.5. If need be establish an offshore presence for the Company and domicile it for tax advantages and compatibility with a UK IPO (or alternative exit strategy)

1




3.6. Establish a public relations presence for the company that will drive branding, business opportunities and liquidity.

3.7. Lead and drive a liquidity event for the Company.

4. **Compensation and Reimbursement**. As compensation for the Services, the Company agrees to pay the Consultant compensation as follows (the "Compensation"):

4.1. *Stock Grant*. A stock grant of 2% of the Company's common stock, vesting over two years on a monthly basis. The stock grant shall accelerate to 100% upon a Change of Control (as defined in Section 5.4 hereof) or termination of the Services by the Company without cause or by the Consultant for cause. If the Services are terminated by the Consultant for convenience or by the Company with cause, the stock grant shall cease vesting.

4.2. *First Round Financing Bonus*. Upon consummating the "First Round" of financing of $1mil or more (meaning the receipt by the Company, by way of sale of the Company's equity, an investment or series of investments in the aggregate of at least one million dollars ($1,000,000), including any purchase of the Company's equity by the Consultant), the Company shall pay the Consultant a fee of five percent (5%) of the raised amount in cash and a fee of five percent (5%) of the amount raised in warrants of the Company's stock at current round strike price.

4.3. *Sales Commissions*. The Company shall pay the Consultant a Five Percent (5%) commission in perpetuity on all sales outside of the United States which arise out of the Consultant's identification and/or engagement of the respective purchaser of Company products. The Company shall pay the commission for the life of the relationship with the respective purchaser and on a monthly basis. In case of a Change of Control (as defined in Section 5.4 hereof), the Company shall make a good faith effort to negotiate the continued payment of the commissions following the Change of Control, but if unsuccessful in its effort no longer have the obligation to pay such commission to the Consultant. *Dog Food*. The Company shall supply the Consultant with "a lifetime supply" of its dog food products for his Boston Terrier, Romeo at the request of the Consultant (or, following the Consultant death, an assignee of the Consultant) until the death of Romeo.

4.4. *Reimbursement for Expenses*. The Company shall reimburse the Consultant on a monthly basis for all expenses expended by the Consultant and authorized in advance by the Company, in connection with the Services and his other duties hereunder after written submission by the Consultant to the Company of signed expense reports, including invoices and bills substantiating the expenses.

5. **Additional Terms and Covenants**.

5.1. *Right to Contribution*. The Consultant shall have the right to invest in the Company on the same basis as other First Round investors.

2




5.2. *No Restrictions on Activities*. The Consultant shall provide the Services in his own discretion, devoting an amount of time to the Services in his own discretion, and the Consultant shall not be prohibited from engaging in any other business opportunities or activities, whether or not in competition with the Company.

5.3. *Shareholder Agreement*. The Company shall produce a shareholder agreement for the shareholders of the Company and shall use its best efforts to have it executed by each of the shareholders of the Company within a month of the Effective Date.

5.4. *Change of Control*. A "Change of Control" shall be defined as any event where in an arms-length transaction with reasonable consideration (a) the Company is merged with or into or consolidated with another corporation or other business entity under circumstances where the stockholders of the Company immediately prior to such merger or consolidation do not own after such merger or consolidation shares or other equity interests representing at least fifty percent (50%) of the voting power of the Company or the surviving or resulting entity, (b) shares representing fifty percent (50%) or more of the voting power of the Company are transferred to any person who is not, immediately prior to the transfer, a holder of stock of any class or preference of the Company, and (c) the Company is liquidated, or sells or otherwise disposes of all or substantially of its assets.

6. **Nondisclosure Obligation**. The Consultant shall not at any time, or in any manner, whether during or after the termination of the Services or this Agreement, for any reason whatsoever (other than to promote and advance the business of the Company), reveal to any person or entity (both commercial and non-commercial) any of the trade secrets, proprietary, technical and/or confidential business information concerning the Company or third parties entrusting their own confidential information with the Company including, but not limited to: marketing plans, its research and development activities; product designs, prototypes and technical specifications; inventions (whether patentable or not), show-how and know-how; proposals and strategies; pricing and costing policies, sales; customer and supplier lists and accounts, employees; nonpublic financial information of the Company; or information received by the Company from others under an obligation of confidentiality, except as may be required in the ordinary course of performing his duties to the Company, without the express written permission of the Company. This restriction shall not apply to: (i) information that is disclosed generally or is in the public domain through no fault of the Consultant; (ii) information approved for release by written authorization of the Company; or (iii) information that may be required by law or an order of any court, agency or proceeding to be disclosed.

7. **Company Property**. The Consultant agrees that during his engagement with the Company, the Consultant shall not make, use or permit to be used any Company Property (as hereinafter defined) otherwise than for the purpose of performing services pursuant to his engagement with the Company. The term "Company Property" shall include, but is not limited to, all notes, memoranda, reports, lists, agreements, records, drawings, sketches, specifications, software, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, passwords, accounts, documentation or other materials of any nature and in any form,




whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in his possession, custody or control. The Consultant further agrees that he shall not, after the termination of his engagement with the Company, possess, use or permit others to possess or use any such Company Property. The Consultant acknowledges and agrees that all Company Property shall be and remain the sole and exclusive property of the Company. At any time and from time to time upon the request of the Company, the Consultant shall deliver immediately to the Company all or any part of the Company Property in his possession, and all copies thereof (including, without limitation, electronic copies), specified by the Company in such request. In addition, immediately upon the termination of his engagement with the Company, the Consultant shall deliver to the Company all Company Property in his possession, and all copies thereof (including, without limitation, electronic copies).

8. **Miscellaneous**.

8.1. *Waiver*. Any waiver by the parties of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

8.2. *Severability*. If any part of this Agreement is determined to be invalid or unenforceable pursuant to applicable law, then the invalid and unenforceable provision will be deemed superseded by a valid, enforceable provision that most closely matches the intent of the original provision and the remainder of the agreement shall continue in effect.

8.3. *Merger*. This Agreement, as amended from time to time, constituted the entire agreement between the parties with respect to the issues hereof and supersedes all prior agreement between the parties.

8.4. *Assignment*. The Company may assign this Agreement to its successors and assigns.

8.5. *Independent Contractor*. The Consultant agrees and acknowledges that he is solely responsible to pay all of his own taxes with respect to the payment to him hereunder. The Consultant shall not be entitled to receive, and shall not receive, any benefits of employment from the Company, including, without limitation, disability insurance, worker's compensation or any other benefits incidental to any employer-employee relationship. It being the intention and agreement of the parties that the Consultant's relationship with the Company is that of an independent contractor.

8.6. *Governing Law; Jurisdiction; Enforcement*. This Agreement and all subsequent modifications or amendments thereto shall be construed, governed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts, United States. The parties agree to the exclusive jurisdiction of the courts Boston, Massachusetts. By its execution hereof, the parties hereto hereby consent and irrevocably submit to the in personam jurisdiction of the courts located in Boston, Massachusetts, and agree that any process in any suit or proceeding commenced




in such courts under this Agreement may be served upon them by registered mail, return receipt requested, or by Federal Express or other courier service, with the same force and effect as if personally served upon it in Boston, Massachusetts. The parties hereto each waive any claim that any such jurisdiction is not a convenient forum for any such suit or proceeding and any defense of lack of in personam jurisdiction with respect thereto. In the event that a party must take legal action to enforce the terms of this Agreement, the prevailing party shall have the right to its legal costs and expenses (including reasonable attorney's fees) in addition to any other remedy.

8.7. *Construction*. The section titles in this Agreement are for convenience only and have no legal or contractual effect. As used in this Agreement, the term "including" is illustrative and not limitative.

**IN WITNESS WHEREOF**, the undersigned Consultant and the Company have executed this Agreement as of the Effective Date.

**MURR EHF.**                                    **STEVEN BARLOW**

_____                        _____
By: Einar Tamimi
Title: Founder/Chairman/CEO