IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FOSSA LTD., ICELANDICPLUS LLC and STEVEN BARLOW, <br>         Plaintiffs, <br><br> v. <br><br> I JIAN LIN and <br> ENCOMPASS COMMUNICATIONS, INC., <br>         Defendants, | Case No. **1:16-cv-11914** <br><br><br> <u>**FIRST AMENDED ANSWER AND COUNTERCLAIMS OF I JIAN LIN AND ENCOMPASS COMMUNICATIONS, INC.**</u> |
| I JIAN LIN and <br> ENCOMPASS COMMUNICATIONS, INC. <br>         Counterclaim-Plaintiffs, <br><br> v. <br><br> FOSSA LTD., ICELANDICPLUS LLC, STEVEN BARLOW, <br>         Counterclaim-Defendants, <br><br> and <br><br> VALENTIN DAVID GURVITZ, ESQ., BOSTON LAW GROUP, P.C., and SONYA LIVSHITS <br><br>         Additional Counterclaim-Defendants. | |

For their Answer to the Complaint, Defendants I Jian Lin ("Lin") and Encompass Communications, Inc. ("Encompass") (collectively "Defendants"), respond as follows:

1.      Defendants lack personal knowledge and information of the facts alleged in Paragraph 1 of the Complaint sufficient to admit the truth of the matters asserted; however, Defendants admit the allegations in Paragraph 1 upon information and belief.

1

2.     Defendants lack personal knowledge and information sufficient to form a belief as to the truth of the matters alleged in Paragraph 2 of the Complaint; however, Defendants admit the allegations in Paragraph 2 upon information and belief.

3.     Defendants lack information sufficient to form a belief as to the truth of the matters alleged in Paragraph 3 of the Complaint and therefore deny them.

4.     Admitted.

5.     Admitted.

6.     Admitted.

## FACTS

7.     Defendants lack information sufficient to form a belief as to the truth of the matters asserted in Paragraph 7 of the Complaint as to Plaintiff Barlow, and therefore deny them. Defendants admit that prior to March 2013 and thereafter to the present, Defendant Lin is a marketing, branding, and strategic planning consultant who does business through Encompass Communications, Inc. d/b/a BrandIntent.

8.     Denied.

9.     Defendants admit that in or around March of 2013, Defendant Lin approached Plaintiff Barlow to discuss Barlow's potential investment in an Icelandic company named Murr Ehf., for which Encompass had been providing consulting services in connection with the development of a business relating to pet supplies, and which had encountered financial difficulties.  Defendants deny all other allegations of this Paragraph.

10.     Defendants admit that in or about March of 2013, Defendant Lin approached Barlow to discuss Barlow's potential investment in Murr, Ehf., for which Encompass had been

providing consulting services, but deny that Lin and Barlow pursued any business opportunity in relation to Murr, Ehf. together.

11.     Defendants admit that, on or about May 1, 2013, Barlow and Murr Ehf. entered into a consulting agreement (the "Murr Consulting Agreement"), to which neither Defendant was a party.  A true and correct copy of the Murr Consulting Agreement is attached as **Exhibit 1** hereto.  Defendants deny all other allegations of this Paragraph.

12.     Defendants admit that Murr Ehf.'s United States affiliate, Murr, Inc., intended to sell Murr pet food products in the United States and elsewhere.  Defendants deny all other allegations in this Paragraph.

13.     Denied.

14.     Defendants admit the allegation in the first sentence of Paragraph 11 that Barlow and Lin attempted to locate third-party investors to provide financing to grow Murr Ehf.'s United States business through its affiliate, Murr, Inc.  Defendants further admit on information and belief the allegation in the second sentence of this Paragraph that Murr, Ehf. decided to stop pursuing opportunities to expand their business in the United States due to financial difficulties, but lack information sufficient to form a belief as to the truth of all other matters stated in the second sentence of this Paragraph, and therefore deny them.  Defendants lack information sufficient to form a belief as to the truth of the matters asserted in the third and fourth sentences of this Paragraph, and therefore deny them.  Defendants admit on information and belief the allegation in the fifth sentence of this Paragraph that Murr, Ehf. filed for bankruptcy in Iceland. Except as expressly admitted herein, Defendants deny the allegations contained in Paragraph 14.

15.     The allegations in Paragraph 15 of the Complaint are legal conclusions under Icelandic law as to which no response is required.  To the extent they may be deemed allegations

of fact, Defendants lack information sufficient to form a belief as to the truth of the matters asserted, and therefore deny them.

16.     Defendants admit that Barlow agreed to cover expenses associated with selling Murr inventory in the United States, pursuant to the Murr Consulting Agreement.  Defendants deny that these expenses were provided in the form of loans to Lin and BrandIntent.  Defendants deny the allegations in the second sentence of Paragraph 16.  Defendants deny all other allegations in this Paragraph.

17.     Defendants admit that Barlow provided financing for expenses related to the maintenance, processing, and hoped-for eventual sale of Murr products stored in the United States and Canada.  Except as expressly admitted, Defendants deny the allegations of Paragraph 17.

18.     Defendants admit that Lin, through his own longstanding and considerable efforts and contacts, had already established connections with individuals and potential partners and vendors in Iceland, the United States, Canada, and China, and otherwise created business connections with the intent of furthering the business interests of Murr, Inc.  Defendants specifically deny that any funds advanced by Barlow "gave Lin the opportunity" to make such connections.  Defendants admit that Barlow spent certain sums pursuant to the Murr Consulting Agreement in connection with the maintenance, processing, and hoped-for eventual sale of Murr products stored in the United States in Canada.  Except as expressly admitted, Defendants deny the allegations of Paragraph 18.

19.     Defendants lack information sufficient to form a belief as to the truth of the matters asserted in Paragraph 19, and therefore deny them.

4

20.      The allegations in Paragraph 20 are so vague as to be incapable of being admitted or denied, and Defendants therefore deny them.

21.      Defendants admit that, due to short-dating and spoilage issues, the Murr products were unable to be sold as had been hoped-for and that the products had to be, and were, disposed of.

22.      Denied.

23.      Defendants admit that in or about the summer of 2014, Defendant Lin explained to Barlow his idea, developed on his own after working for several years in Iceland in connection with Murr and on other projects, of processing and importing Icelandic lamb horns that otherwise would be treated as biological waste from the Icelandic lamb industry into the United States for sale as dog treats (the "Lamb Horn Business").  Defendants deny that Barlow played any role in "identifying" the Lamb Horn Business opportunity, which was exclusively Lin's idea. Defendants deny all other allegations in this Paragraph.  Defendants further deny that Barlow played any role in "identifying" any other business opportunities beyond the Lamb Horn Business.  Defendants deny all other allegations in this paragraph.

24.      Denied.  Further answering, Defendants admit that Barlow proposed and took the lead role in creating certain business entities in connection with the Lamb Horn Business, including Plaintiff Fossa, Ltd. (Anguilla), Fossa Enterprises, Ehf. (Iceland), IcelandicPLUS, Ehf. (Iceland) and IcelandicPLUS, LLC (Delaware), each of which was owned equally by Plaintiff Barlow and Defendant Lin.  Defendants deny that they had any role in determining the corporate entities and locations used, instead following Barlow's instructions while Defendant Lin focused on activities in Iceland and in the United States to bring Lin's idea for the Lamb Horn Business to fruition.  Defendants lack information sufficient to form a belief as to the specific purpose of

Fossa Ltd. in the Lamb Horn Business, but deny that it was "the entity which they formed to pursue the Icelandic business opportunities in Iceland." Further answering, Defendants state that despite the formation of Fossa, Ltd. (Anguilla), Fossa Enterprises, Ehf. (Iceland), IcelandicPLUS, Ehf. (Iceland) and IcelandicPLUS, LLC (Delaware), for much of the relevant time period, Barlow insisted that Lin carry on the Lamb Horn Business through Lin's consulting company, Encompass Communications, Inc. rather than through the entities that Barlow had determined to set up, ostensibly because those entities lacked bank accounts.

25.    Defendants admit that IcelandicPLUS LLC was incorporated in Delaware. Defendants lack information sufficient to form a belief as to the specific purpose of IcelandicPLUS LLC in implementing Lin's idea for the Lamb Horn Business, and therefore deny all other allegations of Paragraph 25. Further answering, Defendants state that despite the formation and existence of Fossa, Ltd. (Anguilla), Fossa Enterprises Ehf. (Iceland), IcelandicPlus, Ehf. (Iceland) and IcelandicPLUS LLC (Delaware), for much of the relevant time period, Barlow insisted that Lin carry on the Lamb Horn Business through his consulting company, Encompass Communications, Inc. rather than through the entities that Barlow had determined to set up, ostensibly because those entities lacked bank accounts.

26.    The allegations in Paragraph 26 are not allegations of fact but Plaintiffs' characterization of their Complaint and therefore require no response; to the extent they may be deemed allegations of fact, they are denied.

27.    Admitted.

28.    Upon information and belief, Defendants deny the allegations in Paragraph 28. Further answering, Defendants state upon information and belief that the nominal sole stock owner and sole officer and/or manager of Fossa, Ltd. is one John Benjamin ("Benjamin"), on

behalf of AGM International, Ltd., of Anguilla. Defendants further understand that Benjamin holds said stock in trust for Plaintiff Barlow and Defendant Lin, each of whom is the beneficial owner of 50% of said stock, and may only act in accordance with the instructions of both stock owners. Attached as **Exhibit 2** hereto is a true and correct copy of a Declaration of Trust, confirming *inter alia* that Benjamin is the nominee for the owners of the stock of Fossa, Ltd., "one half owned by each" of Plaintiff Barlow and Defendant Lin and that he may only act in accordance with their instructions. Defendants lack information concerning the officers and/or managers of IcelandicPLUS, LLC, as they have never received any information about that corporation's structure from Plaintiffs.

29.     Defendants deny that Plaintiff Barlow loaned any money to Fossa, Ltd. (Anguilla) or IcelandicPLUS, LLC (Delaware) prior to the incorporation of either such entity. Defendants admit that Barlow advanced certain funds in connection with bringing to fruition Lin's idea of the Lamb Horn Business. Defendants deny all other allegations in this Paragraph.

30.     Denied.

31.     Defendants admit that Lin used funds advanced by Barlow in connection with the Lamb Horn Business reasonably and for the purpose of developing and implementing his idea of the Lamb Horn Business. Defendants further state that, prior to their incorporation, and thereafter on the supposed basis that Fossa, Ltd. (Anguilla), Fossa Enterprises, Ehf. (Iceland), IcelandicPLUS, Ehf. (Iceland), and IcelandicPLUS LLC (Delaware) had no bank accounts, Barlow initially advanced such funds through Defendant Encompass's corporate bank account (the "Primary Account"). Defendants further state that Barlow subsequently requested that Lin establish a bank sub-account (the "Sub-Account") for Encompass, into which Barlow would deposit, *inter alia*, funds for use in developing and implementing Lin's idea of the Lamb Horn

Business, and that such funds were in fact used for such purposes.  Defendants further state that

Barlow deposited substantial additional funds into the Sub-Account and subsequently directly or

in conjunction with others working in concert with him withdrew those additional funds, and that

Barlow used those additional funds for his own purposes, including, on information and belief, to

hide funds from Barlow's wife (whom on information and belief Barlow was or is in the process

of divorcing), to purchase the services of prostitutes, to fund Barlow's lifestyle and to provide

personal gifts to various of Barlow's girlfriends, and to further Barlow's own business ventures,

including on information and belief, illegal cockfighting businesses in Puerto Rico.

  32. Defendant Lin admits that he used funds deposited into the Primary Account and

subsequently into the Sub-Account reasonably and for the purpose of pursuing his idea of the

Lamb Horn Business.  Defendants deny the implication in this Paragraph that Lin used such

funds for any improper purposes.

  33. Defendants lack information sufficient to form a belief as to the truth of the

matters asserted in the first sentence of this Paragraph, and therefore deny them. The allegations

in the second sentence of this Paragraph are so vague as to be incapable of being admitted or

denied, and therefore Defendants deny them.

  34. Defendants admit that Lin used funds deposited by Barlow solely for the purpose

of pursuing his idea of the Lamb Horn Business.  Defendants deny the implication in this

Paragraph that Lin used such funds for any improper purpose.  Defendants deny all other

allegations in this Paragraph.

  35. Denied.  Further answering, Defendants state that the allegations in Paragraph 35

refer to the terms of a certain Agreement Regarding the Distribution of Funds, dated April 5,

2015, by and between Steven Barlow, I Jian Lin, Fossa, Ltd., and Fossa, Ehf., a true and correct

copy of which is attached hereto as **Exhibit 3**  (the "Agreement Regarding the Distribution of Funds").  The terms of that Agreement, which was an adhesion contract imposed upon Lin and prepared at the request and direction of Barlow by Plaintiffs' initial (now withdrawn) counsel of record in this matter, who was also counsel for each of the corporate entities described herein, speak for themselves.

36.     Denied.  Further answering, Defendants state that the allegations in Paragraph 36 refer to the terms of the Agreement Regarding the Distribution of Funds, which terms speak for themselves.

37.     Defendants admit that the Plaintiffs agreed to reimburse Lin for any expenses incurred in connection with pursuing Lin's idea of the Lamb Horn Business.  Defendants further admit that, on the supposed basis that Fossa, Ltd. (Anguilla), Fossa, Ehf. (Iceland), IcelandicPLUS Ehf. (Iceland) and IcelandicPLUS LLC (Delaware) had no bank accounts and at Barlow's insistence, Barlow periodically deposited funds into the Sub-Account, *inter alia* for Lin's use in connection with the Lamb Horn Business, either to reimburse expenses already incurred or to pay for anticipated expenses.  Defendants further admit that Barlow agreed that Lin's expenses incurred in connection with the Lamb Horn Business would be reimbursed by Barlow, but deny that Barlow did so in full.

38.     Defendants admit that Lin would pay expenses associated with the Lamb Horn Business using funds from the Encompass Primary Account and/or Encompass's or Lin's credit cards, and that he would periodically request that Barlow reimburse him for those expenses, but state that Barlow did not always agree to reimburse those expenses and/or substantially delayed or refused reimbursements.

39.     Defendants state that Lin provided all information that Barlow requested in connection with his expenses to the best of his ability, but denies that there was any requirement that he provide formal detailed expense reports, bank records, or receipts.

40.     Defendants admit that Exhibits 2, 3, 4, and 5 are portions of certain email communications between Barlow and Lin, which emails speak for themselves.  Defendants deny that these emails represent the sum total of the communications between Barlow and Lin concerning expenses for the Lamb Horn Business.  Defendants further note that Exhibit 4 appears to contain redacted information, the contents of which are presently unknown to Defendants.  Except as explicitly admitted herein, Defendants deny the allegations in this Paragraph.

41.     Denied.  Further answering, Defendant specifically deny that Lin provided fraudulent explanations of his expenses and reimbursement requests and further specifically deny that Plaintiffs had been paying Defendants for Lin's personal expenses or expenses not otherwise related to the Lamb Horn Business.  Further responding, Defendants deny that Plaintiffs had either access to or the legal right to access Encompass's bank account records.  To the extent that Plaintiffs have obtained access to certain of Encompass's bank account records, said access was obtained through illegal or otherwise improper means.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Defendants lack information sufficient to form a belief as to the truth of the matters asserted in Paragraph 45 and therefore deny them.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Defendants deny that they used funds advanced by Barlow for purposes other than legitimate business expenses in connection with the Lamb Horn Business.

50.     Defendants deny each of paragraphs 50.a – 50.o, inclusive, except that Defendants admit that Exhibits 6-19 are portions of bank statements, which documents speak for themselves.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Defendants lack information sufficient to form a belief as to the truth of the matters asserted in Paragraph 55 and therefore deny them.

56.     Denied.

57.     Defendants lack information sufficient to form a belief as to the truth of the matters asserted in this Paragraph, and therefore deny them.

58.     Denied.

59.     Denied.

60.     Defendants admit that Lin traveled to Iceland in connection with the Lamb Horn Business on or around February 2, 2015 through February 13, 2015.  Defendants further admit that Exhibit 21 is an incomplete part of a bank statement, which document speaks for itself. Defendants deny all other allegations in this Paragraph.

61.     Defendants admit that Exhibit 21 is an incomplete portion of a bank statement, which portion shows certain transactions, including those listed in this Paragraph.  Defendants deny all other allegations in this Paragraph.  Defendants specifically deny that Exhibit 21 shows any improper expenditure of funds advanced by Barlow for the Lamb Horn Business.

62.     Defendants admit that Lin travelled to Iceland in connection with the Lamb Horn business on or about July 1 through July 14, 2015.  Defendants admit that Exhibit 22 is an incomplete portion of a bank statement, which document speaks for itself.  Defendants deny all other allegations in this Paragraph.

63.     Defendants admit that Exhibit 22 is an incomplete portion of a bank statement, which portion shows certain transactions, including those listed in this Paragraph.  Defendants deny all other allegations in this Paragraph.  Defendants specifically deny that Exhibit 22 shows any improper expenditure of funds advanced by Barlow for the Lamb Horn Business.

64.     Denied.

65.     The allegations in this Paragraph are so vague as to be incapable of admitting or denying, and therefore Defendants deny them.

66.     Defendants admit that the quoted language is excerpted from an email dated January 20, 2015 attached as Exhibit 23 to the Complaint, which document speaks for itself. Defendants deny all other allegations of this Paragraph.

67.     Denied.

68.     This Paragraph characterizes an email dated February 16, 2015 attached as Exhibit 24 to the Complaint, which document speaks for itself.  Defendants deny all other allegations of this Paragraph.

69.     Defendants deny that "Fossa," whether defined as Fossa, Ltd., Fossa Enterprises, Ehf., IcelandicPlus, LLC or IcelandicPlus, Ehf., or any combination thereof, hired a bookkeeper; rather, Defendants state that they learned that Barlow had hired a bookkeeper without consulting with Lin as 50% owner of the foregoing corporations and without his authorization.  Exhibits 25 and 26 are emails dated April 11, 2015 and August 10, 2015, the latter of which appears to have been partially redacted for reasons unknown to Defendants, and which documents speak for themselves.  Defendants deny all other allegations in this Paragraph.

70.     Defendants admit that Exhibit 27 is one page of a 14-page bank statement, which document speaks for itself.  Further answering, Defendants admit that on or about June 1, 2015, the Icelandic development agency Vaxtasamningur Vestfjarda deposited $2,743.96 into the bank account a portion of which is attached as Exhibit 27.

71.     Denied.

72.     Denied.

73.     Defendants admit that one of Lin's many contacts in Iceland, with whom he had built a personal and business relationship and been in contact with since long prior to his involvement with Barlow as part of his prior work in Iceland, was Shiran K. Porisson. Defendants deny all other allegations of this Paragraph.

74.     Denied.  Further responding, Defendants state that Mr. Shaw is a childhood friend of Lin and a venture capitalist who has long monitored Lin's business activities for potential investments.

75.     Defendants lack information sufficient to form a belief as to the matters asserted in this Paragraph, in that it alleges that "the business with Mr. Shaw" was "a Fossa opportunity" without in any way describing or otherwise stating what "the business" is alleged to have been.

Further answering, Defendants deny that any business opportunities that Mr. Shaw may or may not have explored was a "Fossa business opportunity."  Defendants further deny that they worked with Mr. Porisson to "usurp" any Fossa business opportunity whatsoever for themselves.

76.     Defendants admit that Paragraph 76 partially quotes from an email dated July 28, 2015 attached as Exhibit 28 to the Complaint, which document speaks for itself.  Except as explicitly admitted, Defendants deny the allegations of this Paragraph.  Further responding, Defendants state that Mr. Shaw is a childhood friend of Mr. Lin and a venture capitalist who has long monitored Lin's business activities for potential investments.  Defendants explicitly deny the implication in this Paragraph that any meeting with Mr. Shaw was in connection with or "usurped" any "Fossa business opportunity."

77.     Denied.

78.     Denied.  Further responding, Defendants admit that in December 2015, Lin traveled to Iceland, and that he was accompanied by his girlfriend, Hadley Pollet, and his children, but denies that this was a "family trip" or that Defendants in any way hid the trip.

79.     Denied.  Further responding, Defendants state that Ms. Pollet and Lin's children were there to provide substantial assistance to Lin in connection with the Lamb Horn Business. Without limitation, Defendants note that Lin's son is an Emmy Award-winning videographer and that he, with the assistance of Ms. Pollet and Lin's daughter, produced significant amounts of business promotional videos during this trip.  Defendants deny that Lin "expensed the trip to Fossa" and specifically deny that either "Fossa" or Barlow paid any expenses associated with his children, who paid their own expenses and put in substantial amounts of time and effort with no reimbursement in an effort to assist Lin in developing the Lamb Horn Business.  Defendants deny all other allegations in this Paragraph.

14

80.    Denied.

81.    Defendants admit that, in addition to the Lamb Horn Business, based on his experience and contacts developed during his several years of work in Iceland prior to any involvement with Barlow, Lin developed the idea of importing Icelandic fish skins and other fish-related products to the United States for use as pet treats.  Defendants further admit that Lin and Barlow discussed this possible future business at various points.  However, Defendants state that this possible future business was unrelated to the Lamb Horn Business for which Barlow had provided funding, and further state that Barlow repeatedly denied interest in pursuing Lin's idea for fish skin products because he wanted to focus on the Lamb Horn Business.  Defendants deny that "Fossa, Barlow and Lin discussed and had plans to expand the business of Fossa" to any other items sourced from Iceland beyond the Lamb Horn Business.

82.    Defendants admit that Barlow and Lin had various conversations over a period of time, in which Lin tried to interest Barlow in developing Lin's fish skin product idea, but state that Barlow repeatedly denied interest in pursuing this idea because he wanted to focus on the Lamb Horn Business instead.  Defendants admit that Exhibits 29-31 attached to the Complaint are emails that Lin sent to Barlow in his fruitless effort to convince Barlow to help him pursue his fish skin idea, which documents speak for themselves.  Defendants lack information as to the nature of the material redacted from Exhibit 31 and deny that redaction was proper.

83.    Denied.

84.    Denied.

85.    Denied.

86.    Defendants admit that Exhibit 32 is an incomplete copy of an email that Mr. Porisson erroneously emailed to Lin at his Fossa email address and incorrectly referred to Lin's

fish skin idea as a Fossa project, which error Lin promptly corrected, as Barlow had repeatedly denied interest in Lin's fish skin product idea.

87.     Defendants admit that Lin promptly and accurately informed Mr. Porisson to correct his error and to inform him that Lin's fish skin product idea was not a Fossa project. Defendants deny all other allegations in this Paragraph.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Defendants admit that a discussion about potentially selling some Murr products to a Chinese purchaser occurred in or about March 2014.  Defendants deny all other allegations of this Paragraph.

94.     The allegations of Paragraph 94 about "the China deal" are so vague as to be incapable of admission or denial, and therefore Defendants deny them.  Further responding, Defendants admit that Lin told Barlow that the potential Chinese purchaser would not purchase the Murr products.

95.     Defendants admit certain Murr products were subsequently sold to a Chinese purchaser including some that were rotten, and that other Murr products could not be sold because they were rotten, and therefore they were destroyed.  Defendants admit that that Exhibit 34 attached to the Complaint is a portion of a bank statement, which document speaks for itself, and that it shows an incoming wire transfer from Zenwotronic Enterprises in the amount of $46,130.00 on May 21, 2014.  Defendants further state that these funds were used to pay for

16

Murr-related expenses, including but not limited to two warehouses, warehouse workers, utilities, sales support, and packaging materials, and that Defendant Barlow was aware of these costs.  Defendants deny all other allegations in this Paragraph.

96.     Defendants lack information sufficient to form a belief as to the truth of the matters asserted in Paragraph 96 with respect to Exhibit 35, including the accuracy of the screenshot, the website referred to, the nature or origin of the products displayed (including whether they may have originated from Murr in Iceland), and whether the displayed products are actually Murr products or are counterfeits, and therefore deny them.  Further answering, Defendants deny that Lin sold Murr products to the referenced website.

97.     Defendants deny that there was any revenue to "share" with Barlow in that the referenced funds were used to pay for Murr-related expenses, including but not limited to two warehouses, warehouse workers, utilities, sales support, and packaging materials and that Defendant Barlow was aware of these expenses.  Defendants deny all other allegations in this Paragraph.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

**COUNT I**
**Breach of Fiduciary Duty**
**Plaintiffs Against Lin**

104.    Defendants incorporate by reference their responses to the preceding Paragraphs as if expressly stated herein.

17

105.    The allegations in this Paragraph are legal conclusions to which no response is required; to the extent they may be deemed allegations of fact, they are denied.

106.    Denied.

107.    Denied.

108.    Denied.

**COUNT II**
**Breach of Contract**
**Plaintiffs Against Lin**

109.    Defendants incorporate by reference their responses to the preceding Paragraphs as if expressly set forth herein.

110.    The allegations in this Paragraph are so vague as to be incapable of admission or denial, and therefore Defendants deny them.  Further answering, Defendants admit that Barlow, Fossa, Ltd., Fossa Enterprises, Ehf., and Lin are parties to the Agreement for Distribution of Funds, attached as **Exhibit 3** hereto, which document speaks for itself.  Except as expressly admitted, Defendants deny the allegations of this Paragraph.

111.    The allegations in this Paragraph are so vague as to be incapable of admission or denial, and therefore Defendants deny them.  Further answering, Defendants admit that Barlow, Fossa, Ltd., Fossa Enterprises, Ehf., and Lin are parties to the Agreement for Distribution of Funds, attached as **Exhibit 3** hereto, which document speaks for itself.  Except as expressly admitted, Defendants deny the allegations of this Paragraph.

112.    The allegations in this Paragraph purport to characterize the terms of the Agreement for Distribution of Funds, attached as **Exhibit 3** hereto, which document speaks for itself.  Except as expressly admitted, Defendants deny the allegations of this Paragraph, and Defendants specifically deny the implicit allegation that Lin used funds advanced by Barlow for purposes unrelated to the Lamb Horn Business or for personal or other purposes.

18

113.    Denied.

114.    The allegations in this Paragraph purport to characterize the terms of the

Agreement for Distribution of Funds, attached as **Exhibit 3** hereto, which document speaks for

itself.  Defendants otherwise deny the allegations of this Paragraph, and Defendants specifically

deny the implicit allegation that Lin took any action that caused damage to Fossa's assets,

business, or goodwill.

115.    Denied.

116.    Denied.

117.    Denied.

## COUNT III
## Unjust Enrichment
## Plaintiffs against Defendants

118.    Defendants incorporate by reference their responses to the preceding Paragraphs

as if expressly stated herein.

119.    Denied.

120.    Denied.

121.    Denied.

## COUNT IV
## Fraudulent Misrepresentation
## Plaintiffs against Defendants

122.    Defendants incorporate by reference their responses to the preceding Paragraphs

as if expressly stated herein.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Defendants admit that the expenses for which they requested reimbursements from Barlow were for the purpose of the Lamb Horn Business.  Defendants deny all other allegations of this Paragraph.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

**COUNT V**
**Embezzlement**
**Plaintiffs against Defendants**

132.    Defendants incorporate by reference their responses to the allegations of the preceding paragraphs as if expressly set forth herein.

133.    Denied.

134.    Denied.

135.    Denied.

136.    Denied.

**COUNT VI**
**Conversion**
**Plaintiffs Against Defendants**

137.    Defendants incorporate by reference their responses to the preceding Paragraphs of the Complaint as if expressly stated herein.

138.    Denied.

139.    Denied.

140.    Denied.

**COUNT VII**
**Civil Conspiracy**
**Plaintiffs against Defendants**

20

141.    Defendants incorporate by reference their responses to the preceding Paragraphs of the Complaint as if expressly stated herein.

142.    Denied.

143.    Denied.

144.    Denied.

145.    Denied.

**COUNT VIII**
**Accounting**
**Plaintiffs against Defendants**

146.    Defendants incorporate by reference their responses to the allegations in the preceding Paragraphs of the Complaint as if expressly stated herein.

147.    Denied.

148.    Denied.

149.    Denied.

150.    Denied.

151.    Denied.

**COUNT IX**
**Violation of RICO, 18 U.S.C. § 1962(c)**
**Plaintiffs against Defendants**

152.    Defendants incorporate by reference their responses to the allegations in the preceding Paragraphs of the Complaint as if expressly stated herein.

153.    Denied.

154.    Denied.

155.    Denied.

156.    Denied.

157.    Denied.

158.    Denied.

159.    Denied.

160.    Denied.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied.

166.    Denied.

167.    Denied.

168.    Denied.

169.    Denied.

170.    Denied.

171.    Denied.

172.    Denied.

173.    Denied.

174.    Denied.

## COUNT X
## RICO CONSPIRACY, 18 U.S.C. § 1962(d)
## Plaintiffs against Defendants

175.    Defendants incorporate by reference their responses to the preceding Paragraphs

of the Complaint as if expressly stated herein.

176.    Denied.

177.    Denied.

178.    Denied.

179.    Defendants deny that there is any conspiracy from which to withdraw or otherwise disassociate themselves.

180.    Denied.

181.    Denied.

## **AFFIRMATIVE DEFENSES**

1.  The Complaint in whole or in part fails to state a claim for which relief may be granted.

2.  The Complaint should be dismissed in whole or in part because Plaintiff has failed to plead fraud with particularity as required by Fed. R. Civ. P. 9(b).

3.  The Complaint should be dismissed because, to the extent that Plaintiff suffered any damages, they were caused by Plaintiffs, and not by Defendants.

4.  Plaintiff's claims are barred by the doctrine of unclean hands.

5.  Plaintiff's claims are barred by the doctrine of equitable estoppel.

6.   Plaintiff's claims are barred by failure of consideration.

7.  Plaintiff's claims are barred by fraud.

8.  Plaintiff's claims are barred by the doctrine of waiver.

9.  Plaintiff's claims are barred by the statute of frauds.

10. Plaintiffs failed to mitigate their alleged damages.

11. Plaintiff's claims for damages are subject to setoff and/or recoupment.

12. Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations.

13. Plaintiffs' claims are barred in whole or in part for lack of standing.

14. Plaintiffs' claims are barred for failure to join necessary parties.

15. Plaintiffs' claims are barred on the basis of improper venue.

16. The Agreement Regarding the Distribution of Funds is an unconscionable and unenforceable adhesion contract and is fatally vague and ambiguous and therefore unenforceable.

WHEREFORE, Defendants deny that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

## COUNTERCLAIMS

For their Counterclaims against Steven Barlow, Fossa, Ltd., IcelandicPlus, LLC, Sonya Livshits, Valentin Gurvits, and Boston Law Group LLC (collectively "Counterclaim-Defendants'), Counterclaim-Plaintiffs I Jian Lin, Encompass Communications, Inc. (collectively, "Counterclaim-Plaintiffs") allege as follows:

## PARTIES

1.      Counterclaim-Plaintiff I Jian Lin is an individual residing in Amesbury, MA, and is 50% owner or beneficial owner of Counterclaim-Defendants Fossa, Ltd. and IcelandicPLUS, LLC.

2.      Counterclaim-Plaintiff Encompass Communications, Inc. is a Massachusetts corporation with a principal place of business in Amesbury, MA.

3.      Counterclaim-Defendant Steven Barlow is an individual residing, on information and belief, in Boston, MA.

4.     Counterclaim-Defendant Fossa, Ltd. is an Anguilla international business corporation with a registered office at Hannah Waver House, The Valley, Anguilla, British West Indies, and a principal place of business in Massachusetts.

5.     Counterclaim-Defendant IcelandicPLUS, LLC is a Delaware corporation with a principal place of business in Massachusetts.

6.     On information and belief, Counterclaim-Defendant Sonya Livshits ("Livshits") is an individual residing in MA.  Livshits is made a party hereto and a Counterclaim-Defendant in accordance with Fed. R. Civ. P. 13(h) and 19(a) and/or 20(a)(2).

7.     On information and belief, Counterclaim-Defendant Valentin Gurvits ("Gurvits") is an individual residing in MA, and is a principal in the Boston Law Group, PC ("BLG"). Gurvits is made a party hereto and a Counterclaim-Defendant in accordance with Fed. R. Civ. P. 13(h) and 19(a) and/or 20(a)(2).  Gurvits is an attorney who, on information and belief, has for some time provided legal advice to Plaintiff and Counterclaim-Defendant Barlow in connection with, *inter alia*, setting up off-shore corporations for tax avoidance and other reasons.  Gurvits also acted and on information and belief continues to act as the attorney for Plaintiffs Fossa, Ltd. and IcelandicPLUS LLC, both for general corporate and legal advice and for ongoing legal advice relating to this litigation, for which he prepared and filed the Complaint before officially withdrawing as counsel of record.  On information and belief, Gurvits continues to advise Plaintiff Barlow and purports to advise Plaintiffs Fossa, Ltd. and IcelandicPLUS LLC in connection with this litigation and their other legal and business interests, despite the conflict of interests and the appearance of new counsel of record in this litigation.

8.     Counterclaim-Defendant Boston Law Group, PC ("BLG") is a Massachusetts Professional Corporation with a principal place of business at 825 Beacon St., Suite 20, Newton,

MA 02459. BLG is made a party hereto and Counterclaim-Defendant in accordance with Fed. R. Civ. P. 13(h) and 19(a) and/or 20(a)(2).  BLG, by and through its Principal, Gurvits, acted, and on information and belief continues to act, or purport to act, as the attorney for Plaintiffs Fossa, Ltd. and IcelandicPLUS LLC, both for general corporate and legal advice and for ongoing legal advice relating to this litigation, for which BLG, acting through Gurvits, prepared and filed the Complaint in this action, before officially withdrawing as counsel of record.  On information and belief, BLG, by and through its Principal, Gurvits, continues to advise Plaintiff Barlow and purports to advise Plaintiffs Fossa, Ltd. and IcelandicPLUS LLC in connection with this litigation and their other business and legal interests, despite the conflict of interests and the appearance of new counsel of record in this litigation.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a), and Fed. R. Civ. P. 13(h) and 19(a) and/or 20(a)(2).

10.      Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## FACTS

11.      I Jian Lin ("Lin") is a creative branding and marketing professional with substantial experience creating highly successful branding and marketing programs for a wide variety of products and entities, both domestically and internationally.  Lin offers his professional services through Encompass Communications, Inc. ("Encompass).

12.      Beginning in or around 2008 and continuing thereafter, Lin provided creative branding and marketing services to the government agencies of Iceland, various Icelandic Economic Development Agencies, and various Icelandic businesses, to boost economic

productivity and to develop new domestic and foreign market opportunities and other innovations for Icelandic businesses, including in the farming and meat production industries.

13.     In the course of his years working throughout Iceland, Lin developed close personal relationships with Icelandic government and business leaders, including particularly those involved in the farming and meat production industries, and developed a deep understanding of those industries.  These relationships and the acquisition of this understanding took significant time and effort to build, in part because of a general anti-foreigner mindset among Icelandic businesspeople, particularly after the Icelandic economic collapse in 2008, which was, in the eyes of many in Iceland, caused by foreigners.  Despite this anti-foreigner bias, Lin was able to forge strong business relationships because of his obvious understanding of branding and marketing, his focus on personal relationships and trust, and his ability to develop new ways to expand Icelandic domestic and foreign economic activity.

14.     Among the Icelandic companies to which Lin provided branding and marketing services was Murr, Ehf., an Icelandic corporation that produced and marketed pet-related products manufactured from Icelandic resources, and that wished to expand its operations to sell its products in the United States and Canada.  With Lin's assistance, Murr, Ehf. established a U.S. affiliate, Murr, Inc., to act as its distributor in the United States and Canada, and Murr, Ehf. shipped some of its pet food and related products to the United States, where it was stored in warehouses pending sale.

15.     However, after a successful initial product launch in the U.S. and Canada, Murr's U.S. business slowed greatly, in part because Murr, Ehf.'s owner married and lost interest in further funding the U.S. expansion, leaving the Murr brand without sufficient marketing and operational support and financing.

16.     In or around March 2013, Lin happened to run across Counterclaim-Defendants Barlow and Gurvits in a café in Newton, MA.  Lin knew Barlow, with whom he had previously successfully worked.  Barlow presented himself as semi-retired, but indicated interest in investment opportunities.  Lin took the opportunity to discuss the Murr situation with Barlow, and asked whether Barlow might be interested in assisting Murr.

17.     Barlow was interested in this opportunity, and on May 1, 2013, Barlow entered into a Consulting Agreement with Murr, Ehf.  (the "Murr Consulting Agreement").  A true and correct copy of the Murr Consulting Agreement is attached hereto as **Exhibit 1**.  As compensation for the services he agreed to provide under the Murr Consulting Agreement, which included providing business consultation and attempting to locate additional investors, Barlow agreed to take a stock grant of 2% of Murr, Ehf.'s common stock, a financing bonus to be paid upon consummating a first round of financing of at least $1 million, sales commissions arising out of Barlow's identification and/or engagement of purchasers of Murr products, a lifetime supply of Murr dog food for Barlow's dog, and reimbursement by Murr, Ehf. of Barlow's expenses in providing these services.  The Murr Consulting Agreement was the sole written agreement governing the services that Barlow would provide to Murr and the compensation that he would receive in exchange.

18.     Neither Lin nor Encompass was a party to the Murr Consulting Agreement.

19.     By October 8, 2013, Barlow noted in an email to Einar Tamimi, the owner of Murr, Ehf., that he believed that Murr, Ehf. was on the verge of bankruptcy and that the lack of funding for Murr's U.S. activity had brought sales and marketing efforts in the U.S. and Canada to a standstill.  A true and correct copy of this email is attached as **Exhibit 4**.

20.     On October 13, 2013, Mr. Tamimi emailed Barlow and Lin, advising that he believed that Murr could remain afloat financially only through November 2013, when he anticipated that Barlow's efforts to obtain financing under the Murr Consulting Agreement would come to fruition, and noted that "substantial new revenue" would be required to keep the company afloat, and that "further growth and sales efforts in North America require funds."  A true and correct copy of this email is attached as **Exhibit 5**.

21.     Because of the lack of financial backing from Murr, Ehf. to fund the U.S. and Canada sales and marketing operations, and because the expiration dates marked on the Murr products were far shorter than U.S. and Canadian distributors and retailers required, it was very difficult to sell the Murr U.S. and Canadian inventories.  Accordingly, fully aware of Murr Ehf.'s and Murr, Inc.'s tenuous financial situation and of Mr. Tamimi's statement that growth and sales efforts in North America would require an infusion of additional funds, Barlow provided funds to pay Murr, Inc.'s business expenses, including travel expenses for Barlow and Lin in their effort to market and sell the Murr products, labels and printers to re-date the early-expiring products in an effort to sell them, product packaging, employee wages, warehouse rent, and similar business expenses, as contemplated by the Murr Consulting Agreement.  In addition, Lin provided creative, sales and marketing, customer support, and warehouse management with his own team and near full time personal efforts.

22.     The Murr Consulting Agreement between Barlow and Murr, Ehf. was the only agreement concerning the manner in which Barlow would be reimbursed for expenses incurred on Murr's behalf.  In particular, there was no contemporaneous agreement between Barlow and Lin concerning reimbursement of Barlow's expenses for Murr business.  To the contrary, Lin and Barlow generally understood that the marketing and sales services that Lin was providing

and the funds Barlow was providing would only be compensated if they were successful in selling off the Murr inventory and paying Murr Inc.'s business expenses.  Specifically, Barlow and Lin had no understanding that any Murr business expenses paid by Barlow would be considered a "loan" to Lin or to Encompass.

23.     In or around April 2014, Murr, Ehf. filed for bankruptcy protection under Icelandic law, as Barlow had anticipated in October 2013.  Barlow and Lin continued efforts to find additional financing, but were unable to do so.

24.     After the Murr, Ehf. bankruptcy filing, Murr, Inc. continued to lack funds for marketing and sale of the Murr products that were in warehouses in the U.S., sales continued to slow, and retailers rejected purchases of products from Murr, Inc. because of the early expiration dates and product spoilage.  Retailers increasingly returned the Murr products and demanded refunds, or required generous promotional programs in exchange for stocking the Murr products. By September 2014, Lin was forced to pay out of his own pocket for boxes for the existing U.S. stock of Murr products in an effort to sell the products off.

25.     Eventually the spoilage and expiration problems became so acute that it was impossible to continue selling the products in the U.S. or Canada.  Although Lin later managed to sell a small amount of the products to a buyer in China, most of the Murr products were spoiled and unsaleable and were disposed of as bio-waste.  The funds received from the limited sale to the buyer in China were used to pay U.S. expenses of Murr, including warehouse rental, worker wages, and similar Murr business expenses, as Barlow and Lin had planned.

<u>The Lamb Horn Business</u>

26.     In the course of his work in Iceland beginning in 2008, and with Murr, Ehf., Lin became very familiar with the production of pet food and treats and with the Icelandic meat

farming and meat production industries, including the Icelandic sheep farms.  Icelandic sheep are unlike sheep virtually anywhere else in the world because they have been isolated for thousands of years as a result of strict government importation restrictions and because the lambs grow horns, which have been genetically bred out of sheep in other parts of the world.

27.     While working in Iceland, Lin observed that Icelandic slaughterhouses responsible for the annual lamb slaughters treated the horns as bio-waste, and they ended up in landfills.  Lin also observed that some individuals gave the lamb horns to their dogs as highly nutritional treats.  Lin became passionate about diverting materials that would otherwise end up in landfill and creating new jobs and new revenue channels to significantly improve the quality of life for Icelandic farmers.  Lin also recognized that there was no product in the U.S. pet food market comparable to Icelandic lamb horns and that the pet food industry had not had significant new products enter the market for years.

28.     As a result of these observations, and long before any involvement with Barlow in connection with Murr, Lin developed the idea of acquiring the lamb horns that otherwise would be treated as waste and instead creating a process to preserve, clean, sterilize, brand them in a way that emphasized their Icelandic purity, and then import and market them in the United States, where pet food and treats are a very large market (the "Lamb Horn Business.").

29.     After the Murr, Ehf. bankruptcy and as the efforts to sell off the remaining Murr inventory in the U.S. and Canada came to an unsuccessful end, Lin revisited his idea to develop the Lamb Horn Business, and shared his idea with Barlow.  Although Barlow was initially reluctant, Lin convinced him to visit Iceland, a trip that was partially paid for by Lin's girlfriend, Hadley Pollet ("Pollet").  Barlow returned from this trip with several lamb horns, which he successfully "test marketed" on his own dog.  As a result of this trip, Barlow's "test market" and

Barlow's attendance at several industry trade shows with Lin and Pollet, Barlow became convinced that Lin's Lamb Horn Business idea was not only highly unique but represented a significant innovation in the pet food industry with substantial financial potential.

30.     At the outset of Barlow's involvement in the Lamb Horn Business, Barlow and Lin anticipated that Barlow would invest approximately $50,000 to do an initial evaluation of the potential business.  However, Barlow soon appreciated that Lin's idea was not only viable but potentially extremely lucrative, and Barlow insisted that Lin lock up two years' worth of lamb horn production in Iceland in order to prevent any competitors from entering the market. Accordingly, Barlow invested more than Lin initially anticipated, on the basis of Barlow's own eagerness to make as much money as possible and to prevent competition.  As a result, Lin quickly devoted nearly all of his time to developing the resources and techniques to mass produce lamb horns for sale.

31.     As an indication of his interest in the Lamb Horn Business, Barlow funded the first development trip to Iceland for Lin and Pollet to investigate the feasibility of large-scale harvesting, storing, and processing of the lamb horns.  During this trip, which occurred in the middle of the 2014 slaughtering season (September and October), Lin and Pollet visited several Icelandic slaughterhouses.  Through a great deal of time and hard work, Lin was able to build strong personal relationships with the slaughterhouse executives and workers and, through these relationships, was able to overcome their initial reluctance to be involved with foreigners in a new business centered on what the slaughterhouses had always considered to be waste material.

32.     Although the slaughterhouse owners expressed interest in Lin's idea of collecting and selling what they had considered waste, the process was very complex and required significant changes to the slaughtering process, including pulling workers and equipment to

collect the horns the moment they were cut from the head of the lambs and to quickly cool and store them to keep the raw horns from rotting.  This was a tremendously challenging task, for a number of reasons, including that the workers used during the slaughtering season are imported from Poland and most speak neither English nor Icelandic, Iceland has very strict regulations on workers and what they are permitted to do, and the proper collection, cooling and storage of the raw horns during the slaughtering process required substantial changes to traditional slaughterhouse procedures and strict compliance with Icelandic MAST (similar to USDA) regulations, as well as the import regulations of the USDA and FDA.  Lin and Pollet also negotiated with providers of freezer storage containers to place containers near the slaughterhouses to facilitate the prompt freezing of the horns to prevent spoilage.

33.     During their exploratory trip to Iceland, Lin and Pollet also spent time with a woman (Hanna Thordardottir) and her company (Dyrakotsnammi ehf.) which had been turning lamb horns into dog treats on a small scale for a number of years, with limited distribution in Iceland and Denmark.  Lin and Pollet learned about her process and began developing improved procedures to mass produce the horns and acquire the machinery and skills that would be necessary to make the Lamb Horn Business successful.  At this time, Thordardottir was commissioned to produce a limited amount of finished horn products for use as introductory samples in the North American market, as a bridge between sampling, testing, and official launch.

34.     After the 2014 slaughtering season had concluded, Lin and Pollet traveled to northern Iceland again to search for and inspect potential facilities to process the lamb horns in larger volumes and with improved and more consistent procedures than the small-scale production they had observed.  During this visit, the CEO of the Nordlenska slaughterhouse

advised Lin and Pollet that Nordlenska had recently purchased a former fish processing facility in Husavik, Iceland, and converted it into a factory for processing other lamb by-products for export.  This facility was only being used during the slaughter season, and would be unused between November and August, making it a viable facility for the Lamb Horn Business.

35.     Upon inspecting this facility, Lin and Pollet negotiated a short-term rental agreement and began executing the necessary build-out plans.  This process also turned out to be very challenging because of the strict Icelandic regulations for meat production facilities, which required a specific amount of time between use of machinery for the production of products for human consumption and use to process products for pets or animal feed.  Lin and Pollet quickly realized as well that the coming Icelandic winter season left a very limited window of time to transport raw horns from all participating slaughterhouses to the Husavik facility.

36.     Lin recognized that it would be beneficial to hire the same workers who were employed in the same slaughterhouses during the slaughtering season to collect and process the raw lamb horns.  With the assistance of Nordlenska's production manager and foreman, Lin and Pollet interviewed the Polish workers and hired and personally trained several of the workers to meet the strict Icelandic MAST rules and regulations, EU standards, and USDA import requirements, and obtained an oven to bake and produce the horns.

37.     Lin was able to convince three Icelandic slaughterhouses (Blonduos, Hvamstangi, and Nordlenska) to participate in a test of Lin's idea, after he convinced them of the potential benefit of selling what had previously had been treated as waste.  As a result of Lin's efforts, these three slaughterhouses agreed to harvest the horns for this test essentially for free, and Lin was able to collect the horns from approximately half of the 2014 slaughtering season, which

were processed in the winter of 2014 and spring of 2015.  These horns were then stored inside freezer containers that Lin had arranged to have delivered to the three slaughterhouse facilities.

38.     However, because the Lamb Horn Business did not yet have an Icelandic corporate entity or bank account, Lin and Encompass were forced to use their company name and bank accounts to pay workers, facility and storage lease payments, often in the form of cash payments, and out-of-pocket expenses were subject to later reimbursement decisions by Barlow. Lin and Encompass also were responsible for managing the workers, the production processes, quality control, and paying salaries for the workers and amounts owed to vendors, as well as the fees of Omar Mar Jonsson, the Icelandic manager of the Lamb Horn Business efforts, and Hanna Thordardottir, who was producing lamb horn dog treats on a small scale, with the funds that Barlow provided and approved for these uses.  Because Mr. Jonsson was trying to revive and was heavily involved in his own separate business ventures, Lin and Pollet were forced to make multiple return trips to establish and manage business and production processes, to obtain the quality necessary to build the Lamb Horn Business, and to closely supervise (and personally participate in) the labor intensive tasks required.  All of these Icelandic expenses, as well as others, were supposed to be reimbursed by Barlow as investments in the business, but reimbursements were often delayed or scrutinized and sometimes disapproved, leaving Lin and Encompass (and in some cases Pollet) to cover some of the expenses.

39.     In addition, Lin and Encompass were forced to cover for initial warehouse lease costs and pay expenses of warehouse workers, while using Encompass and its bank account as the corporate entity to enter purchase agreements and for the development and printing of marketing materials, and other Lamb Horn Business expenses, and to enter into contracts for the

same in the name of Encompass, because there was not yet another entity with a U.S. bank account.

40.     On or around June 10, 2015, Barlow unilaterally hired Livshits and informed Lin that he would only be reimbursed costs as authorized by Livshits.  Barlow and Livshits imposed unreasonable expense policies that further restricted and limited Lin's business development efforts in Iceland and the U.S. and his establishment of collection and production systems and branding and marketing materials.

41.     On information and belief, Barlow had a prior relationship with Livshits, and hired her in furtherance of a scheme to defraud Lin and Encompass.

42.     When Lin raised objections to this hire and to the imposition of unwarranted and cumbersome procedures on reimbursements for what was a fast-paced and constantly developing new business and further expressed concern about the fact that he was required to advance funds for the business from his own and Encompass's accounts and then deal with cumbersome reimbursement procedures, Barlow told him in an email dated August 25, 2015 that although he had plenty of money, he was "throttling" it until the business had sold its first batch of horns. Barlow assured Lin that "[o]nce we get paid on the horns sitting in our warehouse the flood gates will open again."  A true and correct copy of this email is attached as **Exhibit 6**.

43.     In that same email, Barlow asserted that the Lamb Horn Business already had $980,000 worth of ordered product sitting in its warehouse and storage, "and more beyond that." Barlow also told Lin that "all we need to do is ship 100K of horns and life will be good again."

44.     Despite Barlow's statements to Lin, Lin has never received any financial benefit from the Lamb Horn Business he created.  To the contrary, every penny of the revenues generated has gone either to reimbursing part (but not all) of Lin's advanced Lamb Horn

Business expenses, or to Barlow personally, or has been diverted to Gurvits's and BLG's IOLTA client trust account and/or to hiring and paying people without Lin's approval, including Livshits and other consultants, including Livshits' husband.

45.     Despite repeated demands by Lin as 50% co-owner of the Lamb Horn Business, Barlow and Livshits have repeatedly refused to provide detailed financial information about the Lamb Horn Business, the corporate entities established, corporate bank accounts, or revenue flows.

46.     Since that August 25, 2015 email, at least approximately $420,000 worth of lamb horns were sold to Pet Food Experts ("PFX"), one of the largest pet food distributors in the United States.  Additionally, substantial additional numbers of lamb horns have been acquired, processed, imported, and packaged, with a total estimated value (as stated by Barlow to Lin in late 2015) of approximately $10,000,000.

47.     On information and belief, at least a portion of that inventory has been sold, resulting in additional revenues received.  Still, Lin has yet to receive the financial benefit of the highly profitable business that he created or any information about the financial records of the business.  To the contrary, Barlow, with the assistance of Livshits and on information and belief Gurvits and BLG, have shut Lin out of the business and deliberately deprived him of access to any information in an effort to squeeze him out of the business and allow Barlow to take it over and obtain all of the benefits for himself.

48.     This lawsuit represents a continuation of that effort to deprive Lin of his right to 50% of the proceeds from the Lamb Horn Business he conceived of and spent virtually all of his time on over the past several years bringing to fruition.

**The Scheme to Defraud Lin and Encompass**

49.     On information and belief, Barlow, Gurvits, BLG, and Livshits conspired in an elaborate scheme to defraud Lin and Encompass and to deprive Lin of his ownership interest in and the financial benefits of the Lamb Horn Business, which he had conceived, developed, implemented, marketed, promoted, and successfully launched.  This scheme to defraud involved numerous steps, including, but not limited to, the following:

<u>Barlow, Gurvits, and BLG Force Lin to Sign an Adhesion Contract,</u>
<u>the Agreement Regarding Distribution of Funds</u>

50.     Barlow directed Gurvits and BLG to prepare and to force Lin to sign, an unfair and unduly burdensome adhesion contract entitled "Agreement for Distribution of Funds," a true and correct copy of which is attached hereto as **Exhibit 1**) (the "Adhesion Contract").  The Adhesion Contract purported to be between Barlow, Lin, Fossa Enterprises, Ehf., and Fossa, Ltd., although neither Barlow nor Lin had the direct right to bind Fossa Ltd. because Mr. Benjamin was the sole shareholder of that corporation and they were only beneficial owners. The Adhesion Contract unfairly recharacterized and fundamentally changed the prior understanding between Barlow and Lin with respect to the funds that Barlow had already invested in the efforts to keep Murr, Inc. afloat and to sell off its inventory, and the funds that Barlow agreed to invest in the Lamb Horn Business.

51.     As noted above, Lin and Barlow had previously understood and agreed that Barlow's advance of funds and Lin's marketing and promotional efforts in connection with Murr represented a joint effort to keep that company afloat and then to sell off its inventory before it was completely unsaleable.  There was no agreement between Lin and Barlow that Barlow would recover his financial investment in any way other than reimbursement from Murr, Ehf. pursuant to the Murr Consulting Agreement.

52.     After the failure of the Murr business and Barlow's agreement to invest in the Lamb Horn Business, Lin and Barlow understood and agreed that, in consideration of Barlow's investments in Lin's concept and Lin's knowledge, experience, and "sweat equity" devoted to turning his concept into a viable business, Lin and Barlow would be equal 50/50 owners of all aspects of the Lamb Horn Business and would equally reap the financial rewards of the business.

53.     In April 2015, Lin's years of hard work were about to pay off with the successful negotiation of a large scale 2-year exclusive deal to sell lamb horns to Pet Food Experts ("PFX"), one of the largest pet food distributors in the U.S., which was initially worth in excess of $3,000,000, with a $420,000 up-front down payment.  At this critical moment, Barlow directed Gurvits and BLG to prepare the Adhesion Contract and forced Lin either to sign it or lose access to Barlow's funding and thereby cause the Lamb Horn Business to crash just as it was about to bear fruit.

54.     Barlow used his far stronger financial position and legal acumen and resources, and the fact that he had the ability to destroy Lin's Lamb Horn Business idea before it could get a toehold in the U.S. market to force Lin to sign a document that fundamentally changed the relationship between Barlow and Lin and that gave Barlow far more control over the Lamb Horn Business and its finances than had previously been agreed.

55.     The terms of the Adhesion Contract, prepared by Gurvits and BLG to meet the express instructions of Barlow, and without any input from Lin, provided that Barlow would not only own 50% of the Lamb Horn Business despite the fact that it was not his idea and that he had contributed little but money and expertise setting up off-shore corporations, but also that Barlow would recover all of the money that he had invested by reimbursing Lin for Lamb Horn Business expenses, including not just the funds themselves but also vague and unspecified "negative tax

39

implications" from Barlow's advancing of such funds.  Neither the amount of funds that Barlow expected to be repaid nor the nature or amount of the "negative tax implications," nor the payment terms or repayment period were quantified or explained in the Adhesion Contract or at any time thereafter.  The Adhesion Contract therefore was not only an unfair adhesion contract that was contrary to the interests of Fossa Enterprises, Ehf., Fossa Ltd., and Lin, but was also fatally vague and ambiguous.

56.     The unspecified amounts that Barlow expected to be repaid were characterized in the Adhesion Contract as the "Initial Barlow Recovery" and were to be paid in full to Barlow from any proceeds from the Lamb Horn Business before Lin would ever see a penny from the work to which he had devoted nearly all his time for the past several years.

57.     Thereafter, Lin would be entitled to recover nothing for the value of his original idea, all of his hard work, and his creative and marketing expertise, but only any actual money invested by Lin or paid by Lin in connection with the Lamb Horn Business (the "Lin Recovery").  Compensation for Lin's original idea, expertise, sales, marketing and promotional work and hard physical labor was explicitly excluded from the so-called "Lin Recovery." Moreover, since at least in theory, any money that Lin spent on Lamb Horn Business Expenses was supposed to be reimbursed by Barlow, the "Lin Recovery" was for all intents and purposes a complete mirage except to the extent that Barlow and Livshits refused to reimburse certain expenses.  Indeed, Lin has never recovered a penny of the costs he incurred that Barlow and Livshits refused to reimburse, and has never received any financial benefit at all from the business that he conceived of and created and devoted his life to for the past several years.

58.     The Adhesion Contract also provided that after the purely theoretical but practically meaningless "Lin Recovery," Barlow would be repaid the money that he had

previously used to pay expenses in the effort to keep Murr, Inc. afloat and to sell off its

inventory, characterized as the "Final Barlow Recovery," before Lin would receive any financial

benefit from the Lamb Horn Business he had created.  This provision unfairly forced Lin to

repay Barlow's prior and unrelated expenditures for Murr, even though Barlow knew before

spending that money that it was a highly risky investment because Murr, Ehf. was bankrupt and

the U.S. products were rapidly becoming unsaleable, and that the Murr Consulting Agreement to

which neither Lin nor Encompass were a party required Murr, Ehf. to reimburse Barlow's

expenses.  The Adhesion Contract therefore transformed Barlow's acknowledged risky Murr

expenditures subject to reimbursement by Murr under the Murr Consulting Agreement into a

"sure thing" by forcing Lin to agree to repay them from the Lamb Horn Business before Lin

received any financial benefit at all from it.

59.     The Adhesion Contract was detrimental to Lin as well as to Fossa, Ltd. and Fossa

Enterprises, Ehf., which now were forced to bear the cost of reimbursing Barlow's expenses that

were to be reimbursed by Murr under the Murr Consulting Agreement.

60.     Barlow's, Gurvits's, and BLG's actions in connection with the Adhesion Contract

constituted an abuse of their knowledge and financial strength against Lin, whom they knew had

been under severe financial and health strain for the past several years as a result of his nearly

full-time focus on the Lamb Horn Business to the detriment of being able to continue making

money by providing marketing and branding services to other paying clients of Encompass.

61.     Barlow, Gurvits, and BLG also prepared and forced Lin to sign the unfair

Adhesion Contract in violation of Gurvits's and BLG's ethical obligations and in breach of

Barlow's fiduciary obligations to Lin as a 50% owner of the Lamb Horn Business.

62.     On information and belief, Barlow and Gurvits had a prior relationship that existed before Barlow became involved in Lin's idea for the Lamb Horn Business.

63.     On information and belief, Barlow instructed Gurvits and BLG to prepare the Adhesion Contract to promote Barlow's own personal financial interests, contrary both to Lin's business and financial interests and to the interests of the corporate entities that make up the Lamb Horn Business, including Fossa Enterprises, Ehf. and Fossa, Ltd, which Barlow, Gurvits, and BLG made parties to the Adhesion Contract.

64.     Specifically, but without limitation, Gurvits and BLG were not Barlow's personal legal counsel, but rather were legal counsel to both Barlow and Lin as joint owners of the Lamb Horn Business and to the corporate entities that Barlow, Gurvits and BLG set up to carry out the Lamb Horn Business, including Fossa, Ltd., Fossa Enterprises, Ehf., IcelandicPLUS LLC and IcelandicPLUS, Ehf., and any other entities, foreign or domestic, that in any way relate to the Lamb Horn Business but of which Lin may presently be unaware.  As such, Barlow, Gurvits and BLG had fiduciary and ethical responsibilities to Lin as the 50% owner of the Lamb Horn Business, which they breached by acting on the sole instructions of Barlow to prepare the Adhesion Contract and present it to Lin for signature.  In so doing, they consciously and deliberately promoted the interests of Barlow over those of Lin, Fossa, LTd., and Fossa Enterprises, Ehf., when Barlow had a fiduciary duty to Lin, and Gurvits and BLG were ethically obligated to act in the interest of both of them and of the corporate entities that make up the Lamb Horn Business and not to favor the interests of one half-owner of that business over those of the corporate entities and the other half-owner.  In doing so, Barlow breached his fiduciary duties, and Gurvits and BLG violated at least Massachusetts Rules of Professional Responsibility 1.7.

65.     Further, Barlow, Gurvits and BLG improperly attempted to sidestep their fiduciary and ethical responsibilities to Lin and to the corporate entities that make up the Lamb Horn Business by inserting a self-serving and false purported "waiver of conflict" clause in the Adhesion Contract (the "Waiver of Conflict Clause").  That clause (Section 12) stated that the agreement was "in part" prepared by Matthew Shayefar (an associate at BLG), Gurvits, and BLG, because in reality it was prepared at the express direction of Barlow to promote his own interests over those of Gurvits' and BLG's other clients, both Lin and the various corporate entities that make up the Lamb Horn Business.

66.     The Waiver of Conflicts clause also falsely provides that the parties waive any conflict that was created by Gurvits' and BLG's deliberate promotion of Barlow's interests over those of Lin and the Lamb Horn Business corporate entities, when Gurvits and BLG presented the Adhesion Contract to Lin as a *fait accompli* as instructed by Barlow and the Waiver of Conflict Clause was not the product of any discussion or of a knowing and voluntary waiver by Lin or any of the corporate entities that make up the Lamb Horn Business of the obvious and unavoidable conflicts of interest and ethical violations created by Gurvits' and BLG's doing of Barlow's bidding rather than abiding by their professional ethical obligations to Barlow and Lin and the various Lamb Horn Business corporate entities.

67.     The Waiver of Conflict Clause further falsely stated that Gurvits and BLG "did not and do not represent any of [the Parties] in connection with the preparation of this Agreement and that the Attorneys did not advise any of them regarding the contents, purpose or suitability of this Agreement or the underlying business transactions," when in reality Gurvits and BLG were representing the interests of Barlow in preparing the Adhesion Contract and on information and belief advised Barlow with respect to it, and when Gurvits and BLG could not have separated

their drafting of the Adhesion Contract from their concurrent legal representation of Barlow and Lin as co-owners of the Lamb Horn Business and their equally ongoing legal representation of Fossa, Ltd. and Fossa Enterprises, Ehf. (IcelandicPLUS LLC and IcelandicPLUS, Ehf. did not yet exist.)  Indeed, there would have been no need to include the Waiver of Conflict Clause in the Adhesion Contract, *except for* the fact that Gurvits and BLG in fact did represent Barlow and Lin as joint owners of the Lamb Horn Business as well as each of the corporate entities they had set up.  It was that very multi-party legal representation that created the ethical conflict that Gurvits and BLG improperly attempted to immunize themselves against with the Waiver of Conflict Clause.

68.     As a direct result of the actions of Barlow, Gurvits and BLG with respect to the Adhesion Contract, Lin and Encompass have been deprived of the benefit of their bargain and of any financial benefit from the establishment of the Lamb Horn Business and from Lin's 50% ownership thereof.

<u>Barlow, Gurvits, BLG, and Livshits Conspire to Establish Multiple Off-Shore<br>and Domestic Entities and Bank Accounts in an Effort to Obscure the Flow of Money<br>and Deny Lin Any Information About the Finances of the Lamb Horn Business</u>

69.     From the outset of Barlow's expression of interest in Lin's Lamb Horn Business concept, Barlow intended to set up various off-shore corporate entities to ensure that the true ownership of the Lamb Horn Business and its profits would be hidden from U.S. tax authorities and on information from Barlow's wife, whom he was in the process of divorcing.  Barlow intended to use the services of Gurvits and BLG to accomplish this goal.  Upon information and belief, Gurvits and BLG specialize in part in setting up off-shore corporate tax haven entities for their clients, and on information and belief, Gurvits and BLG have performed similar services for Barlow in the past.

70.     Throughout Barlow's involvement in the Lamb Horn Business, Barlow expressed to Lin his desire to maintain distance between Barlow and Lin and the profits they expected to receive from the Lamb Horn Business, by incorporating various domestic and off-shore corporate entities to hide their connection to the Lamb Horn Business profits so as to avoid U.S. taxation and to avoid disclosing this income to Barlow's wife.

71.     Lin reasonably trusted Barlow, Gurvits, and BLG to handle the corporate work, as the use of corporate entities and international taxation issues were not within Lin's normal area of expertise but were within Barlow's, Gurvits's and BLG's, and Lin was entirely focused on developing the Lamb Horn Business.

72.     Despite repeated inquiries by Lin, Barlow, Gurvits and BLG delayed setting up corporate entities and bank accounts that Lin could then use to carry out the Lamb Horn Business.  Eventually, in or around the Fall of 2014, Lin told Barlow that it was extremely difficult to carry out business in Iceland without domestic Icelandic corporations and Icelandic tax ID numbers, and that in order to further develop the Lamb Horn Business opportunity, Lin would need to establish Icelandic entities.

73.     On November 4, 2014, Barlow, acting through Gurvits and BLG, incorporated Fossa, Ltd. in Anguilla.  As conceived of by Barlow, Gurvits and BLG, all of the shares of Fossa, Ltd. were to be owned by one John Benjamin, who on information and belief is a lawyer in Anguilla and an associate of Gurvits, and who was appointed as the sole Director of the corporation.  A true and correct copy of the Fossa Ltd. Certificate of Formation and related documents, including the Register of Directors, Minutes of the first Annual Meeting, and Articles of Incorporation of Fossa, Ltd. are attached hereto as **Exhibit 7**.  Although Mr. Benjamin was the nominal sole shareholder of Fossa, Ltd., on November 4, 2014, he executed a

45

Declaration of Trust declaring that he owned the shares of Fossa, Ltd. as nominee for the true

owners, Barlow and Lin, equally.  A true and correct copy of the Declaration of Trust is attached

hereto as **Exhibit 8**.

<u>Barlow, Gurvits, and Livshits Conspire to Delay and Deny Lin's Reimbursement Requests,<br>to Force Lin and Encompass to Bear Lamb Horn Business Related Expenses</u>

74.     In or about July 15, 2015, Barlow unilaterally hired Livshits without Lin's prior

consent or approval, and announced that Livshits would thereafter be in charge of vetting and

approving all of Lin's requests for reimbursement of Lamb Horn Business expenses.

75.     Lin was not consulted on and did not agree to Barlow's decision to hire Livshits

or to pay her anything as compensation for any work she might do.  Lin was never consulted on

the terms of Livshits's employment, or her compensation.

76.     Livshits, with Barlow's approval, immediately demanded full access to

Encompass's Sub-Account, including international bill-payment and transfer credentials.

Livshits ordered checks and debit cards without Lin's knowledge.

77.     Livshits immediately imposed a small cap on expenses and on any spending

without her prior approval.  This occurred during a critical moment in the development of the

Lamb Horn Business, as Lin and Pollet were traveling to Iceland to begin a new season of

collection of lamb horns and setting up new facilities, as well as traveling to various trade shows

to promote the Lamb Horn Business.  Livshits commonly delayed, scrutinized, or refused to

approve expenditures, putting constant strain on Lin as he attempted to build the Lamb Horn

Business.

78.     Meanwhile, lamb horns from the prior season had been shipped to Massachusetts

and were in a warehouse.  These lamb horns suffered serious damage due to hot weather and

humidity, forcing Lin and Pollet both themselves and with the help of hired workers, to do

massive amounts of hard and often unpleasant physical work to attempt to clean and restore the

lamb horns, which had begun to rot.  In addition to the hard physical labor required to clean the

damaged horns so that they could be sold, the business was required to install a ventilation

system in the warehouse, and Lin had to acquire space heaters wash tubs, tools, and industrial

fans to make the working conditions tolerable as winter came and to address complaints about

the odor of rotting horns.  Lin had to bear these expenses and others, subject to later

reimbursement by Barlow according to Livshits' decisions.

79.     After Barlow hired Livshits as the bookkeeper for the Lamb Horn Business

without Lin's authorization or approval, Livshits repeatedly delayed or simply refused

reimbursements that Lin required for expenses he had legitimately incurred for the benefit of the

Lamb Horn Business, including without limitation the expenses owed to workers and vendors

who had worked extremely hard to wash and salvage lamb horns maintained in the warehouse,

funds owed to Omar Mar Jonsson and Hanna Thordadottir and to other workers, vendors and

suppliers for services they had provided in Iceland.  This pattern of delayed and refused

reimbursements continued until Lin was fully cut out of any information about the Lamb Horn

Business, shortly before this lawsuit was filed.  On information and belief, Livshits's actions

were directed by or at least in conformance with instructions received from Barlow, and were

intended to increase the financial pressure on Lin and Encompass by depriving them of funds to

which they were entitled.

As a result of Barlow's and Livshits's actions, Lin and Encompass have not been fully-

reimbursed for the full amounts incurred for Lamb Horn Business expenses.

80.     In or around December 2014, on the advice of Barlow and Gurvits, Lin

established Fossa Enterprises Ehf., an Icelandic corporation, with one of Lin's Icelandic contacts,

Omar Mar Jonsson, as the local Icelandic Director and Manager.  Attached as **Exhibit 9** is a true and correct copy of the English translation of the Icelandic Certificate of Incorporation for Fossa Enterprises, Ehf.

81.     In or around September 2015, Barlow, upon information and belief with the assistance of Gurvits, BLG, and Livshits, hired an Icelandic law firm ("Logvit") to provide services on behalf of "his yet to be established company IcelandicPLUS Ltd."  According to the engagement letter between Logvit and Barlow, Logvit would act as a director of IcelandicPLUS Ehf. on behalf of IcelandicPLUS Ltd.  On information and belief, "IcelandicPlus Ltd." is meant to refer to IcelandicPLUS LLC (Delaware).  A true and correct copy of the engagement letter between Logvit and Barlow dated September 16, 2015 is attached hereto as **Exhibit 10**.

82.     On information and belief, in or around the same time period Barlow, with the assistance of Gurvits and BLG and/or Livshits, incorporated IcelandicPLUS Ehf. in Iceland.

83.     Also in or around September 2015, Barlow, upon information and belief with the assistance of Gurvits, BLG, and Livshits, hired Logvit to provide services for a "yet to be established" company Fossa Enterprises Ltd.  Attached as **Exhibit 11** is a true and correct copy of the engagement letter between Logvit and Barlow concerning the services to be provided to Fossa Enterprises, Ltd., which was described therein as Barlow's "yet to be established company."  It is unclear what the relationship is between this company and Fossa Enterprises, Ehf., which had previously been established in Iceland, or between this company and IcelandicPLUS Ehf., IcelandicPLUS LLC (Delaware) or Fossa, Ltd. (Anguilla).

84.     According to an email dated September 15, 2015 from Livshits to Simon Thor Jonsson, who on information and belief works for Deloitte (Iceland) and assisted Logvit in establishing the various corporate entities, in which Livshits conveyed information that she had

received from Barlow, "Fossa ehf is a subsidiary of Fossa Ltd (a foreign entity)."  On

information and belief, the reference to "Fossa ehf" was intended to refer to Fossa Enterprises,

Ehf. and the reference to "Fossa Ltd. (a foreign entity") refers to Fossa, Ltd. (Anguilla).

Attached as **Exhibit 12** hereto is a true and correct copy of the referenced email.

85.     Also according to that email, "IcelandicPLUS ehf (Iceland) is a subsidiary of

IcelandicPLUS Ltd (a foreign entity)." It is unclear whether the reference to "IcelandicPLUS Ltd

(a foreign entity) is intended to refer to IcelandicPLUS LLC (Delaware) or to a different foreign

entity.

86.     Also according to that email, "Fossa Ehf" is the corporate entity nominally

responsible for collecting, transporting, and processing lamb horns for the Lamb Horn Business.

87.     Also according to that email, Fossa, Ltd.'s "only purpose is to own Fossa Ehf. and

create a separation between a company that collects products from the farmers and accompany

that sells it to the USA."

88.     Also according to that email, IcelandicPLUS Ehf "provides marketing services to

IcelandicPLUS, Ltd."  On information and belief, "IcelandicPLUS, Ltd." is meant to refer to

IcelandicPLUS LLC.

89.     Also according to that email IcelandicPLUS Ltd. takes ownership of the lamb

horn products from farmers, owns the Icelandic trademark and owns "all the agreements with

U.S. wholesellers [*sic*]."

90.     Lin states on information and belief and in reasonable reliance on statements

made by Barlow and Gurvits that in addition to owning 50% of Fossa, Ltd. (Anguilla), he is also

a 50% owner of Fossa Enterprises, Ehf., IcelandicPLUS, Ehf., IcelandicPLUS LLC (Delaware),

and any other corporate entities that Barlow, Gurvits, and BLG set up in connection with the Lamb Horn Business.

91.     On information and belief, notwithstanding Lin's reliance on Barlow's repeated assurances that he is a 50% owner of the entire Lamb Horn Business and all of the corporate entities that Barlow, Gurvits, and BLG established, Barlow, with the assistance of Gurvits, BLG and Livshits, set himself up as the sole shareholder of both IcelandicPLUS Ehf. and IcelandicPLUS Ltd.  Attached as **Exhibit 13** is a true and correct copy of an IcelandicPLUS Ehf. Shareholder's Resolution dated September 16, 2015, which states that IcelandicPLUS Ehf. "has only one shareholder" and has a signature block for Barlow "on behalf of" the to-be-established IcelandicPLUS Ltd. (believed to refer to IcelandicPLUS LLC (Delaware)).  Attached as **Exhibit 14** is a true and correct copy of an IcelandicPLUS Ehf. "Endorsement Agreement for Shares in the Private Limited Company IcelandicPLUS Ehf.," in which Petur Steinn Guomundsson on behalf of Logvits, indicates that he is the sole shareholder of IcelandicPLUS Ehf. and that with that Agreement, he was endorsing all of the shares of IcelandicPLUS Ehf. to Barlow.

92.     On information and belief, Barlow, with the assistance of Gurvits, BLG, and Livshits, also set himself up as the sole shareholder of both Fossa Enterprises, Ehf., and Fossa Enterprises, Ltd., despite Lin and Barlow's agreement that they would be equal 50% owners of the entire Lamb Horn Business.

93.     In or around August 13, 2015, Lin, at the instruction of Barlow and Livshits, arranged for the transfer of ownership of Fossa Enterprises Ehf. from Omar Mar Jonsson to Fossa, Ltd. (Anguilla).  Mr. Jonsson had been the nominal owner of Fossa Enterprises, Ehf. because of Icelandic legal requirements.  Attached as **Exhibit 15** is a true and correct copy of an Acknowledgment of Notice of Exercise of Warrant confirming this transfer of ownership.

94.     On information and belief, Fossa Enterprises Ehf. is now a subsidiary of Fossa Ltd., and Barlow and Lin are each actual or beneficial owners of 50% of the stock of each corporation.

95.     On or around September 28, 2015, Barlow, acting through and/or with the assistance of Gurvits, BLG, and/or Livshits, incorporated IcelandicPLUS LLC in Delaware.  A true and correct copy of the Certificate of Formation of IcelandicPLUS LLC is attached hereto as **Exhibit 16**. On information and belief, IcelandicPLUS LLC was incorporated in Delaware at least in part because of the limited amount of information that Delaware law requires to be filed with respect to the identity of the owners and directors of a Delaware corporation.  As such, the Delaware Certificate of Formation provides virtually no information as to the true owners of IcelandicPLUS LLC.

96.     Although Lin understands that he is a 50% owner of IcelandicPLUS LLC as well, Barlow, Gurvits, BLG, and Livshits have refused to provide information to Lin about Icelandic Plus LLC or its ownership structure, or its relationship to Fossa, Ltd., Fossa Enterprises, Ehf., Fossa Enterprises, Ltd., IcelandicPLUS Ehf., or IcelandicPLUS, Ltd.

97.     Shortly after these events, on October 8, 2015, Petur Steinn Gudmundsson, acting on instructions from Barlow and Livshits and without Lin's authorization, cancelled Lin's access to the Icelandic bank account of Fossa Enterprises, Ehf., and indicated that Gudmundsson would be the only person with access to that bank account, "until Steven takes over, hopefully next week."  When Lin expressed to Barlow his concern over being cut out of the bank account access, Barlow reassured him that there was no reason to be concerned, and that his goal was to get that bank account under the name of "our nominee for Fossa Ltd." (i.e., Mr. Benjamin in Anguilla) to avoid having either of their names on the bank account, to avoid tax liabilities.

Barlow also assured Lin that this bank account was "not the important one," which instead would be "the account we establish for the new Icelandic+ top-co [which] is where the sales income will go" and would not be in Iceland.  Attached as **Exhibit 17** is an email thread containing true and correct copies of the October 8, 2015 from Mr. Gudmundsson to Lin, Lin's email to Barlow that same day, the email from Barlow to Lin dated October 9, 2015 in response.  It is unclear what "the new Icelandic+ top-co" refers to.

98.     Lin has never been provided information about the "important" bank account or any other (non-Encompass) bank account used in connection with the Lamb Horn Business or any of the corporate entities that Barlow, Gurvits, BLG, and/or Livshits or anyone acting for or on behalf of any of them have established anywhere in the world.

99.     On information and belief, each of Fossa, Ltd. (Anguilla) , IcelandicPLUS LLC (Delaware), Fossa Enterprises, Ehf., Fossa Enterprises Ltd., IcelandicPLUS Ehf., and IcelandicPLUS Ltd., or any of them, have bank accounts located either in the U.S. or abroad. Lin has never been provided with access to or information about these bank accounts or the funds within or that have moved between them.

100.    Other than the Fossa, Ltd. and IcelandicPLUS LLC corporate documents attached as Exhibits hereto, Lin lacks substantial information about the nature or purpose of either corporation, except that both corporations, as well as their Icelandic counterparts, were established at the instruction of Barlow with the assistance of Gurvits, BLG, and Livshits in order to handle various aspects of the Lamb Horn Business and to shield Barlow from taxes and disclosures to his wife during his divorce while ensuring that Barlow would reap the benefits of the Lamb Horn Business.

101.    Specifically, but without limitation, despite repeated requests to Barlow and Gurvits, Lin has been denied information about the nature, purpose, or the finances of any of the corporate entities Fossa, Ltd., IcelandicPLUS LLC, Fossa Enterprises, Ehf., or IcelandicPLUS Ehf.

102.    On information and belief, Lin's name and personal information have been obtained and used by Barlow, Gurvits, BLG, and Livshits to establish bank accounts in various unknown foreign countries and domestically.  Specifically but without limitation, Livshits repeatedly requested and then obtained Lin's Social Security and U.S. Passport numbers to open one or more foreign bank accounts in Lin's and Barlow's name, including but not limited to Cyprus, to which Lin has no information or access rights.

103.    Upon information and belief, Barlow, Gurvits, BLG, and Livshits opened one or more foreign or domestic bank accounts without Lin's knowledge or approval, in order to permit money to flow between the various corporate entities while keeping it outside of U.S. jurisdictions to the greatest extent possible and to keep Lin in the dark with respect to the corporate finances.

104.    On information and belief, Barlow, Gurvits, BLG, and Livshits have moved money and other assets between the various corporate entities and foreign and domestic bank accounts without providing any accounting to Lin in order to keep Lin in the dark as to the corporate finances and to provide Barlow with complete control over the Lamb Horn Business finances to benefit himself to the detriment of Lin.

105.    Notwithstanding the actions of Barlow, Gurvits, BLG, and Livshits in setting up the various corporate entities and bank accounts, Barlow and Livshits continued to insist that Lin use his personal and Encompass's corporate funds and credit cards to pay for the expenses for

the Lamb Horn Business subject to cumbersome reimbursement procedures set up by Barlow and Livshits.  This was done despite the fact that, on information and belief, Barlow, Gurvits, BLG, and Livshits eventually did establish one or more bank accounts that could have been used for the Lamb Horn Business.  On information and belief, Barlow and Livshits continued to insist that Lin use his personal and Encompass's corporate assets and credit cards to pay for the expenses of the Lamb Horn Business so that they would maintain strict control and financial leverage over the Lamb Horn Business and over Lin, and to ensure that Barlow's connection to the Lamb Horn Business would continue to be shielded from U.S. tax authorities and from Barlow's wife during the divorce.

106.    On information and belief, Barlow, acting through Gurvits, BLG, and/or Livshits, has incorporated one or more other foreign or domestic corporate entities to carry out aspects of, or to receive revenues from, the Lamb Horn Business.  To the extent that this has occurred, Lin is a 50% owner of these corporate entities and of any revenues flowing to them as well.

<u>Barlow, Gurvits, BLG, and Livshits Conspire to Launder Money Through Encompass's Bank Account For Barlow's Personal Use, To Shield It From Taxation and from Barlow's Wife During Barlow's Divorce and to Obscure the Lamb Horn Business Finances From Lin</u>

107.    When Barlow initially agreed to incur expenses associated with keeping Murr afloat and selling off its inventory, he did so by charging his American Express credit card, generally in excess of amounts that Lin requested.  Those charged funds would be deposited into Encompass's Primary checking account.  Initially, Lin would give a large portion of the amount charged back to Barlow in the form of cash for his personal use.  In this way, Barlow was able to obtain cash for his personal use while making it seem that funds were entirely provided to Encompass.  Beginning in August 2013, Lin would instead transfer the funds into a separate Encompass Sub-Account that Barlow had instructed Lin to set up.  True and correct copies of bank statements for the Sub-Account (with account information redacted) are attached hereto as

54

Exhibit 18.  Barlow was provided with a debit card on this account, and used that debit card to make personal purchases.  For example, Exhibit 1 to the Complaint shows an $8,500 American Express charge on October 11, 2013, but the Sub-Account bank statements show a transfer from the Primary account to the Sub-Account of $4,200 on October 21, 2013.  The Sub-Account statement for that month also shows that Barlow used his debit card for $4,485.39 in personal charges that month.  Similarly, Exhibit 1 to the Complaint shows American Express charges of $10,000 on November 6, 2013 and $15,000 on November 21, 2013, but the Sub-Account bank statements show that Lin transferred $2,500 from the Primary checking account to the Sub-Account on November 15, 2013, and the full $15,000 on November 29, 2013.  Barlow used his debit card for $5,979.14 in personal charges in November, and $8,393.53 in debit charges and a $600 wire transfer to one of his Russian girlfriends in December 2013.  Again, Exhibit 1 to the Complaint shows an American Express charge of $10,000 on January 17, 2014, but the Sub-Account statement shows that this entire amount was transferred from the Primary checking account to the Sub-Account on January 27, 2014.  During that month, Barlow used his debit card for $5,715.20 in personal charges.  The same pattern continued through April 2014.

108.    During this period, Encompass paid the credit card processing fees on the amounts that Barlow charged on his American Express card, so even when Lin transferred less than the entire amount of the charge from the Primary checking account to the Sub-Account, that did not mean that he or Encompass received the full amount of the remainder for Murr-related expenses.  When Lin did transfer the full amount of an American Express charge, he was effectively subsidizing Barlow's personal lifestyle.

109.    In May 2014, Barlow started making large deposits directly into the Sub-Account from unknown sources in the form of cash, wire transfers, and bank checks, rather than

charging his American Express card.  However, the pattern of using his debit card to access those funds for personal expenses continued for years thereafter.

110.    Thus, Barlow turned Encompass's Sub-Account into a personal piggy bank for Barlow, using it on a near daily basis for his own personal expenses and lifestyle.  Barlow's debit card charges included payments to Seeking Arrangements, which is a service that provides wealthy men the opportunity to meet "Sugar Babies" who provide companionship and sex in exchange for cash and other gifts.  As well, these debit card charges include many restaurant charges, hotel charges, charges for clothing and for lingerie at Victoria's Secret, travel-related charges, furniture, florists in Russia, personal charges such as gas, CVS, and groceries, some or all of which were on information and belief related to Barlow's dalliances with mistresses.

111.    Sometimes, rather than using his debit card for purchases or ATM withdrawals for cash Barlow would withdraw very large amounts by first withdrawing cash and immediately purchasing an Official Check from the bank teller.  For example, on July 1, 2015, Barlow withdrew $50,000.00 in cash from the Sub-Account and immediately purchased a $50,000.00 Official Check made payable to himself.  Similarly, on July 20, 2015 Barlow withdrew $25,008.00 in cash and then immediately purchased an Official Check in the amount of $25,000.00, payable to himself.  Similarly, on July 23, 2015, Barlow again withdrew $25,008.00 in cash and then purchased another $25,000 Official Check payable to himself.  Attached as **Exhibit 19** are true and correct copies of the cash withdrawal slips and the Official Checks for these transactions (with sensitive information and account numbers redacted).

112.    On information and belief, Barlow used the Sub-Account in this manner because it allowed him to hide his connection to the funds and to avoid both taxation and disclosure to his wife, whom he was in the process of divorcing.

113.    Lin did not access any of the funds in the Sub-Account between May and late August, 2014.

114.    When Barlow decided to invest in the Lamb Horn Business in exchange for a 50% equity ownership interest, Barlow continued this practice.  He would deposit funds directly into the Sub-Account, and Lin would obtain Barlow's approval for Lamb Horn related expenses and then transfer the approved amount from the Sub-Account to Encompass's Primary checking account.  This began in approximately late August 2014.  In August 2014, Barlow deposited $15,519.65 into the Sub-Account and spent $5,515.67 on personal charges, while Lin transferred only $3,200 into the Primary checking account for Lamb Horn Business expenses on August 26, 2014.  The same pattern continued thereafter.

115.    Later, when Barlow hired Livshits to assist Barlow in his financial machinations, Livshits also had direct access to the Sub-Account and made sometimes very large deposits and withdrawals without Lin's knowledge or involvement.

116.    Between September 2014 and June 2016, Barlow and/or Livshits deposited approximately $1,087,540.00 into the Sub-Account, often in large round deposits of $50,000, $30,000, $20,000, $15,000, $10,000 and $5,000.

117.    During this same period, Lin transferred $1,850.00 into the Sub-Account, and transferred approximately $496,132.49 from the Sub-Account to Encompass's Primary checking account for Lamb Horn Business expenses that had been approved by Barlow and/or Livshits. Thus, the net amount he withdrew from the Sub-Account for approved Lamb Horn Business expenses was $494,282.49.

118.    In July and August 2016, shortly before filing this lawsuit, Barlow withdrew all of the remaining funds within the Sub-Account through a series of transactions that overdrew the

Sub-Account, incurring overdraft fees and leaving it with a negative balance of -$312.86, for which Barlow has never reimbursed Lin and Encompass.  These transactions included a final $5,000.00 transfer from BLG into the Sub-Account on July 8, 2016, immediately followed by a $5,000 wire transfer out of the Sub-Account.

119.    Between approximately January 8, 2016 and June 16, 2016, Barlow and/or Livshits transferred a total of approximately $87,000.00 from the Sub-Account to IcelandicPLUS LLC for purposes unknown to Lin and that may or may not have been legitimately related to the Lamb Horn Business.  Therefore, on information and belief, IcelandicPLUS LLC has an established bank account to which Lin has been provided no access or information.

120.    Between October 22, 2015 and June 16, 2016, Barlow and/or Livshits transferred a total of approximately $179,000.00 from the Sub-Account to Fossa Enterprises, Ehf., for reasons unknown to Lin and that may or may not have been legitimately related to the Lamb Horn Business.  Thus, upon information and belief, Fossa Enterprises, Ehf. has a corporate bank account to which Lin has been provided neither access nor information.

121.    Between July 1, 2015 and July 8, 2016, Livshits directly withdrew from the Sub-Account a total of approximately $67,573.00, including a single withdrawal of $50,000.00, for reasons unknown to Lin and that on information and belief were largely unrelated to the Lamb Horn Business.  Specifically but without limitation, the $50,000.00 withdrawal is believed to have been for Barlow's personal purposes.

122.    Between August 27, 2015 and March 28, 2016, a total of approximately $35,070.74 was transferred by Barlow and/or Livshits to Mass Marketing Consulting, a company that is on information and belief run by Livshits' husband Yaakov Livshits, for reasons unknown to Lin and that may or may not be legitimately related to the Lamb Horn Business.

58

123.    Between August 31, 2015 and April 21, 2016, a total of approximately

$22,228.98 was paid from the Sub-Account to Graphic Sales, Inc., a company that had done

graphic design work in connection with the Lamb Horn Business.  This total amount included

$9,213.98 in outstanding invoices and $125.00 in court fees in connection with a court-ordered

attachment of Encompass's bank accounts due to a lawsuit filed by Graphic Sales against

Encompass, styled Graphic Sales Products, Inc. v. Encompass Communications, Inc., No. 1663-

cv-0267 (Salem Dist. Ct.), entirely because of Barlow's and Livshits's refusal to approve

payment of Graphic Sales invoices for work that Graphic Sales did for the Lamb Horn Business.

124.    As noted previously, on or around June 12, 2015, PFX entered into a Sales and

Services Agreement with Fossa Ltd (the "PFX Sales Agreement"). This initial sale of lamb horns

to PFX was the first large-scale sale of lamb horns and was the direct result of Lin's and Pollet's

hard work in opening the door at PFX and negotiating the deal.  As the owner of PFX stated to

Lin, this was a new product for PFX and although he viewed the deal as risky and he did not

know Barlow at all, he did it because he had come to know and respect Lin.  Although Barlow

was involved in the negotiation of the final agreement terms with PFX and the sales contract was

in large part prepared by Gurvits and BLG with Barlow's and Lin's input, the sale was

consummated not because of Barlow's actions, but in spite of them.  A true and correct copy of

this Sales and Service Agreement is attached hereto as **Exhibit 20** (certain sensitive pricing and

account information has been redacted).  The PFX Sales Agreement committed PFX to

purchasing a total of $1,400,000 worth of lamb horns with delivery and payment to be made by

December 31, 2015.

125.    The total amount due under the PFX Sales Agreement by December 31, 2015 was

$1,400,000.00.  Of this total, the PFX Sales Agreement required an initial down payment of

$420,000 to be deposited directly into BLG's IOLTA trust account by June 12, 2015.  On June

12, 2015, PFX deposited this amount into BLG's IOLTA trust account.  Attached as **Exhibit 21**

is a true and correct copy of a wire transfer confirmation showing that PFX made this payment

(with certain account information redacted).

126.    Thus, with this single payment from PFX, the Lamb Horn Business had received

income approaching to the total amount that I Jian had transferred from the Sub-Account to

Encompass's Primary checking account for approved Lamb Horn Business expenses.

127.    Between June 13, 2015 and July 8, 2016, Gurvits and BLG deposited into the

Sub-Account a total of approximately $383,908.60 in a sequence of 19 rapid transactions in large

round numbers, including the following:

| 6/15/15 | $50,000.00 |
|---------|-----------|
| 06/30/15 | $100,000.00 |
| 07/16/15 | $50,000.00 |
| 07/20/15 | $50,000.00 |
| 08/11/15 | $5,000.00 |
| 08/12/15 | $5,000.00 |
| 08/18/15 | $5,000.00 |
| 08/19/15 | $10,000.00 |
| 08/27/15 | $10,000.00 |
| 09/02/15 | $7,500.00 |
| 09/10/15 | $10,000.00 |
| 09/15/15 | $10,000.00 |
| 09/28/15 | $15,000.00 |
| 10/6/16 | $6,000.00 |
| 10/15/15 | $10,000.00 |
| 12/9/15 | $20,000.00 |
| 5/10/16 | $15,408.60 |

60

| 7/8/16 | $5,000.00 |
|--------|-----------|

128.    On information and belief, PFX was directed to deposit the funds into the BLG IOLTA trust account in order to maintain Barlow's control over those funds, to to hide them from his wife during his divorce and to avoid potential tax liability for Barlow and instead shift the tax burden – or the burden of explaining away this apparent corporate income to the IRS – to Encompass and Lin.

129.    On information and belief, Gurvits and BLG transferred most of the PFX funds into the Sub-Account rather than into an account associated with Fossa, Ltd. or IcelandicPLUS LLC at the direction of Barlow and/or Livshits.

130.    On information and belief, additional funds related to the sale of lamb horns to PFX were not transferred into Encompass's Sub-Account, including but not limited to the $36,091.40 difference between the $420,000 that was deposited by PFX into BLG's IOLTA trust account and the $383,908.60 that Gurvits and BLG deposited from BLG's IOLTA trust account into the Sub-Account.  Thus, on information and belief Gurvits and BLG still hold at least $36,091.40 of the funds that PFX deposited into BLG's IOLTA trust account plus any other funds received from PFX or any other lamb horn purchaser, or Gurvits and BLG have either transferred such amounts to Barlow or to accounts controlled by Barlow or have taken such funds to be applied to Gurvits and BLG's attorney fees with neither the knowledge nor consent of Lin.

131.    On July 23, 2015, Livshits withdrew $50,000.00 from the Sub-Account.  This was just days after Gurvits and BLG deposited $50,000.00 into the Sub-Account on July 20, 2015.

132.    On information and belief, Fossa, Ltd. has a corporate bank account, to which Lin has been given neither access nor information.

133.    On information and belief, the bank accounts of Fossa, Ltd., IcelandicPLUS LLC, Fossa Enterprises, Ehf. and/or IcelandicPLUS, Ehf., and possibly other bank accounts held in the name of other persons or entities, have or continue to receive and/or contain funds that are the proceeds of the Lamb Horn Business and to which Lin has a right of ownership as a 50% owner of the Lamb Horn Business.

134.    On information and belief, Barlow, Gurvits, BLG, and Livshits have conspired to hide funds that rightfully belong to the Lamb Horn Business and therefore 50% to Lin, and to move said funds between and among various on-shore and off-shore entities and bank accounts in an effort to deprive Lin of his right to receive 50% thereof and to deprive Lin of the benefit of the bargain that he made with Barlow.

135.    The balance of the payments under the PFX Sales Agreement were to be made to an account later to be specified by Fossa, Ltd., but were due immediately after delivery of the horns.  Accordingly, on information and belief, Fossa, Ltd. received an additional $980,000 from PFX on or around December 31, 2015.  On information and belief, all or a portion of this amount has also been deposited either into BLG's IOLTA trust account, or into some other account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.

136.    The PFX Sales Agreement also gave PFX the right to purchase an additional number of lamb horns for a payment of $2,100,000, to be delivered by approximately April 1, 2016.  It is unknown whether PFX has exercised all or a portion of this additional purchase right. However, to the extent that it has done so, on information and belief all or a portion of this $2,100,000 has been deposited either into BLG's IOLTA trust account, or into some other

account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.

137.    In addition to PFX, other pet food distributors have also entered into agreements to purchase lamb horns, including but not limited to Southeast Pet Supply ("Southeast") and Animal Supply Company ("Animal Supply").  These agreements were the direct result of Lin's and Pollet's hard work in contacting the companies and pitching the lamb horns to them directly. Lin and Pollet also continued to work hard to expand agreements with other pet food distributors, including IPP, NewCo, FFE, PetCo, and PetSmart.  Especially with respect to Animal Supply, the opportunities that opened up were the direct result of extensive efforts by Pollet to open doors and pitched the product to them.  Pollet singlehandedly did significant research on Animal Supply and repeatedly contacted the CEO of that company in a concerted and ultimately successful effort to reach a significant player in the pet food industry so that Lin and Pollet could personally meet on multiple occasions with Animal Supply representatives to pitch the lamb horn products on behalf of the Lamb Horn Business.  On information and belief, these efforts have led to substantial additional sales of lamb horns and revenue to the Lamb Horn Business. Barlow agreed in a conversation with Lin that Pollet will be compensated for all of her work on a commission basis, but on information and belief, Barlow made these statements knowing them to be false because he had no intention of compensating Pollet.

138.    Despite Lin and Pollet's hard work opening the door, pitching the product, and starting negotiations with these distributors, several of them refused to deal with Barlow due to his overly-aggressive sales tactics and lack of the interpersonal relationship abilities that Lin and Pollet had brought to the table.  Thus, Barlow has undermined the Lamb Horn Business, to the detriment of Lin and the corporate entities.

139.     On information and belief, Southeast has purchased lamb horns worth at least approximately $40,107.00.  Attached as **Exhibit 22** is a page from the www.southeastpet.com website showing the lamb horns available for sale to retailers.  On information and belief these funds have been deposited either into BLG's IOLTA trust account, or into some other account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.

140.     On information and belief, Animal Supply has purchased or agreed to purchase significant numbers of lamb horns worth substantial amounts of income to the Lamb Horn Business entities.  Animal Supply provides pet supplies to retailers located throughout the United States.  Based on the work that Pollet did to open channels to Animal Supply and initial negotiations, it was anticipated that Animal Supply was about to enter into an agreement to purchase at least $2,000,000 worth of lamb horns, and to begin taking delivery in or around September 2016.

141.     However, shortly before Plaintiffs filed their lawsuit, Barlow completely cut off Pollet and Lin from all information and connection to the Lamb Horn Business and completely cut them out of the discussions with Animal Supply.  Therefore, Counterclaim-Plaintiffs are unable to estimate the amount of money that has been paid by Animal Supply, but on information and belief these amounts are substantial and have been deposited either into BLG's IOLTA trust account, or into some other account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.  Lin has received no portion of his 50% share of this income.

142.     In addition, lamb horns have for some time and continue to be sold directly to consumers via online outlets such as Amazon.com.  Attached as **Exhibit 23** is a page from

Amazon.com showing the lamb horns available for purchase at $15.99/horn, and showing the
excellent product reviews.  It is unknown how many lamb horns have been sold through
Amazon.com or through other online outlets, but on information and belief these amounts are
substantial and have been deposited either into BLG's IOLTA trust account, or into some other
account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities
that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.  Lin has received no
portion of his 50% share of this income.

143.   In addition, lamb horns are sold to consumers directly through IcelandicPLUS's
website, www.icelandicplus.com.  Attached as **Exhibit 24** is a page from IcelandicPLUS's
website, showing the horns available for sale directly at $15.99/horn.  It is unknown how many
lamb horns have been sold directly through the www.icelandicplus.com website or the amount of
money that has been received on account of such sales.  On information and belief, funds from
such sales have been deposited either into BLG's IOLTA trust account, or into some other
account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities
that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.  Lin has received no
portion of his 50% share of this income.

144.   Notably, the ownership of the www.icelandicplus.com Internet domain has been
deliberately concealed behind a private proxy service, Perfect Privacy, LLC.  Attached as
**Exhibit 25** is a true and correct copy of the WHOIS domain ownership information provided by
domain registrar Network Solutions, Inc.  There is, therefore, no way to determine from the
publicly-available information which of the various corporate entities that Barlow has set up with
the assistance of Gurvits, BLG, and/or Livshits owns the www.icelandicplus.com website or has

made lamb horn sales through that website, or where the proceeds from such sales may have been directed.  Lin has received no portion of his 50% share of this income.

145.     In addition, lamb horns are offered for sale to the public through other websites, including without limitation, www.cheshirehorse.com, and https://crateandmarrow.com. Attached as **Exhibit 26** are pages from these two websites showing the lamb horns available for sale.  It is unknown how many lamb horns have been sold through these websites or the amount of money that has been received on account of such sales.  On information and belief, funds from such sales have been deposited either into BLG's IOLTA trust account, or into some other account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.  Lin has received no portion of his 50% share of this income.

146.     In addition, the lamb horns are available for sale through outlets outside the United States.  For example, the lamb horns are available for sale from Noah's Ark Feed and Supply, which on information and belief is a retailer located in Devonshire, England.  Attached as **Exhibit 27** are pages from the www.noahsark.bm website showing that the lamb horns are available for sale and that the company is located in Devonshire, England. It is unknown how many lamb horns have been sold outside the United States or the amount of money that has been received on account of such sales.  On information and belief, proceeds from such sales have been deposited either into BLG's IOLTA trust account, or into some other account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.  Lin has received no portion of his 50% share of this income.

66

147.    On or about November 30, 2015, Lin and Barlow met to discuss among other things the Lamb Horn Business's break even timeframe, corporate financials, spending, and burn rates.  Barlow repeatedly dodged Lin's questions and requests for information, instead insisting that unspecified additional sales would be needed before Lin would receive any financial benefit from the Lamb Horn Business that he had created.  During this meeting Barlow assured Lin that by the end of 2015, Livshits would have produced complete financial documentation to Lin.  Lin never received the promised information, despite repeated additional demands.  Barlow also reassured Lin and Pollet that Lin owned 50% of everything and that the company was then worth $10,000,000 based on lamb horn inventory alone.

148.    By mid-December 2015, additional lamb horn inventory had been received at the U.S. warehouse as a result of Lin's and Pollet's additional travel and work in Iceland during the 2015 slaughter season.  This additional inventory is estimated to be worth approximately $10,500,00 making the Lamb Horn Business worth approximately $20,500,000 based on lamb horn inventory alone.

149.    In addition to the lamb horns themselves, each horn contains marrow bones that are removed from the horns and can be sold separately as pet treats.  Based on the estimated inventory of lamb horns, the estimated value of the marrow bones is approximately $3,739,840.  It is unknown whether there have been any sales of these marrow bones to date, but on information and belief, Barlow has endeavored to sell marrow bones in addition to lamb horns.  On information and belief, proceeds from such sales have been deposited either into BLG's IOLTA trust account, or into some other account associated with Barlow and/or Gurvits and BLG or any of the various corporate entities that Barlow has set up with the assistance of Gurvits, BLG, and/or Livshits.

150.   On information and belief, the combined inventory of lamb horns and marrow bones has an estimated value of at least $24,239,840.

151.   According to Barlow in a conversation with Lin, PFX would cover half of the U.S. market and Animal Supply would cover the other half.  Between them Barlow anticipated selling approximately 520,000 lamb horns in the first year, which would be well over $3,000,000 in revenues depending on actual wholesale sale prices.

152.   Despite the substantial revenue from the sale of lamb horns, Barlow has refused to provide Lin with information about when he will finally obtain any financial benefit from his ownership of the Lamb Horn Business.  To the contrary, Barlow appears to have taken the position that he is entitled to keep spending as much money as he wants for reasons not disclosed to Lin, and thereby to keep the Lamb Horn Business from "breaking even" so that Lin also benefits.

<u>Barlow Attempts to Appropriate Lin's 50% Equity Ownership</u>

153.   On information and belief, in early May 2016, Barlow met with Jim Alden, COO of PFX, and offered him a position as CEO of the Lamb Horn Business.  Barlow did not confer with Lin about this offer, and Lin did not approve of it.

154.   Lin and Pollet met with Mr. Alden shortly after his meeting with Barlow.  During this meeting Mr. Alden told Lin and Pollet of Barlow's offer and expressed his concern that Barlow was trying to force Lin out of the Lamb Horn Business.  Lin also learned that at this meeting that Mr. Alden had indicated to Barlow his satisfaction with his position at PFX and stated that if he were to consider leaving PFX, he would have to receive a substantial equity position in Fossa/IcelandicPLUS.  Mr. Alden told Lin and Pollet that Barlow advised Mr. Alden

that he (Barlow) already owned a substantial part of the equity in Fossa/IcelandicPLUS and would soon own more of it, so there would be no problem providing equity to Mr. Alden.

155.    On information and belief, Barlow's reference to soon owning more of Fossa/IcelandicPLUS equity reflected Barlow's plan to take over control of the Lamb Horn Business by forcing Lin to give up all or a portion of his 50% ownership interest.

<u>Barlow Attempts to Take Advantage of Lin's Financial Difficulties to<br>Deprive Lin of His 50% Ownership Interest in the Lamb Horn Business</u>

156.    Because Lin had devoted the majority of his time over the past several years to creating and developing the Lamb Horn Business, Lin had neglected his usual marketing and branding business through Encompass, and had foregone many opportunities to earn income from it.  Lin had repeatedly told Barlow of his increasing financial distress, and had expressed his need to receive some of the financial benefits from the Lamb Horn Business in order to survive.  Barlow refused to allow Lin to receive any of the financial benefits, instead taking them for himself and paying Livshits and others.  Barlow insisted that Lin would not receive any compensation for all of his work until the Lamb Horn Business had significantly more revenues and had reached an unspecified "break even" point, which Barlow never explained and that Lin has no control over because Barlow has taken control of all of the financial aspects of the business.

157.    When Lin indicated that he simply could not afford to continue devoting all his time to the Lamb Horn Business and required money to live, Barlow saw an opportunity to start to squeeze Lin out of the Lamb Horn Business by offering to "lend" money to Lin in exchange for part of his equity interest in the Lamb Horn Business.  By way of example, on or around June 28, 2016, Barlow sent an email to Lin offering to "help" him pay his personal expenses by providing a "bridge loan" that would be structured in a way that would protect Barlow.  A true

and correct copy of this email is attached hereto as **Exhibit 28**.  This was the third time that Barlow had attempted to use Lin's tenuous finances as leverage to force Lin to give up part of his ownership of the Lamb Horn Business.

158.    Based on his discussion with Mr. Alden about what Barlow had told him, Lin was suspicious of Barlow's offer to "lend" him money and was reminded of the way in which Barlow had used his vastly superior financial resources to force Lin to sign the Adhesion Contract, which recharacterized Barlow's prior investments in Murr and his investments in the Lamb Horn Business as "loans" that would have to be repaid before Lin would be entitled to receive any of the revenues to which he was entitled as a 50% owner of the Lamb Horn Business.

159.    Because of this experience, Lin refused Barlow's "offer" and instead borrowed money from his family members and friends while continuing to work on the Lamb Horn Business.

160.    On information and belief when Barlow was unsuccessful in his effort to gain control of the Lamb Horn Business by "lending" money to Lin so that he could live, Barlow and Gurvits conceived of filing the present lawsuit against Lin and Encompass asserting false allegations against them in the belief that Lin and Encompass would lack the resources necessary to fight the lawsuit and therefore Lin would simply give up his 500% ownership interest in the Lamb Horn Business.

161.    On information and belief, the present lawsuit was conceived of jointly by Barlow and Gurvits as a bad faith and abusive tactic to put pressure on Lin to give all or a portion of Lin's ownership interest in the Lamb Horn Business to Barlow.

<u>Barlow and Gurvits and BLG Conspire to Harm Pollet to Exert Pressure on Lin<br>to Give Up His 50% Ownership Interest in the Lamb Horn Business</u>

162.     Prior to filing the present lawsuit, beginning in or about July 2015, Gurvits and BLG began representing Pollet in an unrelated lawsuit, styled *McGillian v. Pollet*, No. 1481CV05570 (Middlesex County Superior Court).   Shortly after filing the present lawsuit, Gurvits suddenly informed Pollet that he would be withdrawing from representing her in that lawsuit because of "conflicts of interest" that he perceived had arisen.  Pollet learned that Gurvits' threat to withdraw came on the eve of the final pre-trial conference in that case, a date of which she had previously been unaware.  Pollet objected to Gurvits's and BLG's sudden threat to withdraw as counsel. When Pollet asked Gurvits to explain the alleged conflict of interest, Gurvits explained that the conflict was created by the fact that Gurvits had decided to represent Barlow in this lawsuit against Lin and Encompass.  *See* **Exhibit 29** hereto, a true and correct copy of an email dated September 28, 2016, that Gurvits sent to Pollet.  Pollet objected to Gurvits's and BLG's threat to withdraw. Nevertheless, Gurvits and BLG filed a motion to withdraw as counsel in the *McGillian* case over Pollet's written objection.

163.     On information and belief, Gurvits's and BLG's insistence on moving to withdraw from representing her in the *McGillian* lawsuit was part of Gurvits's and Barlow's effort to pressure Lin into giving up all or a portion of his ownership interest in the Lamb Horn Business by filing the present lawsuit.

164.     In filing this lawsuit while he and BLG were already representing Pollet in the *McGillian* lawsuit and then insisting on withdrawing as counsel for Pollet based on Gurvits's and BLG's stated conflict of interest with their representation of the Plaintiffs in this lawsuit, Gurvits and BLG violated the Massachusetts Rules of Professional Responsibility and including but not limited to the Duty of Loyalty they owed to Pollet.  At a hearing on September 22, 2016, Judge Peter Krupp of the Massachusetts Superior Court advised Gurvits that the Court was inclined to

refer Gurvits to the Massachusetts Board of Bar Overseers because of his ethical violations, but advised Pollet that he would permit withdrawal and would provide her with the opportunity to obtain new counsel in that lawsuit.  It is unknown whether Judge Krupp has made a referral to the Massachusetts BBO.

165.    During that hearing, Pollet pointed out that she had been involved in the Lamb Horn Business with Lin and feared that Gurvits's and BLG's effort to withdraw as counsel in the *McGillian* case was in part a preface to the Plaintiffs' assertion of claims against her in this lawsuit as part of their abusive tactics, and that she expected at the very least to be an important fact witness.  In an effort to address Judge Krupp's stated concerns over this, Gurvits provided assurances to Judge Krupp that the Plaintiffs in this case would not add Pollet as a Defendant in any capacity.  Nevertheless, in an Endorsement on Gurvits's Motion to Withdraw, Judge Krupp made the following entry:

> After hearing, ALLOWED ultimately without opposition of Ms. Pollet.  The Clerk shall schedule a Final Pretrial Conference in January 2017 to give Ms. Pollet an opportunity to secure new counsel.  Notwithstanding Mr. Gurvits' agreement to return the money, Ms. Pollet paid him for his representation in this case, that alone does not resolve the potential conflict issue.  I cannot determine on the record before me whether Mr. Gurvits violated the Rules of Professional Conduct by pursuing or agreeing to represent a client adverse to Ms. Pollet's boyfriend and employer, if Ms. Pollet is a potential party or material witness in the new case, or if Mr. Gurvits may ethically continue to represent the plaintiffs in that new case.  *See e.g.* Mass. R. Prof. Conduct 1.6, 1.7, 1.8(b), 1.9(c).  The situation has the appearance of client-shopping.  Before proceeding further with their new representation, it is incumbent on Mr. Gurvits and Mr. Shayefar to determine that they may ethically represent their new client(s) who are now adverse to Ms. Pollet's boyfriend and employer, including potentially seeking a formal ruling from the Office of Bar Counsel.

A true and correct copy of the Docket in the *McGillian v. Pollet* matter containing this endorsement is attached hereto as **Exhibit 30**.

166.     On October 5, 2016, Gurvits and BLG filed their Notice of Withdrawal in this matter.  It is unknown whether Gurvits and BLG had obtained a ruling from the Office of Bar Counsel as Judge Krupp had suggested.  On information and belief, Gurvits and BLG concluded that they had violated or that their was a strong risk that they had violated their ethical obligations to Pollet by filing this lawsuit as Judge Krupp had suggested, and Gurvits and BLG concluded that they should withdraw as counsel in this litigation in an attempt to shield themselves from those ethical breaches.

167.     On information and belief, Gurvits and BLG also determined that they had breached their ethical obligations under the Rules of Professional Responsibility and the Duty of Loyalty by filing this lawsuit against Lin and Encompass on behalf of Barlow and, purportedly, on behalf of Fossa, Ltd. and IcelandicPLUS LLC, because Lin was a 50% owner of the Lamb Horn Business with Barlow, a 50% owner specifically of the Plaintiffs Fossa, Ltd. and IcelandicPLUS LLC, and that Gurvits and BLG had been and still were legal counsel to Barlow and Lin as 50% co-owners of the Lamb Horn Business and legal counsel to both Fossa, Ltd. and IcelandicPLUS LLC.

168.     At the same time that they withdrew as counsel in this litigation, Gurvits and BLG were replaced by present counsel, who now also purports to represent Barlow, Fossa, Ltd., and IcelandicPLUS LLC against Lin, the partner of Barlow and the 50% owner of Fossa, Ltd. and IcelandicPLUS LLC in the same manner that Gurvits and BLG had previously.

<u>Barlow and Livshits Cut Lin Out of the Lamb Horn Business</u>

169.     Barlow and Livshits have over time increasingly cut Lin out of the negotiations with pet food distributors and the relationship with the Icelandic slaughterhouses and other persons in Iceland by taking actions and moving money around without the knowledge or

approval of Lin, including without limitation payments from the Sub-Account to Fossa Enterprises, Ehf., and Omar Mar Jonsson.

170.    Moreover, since the filing of this lawsuit, Lin has been completely cut out of the Lamb Horn Business and has been provided with no information whatsoever by Barlow or Livshits.  On information and belief, cutting Lin out of the loop on the marketing and sale of lamb horns is an integral part of a scheme to deprive Lin of his rightful share of the Lamb Horn Business, of which this lawsuit is also an integral part.

171.    Barlow and Livshits have also deliberately refused to provide Lin with concrete financial information about the financial status of the Lamb Horn Business, amounts received, movement of funds between the various corporate entities and bank accounts, and even the amounts that Barlow alleges he has invested in the Lamb Horn Business.  Barlow and Livshits have repeatedly failed to provide this information to Lin despite his repeated demands for the information, to which he is undoubtedly entitled as a 50% owner of the Lamb Horn Business.

172.    On information and belief, Barlow and Livshits, with the assistance of Gurvits and BLG, have set up complex international corporate structures and bank accounts in part to obscure the revenues from the Lamb Horn Business and the movement of funds between the various entities and bank accounts, in an effort to deprive Lin of the financial benefit to which he is entitled.

173.    On information and belief, Barlow with the assistance of Gurvits, BLG, and/or Livshits, has set one or more bank accounts up on behalf of one or more of the corporate entities that are connected to the Lamb Horn Business, including but not limited to accounts in Cyprus, by using Lin's name, Social Security Number and/or U.S. Passport number.  Despite repeated

requests, Lin has never been provided with access to or any information about any of these bank accounts or the funds within or that have moved between them.

<u>Barlow and Livshits Conspire to Acquire and Sell Lamb Horns Separately from Lin</u>

174.    Both before and since filing this lawsuit, Barlow and Livshits have conspired to cut Lin out of any information at all about the Lamb Horn Business by refusing repeated requests for financial and other information.  In addition, Barlow has ensured that Lin and Pollet are blinded to his activities by cutting off their access to their Fossa email accounts that they had previously used.  On information and belief, Barlow has not only cut off Lin's and Pollet's access to email, but has destroyed or hidden email and other documents related to the Lamb Horn Business.

175.    On information and belief, Barlow and Livshits have conspired in efforts to acquire additional lamb horns in Iceland and to move those lamb horns out of the processing facilities that Lin and Pollet had set up for the Lamb Horn Business and to a new facility to which Lin and Pollet do not have access.  On information and belief, this effort has involved one or more of the Lamb Horn Business corporate entities as to which Lin has no ongoing access or information, or other corporate entities established by Barlow with the assistance of Gurvits and Livshits.

176.    On information and belief, both before and after filing the present lawsuit, Barlow has traveled to Iceland without Lin and has been working with Omar Mar Jonsson to pursue the Lamb Horn Business without Lin's ongoing participation.  On information and belief, Barlow and/or Jonsson have entered into contracts with lamb horn suppliers and processors to produce additional lamb horns to be sold in the United States without the involvement of Lin and without providing any financial benefit to Lin.

75

177.     On information and belief, some or all of the funds that Livshits and/or Barlow transferred from the Sub-Account to Fossa Enterprises, Ehf. and to Omar Mar Jonsson or that Livshits and/or Barlow have directly withdrawn from the Sub-Account have been used in whole or in part to further Barlow's efforts to surreptitiously take control of lamb horns that are rightfully the property of the Lamb Horn Business as to which Lin is a 50% owner.

178.     On information and belief, Barlow, with the assistance of Gurvits, BLG, and Livshits, have established other corporate entities and bank accounts to continue conducting the Lamb Horn Business separately from Fossa, Ltd., IcelandicPLUS LLC, Fossa, Ehf., and IcelandicPLUS Ehf. and without Lin's participation or knowledge, in order to cut Lin out of his rightful share of that business and to keep all of the proceeds of that business for themselves.

<u>Barlow Appropriates Lin's Idea for Obtaining and Processing Unique Icelandic Fish Skins to be Imported and Sold as Pet Treats</u>

179.     During his years of work in Iceland, in addition to the Lamb Horn Business, Lin conceived of another business idea, which would involve acquiring the skin of unique Icelandic fish, and processing it to be used as pet treats in the U.S.  At various points, Lin has discussed this potential future business with Barlow, as something that could perhaps be pursued in addition to the Lamb Horn Business.  Although Barlow has at various times expressed interest in the idea leading Lin to start contacting people in Iceland to discuss the idea, each time that Lin attempted to build that aspect of the business, Barlow has then backed away from the idea, citing the need to concentrate on the Lamb Horn Business first.  These repeated advances and retreats damaged Lin's reputation with potential Icelandic sources, and ultimately, Lin agreed with Barlow that the fish skin idea could not be further discussed until the Lamb Horn Business was on a solid footing, because Barlow's insistence on locking up all Icelandic lamb horn production had made the Lamb Horn Business far more demanding that Lin had originally foreseen.

180.    On June 6, 2016, Barlow met with Lin in response to Lin's repeated requests for financial information.  Barlow insisted that Lin attend this meeting without Pollet.  Because Pollet has been instrumental in taking notes of all aspects of her and Lin's involvement in the Lamb Horn Business and interactions with Barlow, Lin requested, and Barlow agreed, that Lin could record this meeting.  During this meeting, Barlow again refused to provide substantial information to Lin, instead providing vague assurances that all would be fine and that Lin would soon begin receiving the financial benefits to which he was entitled.  On information and belief, Barlow's assurances were false and misleading at the time they were made and were made with the intent that Lin would rely on them, because Barlow was already planning to use his substantial financial and other resources to force Lin out of the Lamb Horn Business by, among other things, filing the present lawsuit and pressuring Lin further by having Gurvits and BLG withdraw from representing Pollet in the *McGillian* lawsuit.

181.    During this meeting, Barlow agreed with Lin that they would not make any effort to pursue any potential future pet food ideas that Lin had developed, including the fish skins.  Lin insisted on this because his and Barlow's focus had to be on the Lamb Horn Business and taking on new projects would only further delay the point at which Barlow would allow Lin to receive any of the financial benefit of the Lamb Horn Business.

182.    On information and belief, Barlow's promise to Lin that there would be no efforts to develop possible future business ideas beyond the Lamb Horn Business was false and fraudulent at the time it was made.  On information and belief, the week after this meeting, Barlow traveled to Iceland, and with Omar Mar Jonsson's assistance, met with Icelandic businesspeople and vendors that Lin had previously developed as possible fish skin providers, and either attempted to purchase or has actually purchased a fish skin and fish chip producer

company and a factory in northern Iceland, as well as large amounts of Icelandic fish based raw materials.

183.    On information and belief, Barlow has continued actively pursuing opportunities to purchase and process Icelandic fish skins with the goal of creating pet treats to be sold in the U.S. and elsewhere without the participation or knowledge of Lin and without providing Lin with the financial benefits thereof.

184.    Lin does not presently know whether Barlow has successfully negotiated the purchase of Icelandic fish skins or fish skin or chip vendors or has sold any fish skin products. To the extent that Barlow has made any efforts to acquire and process Icelandic fish skins or chips for sale as pet treats or has succeeded in doing so, Barlow has misappropriated Lin's business idea for his own use and has deprived Lin of the value of his idea.

<u>Lin and Encompass Created All the Marketing and Promotional Materials<br>for the Lamb Horn Business and Own All Copyrights Therein</u>

185.    In addition to being responsible for virtually all aspects of the Lamb Horn Business from its initial concept through its development and execution, Lin and Encompass were responsible for the development of all of the sales and marketing, promotional materials, trade show materials, brand platform and positioning, and retail and online packaging used for the Lamb Horn Business.  Examples of Lin's creative work, as to which he owns the copyrights, are attached hereto as **Exhibit 31**.

186.    Drawing on Lin's decades of experience developing unique consumer marketing programs and his knowledge of how to create successful brand identities and brand marketing programs, Lin designed all of the marketing materials and designed special and unique packaging to showcase the lamb horns and their unique attributes.  Lin, with the assistance of Pollet and others, also created promotional videos for the Lamb Horn Business.

187.     As the creator of all of the marketing and promotional materials and packaging for the Lamb Horn Business, Lin and Encompass are the owners of all copyrights in those materials.

188.     The marketing and promotional materials have been used successfully to market and promote and sell the lamb horns, and Barlow and the Lamb Horn Business have benefited tremendously from Lin's creative work, a fact that Barlow has repeatedly acknowledged to Lin.

189.     Neither Lin nor Encompass have ever been paid for the work that they did in creating the lamb horn promotional, marketing, website, online stores, and packaging material, nor have they received any financial benefit from the use of those materials.

190.     Barlow continues to use the branding promotional, marketing, and packaging materials written and designed by Lin in connection with selling lamb horns as part of the Lamb Horn Business.

191.     As Barlow has never paid for these materials nor provided Lin with the benefit of his 50% ownership of the Lamb Horn Business, and has to the contrary acted to cut Lin out of the Lamb Horn Business among other things by depriving him of all information, cutting off his access to the Fossa, Ltd. email system and hiding his activities to divert lamb horns from facilities that Lin established for processing in Iceland to other facilities connected to Barlow, Barlow has no right to continue using Lin's marketing, promotional and packaging materials for the Lamb Horn Business.

## COUNT I
### Fraud (Lin and Encompass against Barlow)

192.     Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

193.     Barlow falsely represented to Lin and Encompass that Lin would be and was the owner of 50% of the Lamb Horn Business and of all corporate entities associated with the Lamb Horn Business, including without limitation Fossa, Ltd., Fossa Enterprises, Ehf., IcelandicPLUS, Ehf. and IcelandicPLUS LLC.

194.     Barlow falsely represented to Lin and Encompass that the various corporate entities that he was establishing with the assistance of Gurvits, BLG and Livshits were solely for the purpose of shielding Lamb Horn Business income from U.S. taxes.

195.     Barlow falsely represented that Lin would receive 50% of all of the revenues from the Lamb Horn Business.

196.     Barlow falsely represented to Lin and Encompass that the reason for setting up the Sub-Account was to more easily enable Barlow to provide funds to Lin to reimburse him for Lamb Horn Business Expenses.

197.     Barlow falsely represented to Lin and Encompass that he would reimburse Lin for all of the Lamb Horn Business expenses that Lin incurred after requiring Lin to first pay those expenses out of his own and/or Encompass's funds and using Lin's personal and Encompass's corporate credit/debit cards.

198.     Barlow falsely represented to Lin and Encompass that Barlow and Livshits would provide Lin with full financial information concerning the Lamb Horn Business and full information about the corporate entities that Barlow, Gurvits, BLG, and Livshits were establishing.

199.     Barlow falsely represented to Lin and Encompass that Lin would begin receiving 50% of the revenues from the Lamb Horn Business by approximately the end of 2015.

200.    Barlow falsely represented to Lin and Encompass that Barlow would not pursue the Lamb Horn Business without Lin's involvement and participation and receipt of his share of all revenues.

201.    Barlow falsely represented to Lin and Encompass that Barlow would not pursue Lin's Fish Skin idea without Lin's participation and receipt of 50% of all revenues therefrom.

202.    At each time that Barlow made these false representations of fact, he knew them to be false.

203.    Barlow knowingly made these false representations of fact with the intention of inducing Lin and Encompass to rely on them in continuing to provide their substantial Icelandic experience, contacts, ideas, sales, marketing and promotional efforts, and physical and mental work to build the Lamb Horn Business.

204.    Lin and Encompass in fact reasonably relied on these, and other, false representations of fact by Barlow in deciding to split ownership of the Lamb Horn Business with Barlow on an equal basis, with Barlow providing funding and Lin providing the original idea, experience, Icelandic relationships, sales, marketing, and promotion experience and creative work, and significant uncompensated physical and mental labor to build the Lamb Horn Business.

205.    As a direct and proximate result of Barlow's conduct described above, Lin and Encompass suffered damages as a result of Barlow's actions in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

<u>**COUNT II**</u>
<u>Breach of Oral Contract</u>
<u>(Lin and Encompass against Barlow)</u>

206.     Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

207.     Lin and Encompass on the one hand, and Barlow on the other hand, entered into an oral contract whereby, in consideration for Barlow's reimbursement of the costs of testing, developing and creating the Lamb Horn Business, Lin and Encompass would provide the original idea of processing and importing Icelandic Lamb Horns to be sold as dog treats as well as their substantial Icelandic personal relationships, Icelandic experience, knowledge of the Icelandic farming and meat production industries, government agencies, Icelandic business methods, Icelandic, EU, U.S., and Canadian regulatory requirements, their substantial creative, marketing, sales, and promotional expertise, and their physical and mental labor, with both Barlow and Lin benefiting from the Lamb Horn Business equally as 50% owners thereof.

208.     Lin and Encompass on the one hand, and Barlow on the other hand, entered into an oral contract whereby Barlow and Lin agreed not to pursue Lin's idea for turning Icelandic fish skin into dog treats until the Lamb Horn Business was on solid footing and Lin had started receiving the financial benefit therefrom to which he was entitled as a 50% owner.

209.     At all times, Lin and Encompass complied with their obligations under this oral contract.

210.     Barlow's actions described above constituted material breaches of this oral contract.

211.     As a direct and proximate result of Barlow's actions, Lin and Encompass have suffered damages in an amount to be determined at trial, but to include, without limitation, 50%

of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

**COUNT III**
Breach of Implied Covenant of Good Faith and Fair Dealing
(Lin and Encompass against Barlow)

212.     Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

213.     As a matter of law, the oral contract between Lin and Encompass on the one hand and Barlow on the other hand contained an implied covenant of good faith and fair dealing.

214.     Barlow's conduct described herein breached the implied covenant of good faith and fair dealing and deprived Lin and Encompass of the benefit of their bargain.

215.     As a direct and proximate result of Barlow's conduct described herein, Lin and Encompass have suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

**COUNT IV**
Unfair Business Practices (M.G.L. c. 93A, §§ 2 and 11)
(Lin and Encompass against Barlow, Gurvits, and BLG)

216.     Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

217.    Barlow's, Gurvits's, and BLG's conduct described above constituted unfair business practices in violation of Mass. Gen. L. c. 93A, §§ 2 and 11.

218.    Barlow's, Gurvits's, and BLG's conduct described above was a willful and knowing violation of Mass. Gen. L. c. 93A, §§ 2 and 11.

219.    Barlow's, Gurvits's, and BLG's conduct described above occurred primarily and substantially within the Commonwealth.

220.    Additionally, Barlow's abuse of Encompass's Sub-Account to deposit money from unknown sources for his own personal use and to hide money from taxing authorities and from his wife during his divorce constituted an unfair business practice against Encompass and Lin, which unknowingly made them accomplices to Barlow's actions and put them in serious legal jeopardy.  Among other things, Barlow's use of the Encompass Sub-Account unknowingly made Encompass and Lin accomplices to Barlow's tax avoidance schemes, which may be illegal, and to his scheme to hide money from his wife during the divorce, which is illegal under Massachusetts law.  Moreover, Lin and Encompass have no way of knowing the source or use of substantial amounts of the funds deposited into the Sub-Account.  To the extent they may have been derived from or used for illegal activities, Barlow's actions have put Encompass and Lin in legal jeopardy and possibly of forfeiture of assets or at the very least to the potential harm of criminal or other investigations.

221.    Additionally, Barlow's use of funds deposited into the Encompass Sub-Account, including but not limited to the proceeds of the PFX Sales Agreement, have put Lin and Encompass in a situation where they may have to report those deposits as income (or they may have already been reported by the bank under federal reporting requirements), and they may

therefore have to issue 1099 forms to Barlow to avoid being taxed on the money, which was in no way income to Encompass or Lin.

222.    Lin and Encompass have been harmed by Barlow's, Gurvits's and BLG's conduct in addition because they may have to incur the costs and disruption of tax audits and may need to incur the cost and time of seeking professional legal and tax advice.

223.    In addition, as described below in **Count __** hereof (Abuse of Process), Barlow, Gurvits, and BLG Lin have abused process by filing a frivolous lawsuit against them in a deliberate effort to force Lin to give up all or part of his ownership share in the Lamb Horn Business.  This abuse of process also constitutes an unfair business practice under M.G.L. c. 93A, §§ 2 and 11, and follows on several prior efforts to squeeze Lin out of the Lamb Horn Business by trying to obtain his ownership interests by taking advantage of his and Encompass's financial difficulties.

224.    By filing a lawsuit against Encompass and by abusing Encompass's Sub-Account, and by depriving Encompass of the benefit of Lin's services over the past several years, Barlow, Gurvits, and BLG have engaged in unfair business practices against a separate corporation, not just against Lin as a co-owner of the Lamb Horn Business.

225.    As a direct and proximate result of Barlow's, Gurvits's, and BLG's conduct described herein, Lin and Encompass have suffered damages in an amount to be determined at trial but to include, without limitation, all damages and costs, including attorney fees, incurred in connection with obtaining legal or tax advice, any audits or penalties that might be assessed against them, and in connection with this entire litigation.  Such damages also include the damages suffered by Encompass by the manipulation of Lin and forcing him to abandon his successful branding and marketing business through Encompass to focus full-time on the Lamb

Horn Business, including but not limited to lost income to Encompass.  Such damages also include but are not limited to 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

226.    Lin and Encompass are entitled to treble, or at least double, the amount of their damages as a result of Barlow's willful and knowing violation of Mass. Gen. L. c. 93A, §§ 2 and 11.

227.    Lin and Encompass are entitled to their reasonable attorney fees and costs incurred in connection with this action as provided in Mass. Gen. L. c. 93A, §§ 2 and 11.

**COUNT III**
Unjust Enrichment (Lin and Encompass against Barlow, Fossa, Ltd. and IcelandicPLUS LLC)

228.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

229.    Barlow has been unjustly enriched by his actions described above in the amount of the value of the original Lamb Horn Business idea, the expertise, relationships, mental and physical work of Lin and Encompass, all of Lin's and Encompass's creative, marketing, promotional and sales materials, and the value of all revenues received from the Lamb Horn Business and the value of all lamb horns and marrow bones acquired in connection with the Lamb Horn Business, as well as all revenues received from any purchase or sale of lamb horns or marrow bones outside of the Lamb Horn Business and the corporate entities created in connection therewith.

230.    To the extent that Lin is not a 50% shareholder of the Lamb Horn Business and any corporate entities created in connection therewith, Fossa, Ltd. and IcelandicPLUS LLC have

been unjustly enriched by the actions described above in the amount of the value of the original

Lamb Horn Business idea, the expertise, relationships, mental and physical work of Lin and

Encompass, all of Lin's and Encompass's creative, marketing, promotional and sales materials,

and the value of all revenues received from the Lamb Horn Business and the value of all lamb

horns and marrow bones acquired in connection with the Lamb Horn Business, as well as all

revenues received from any purchase or sale of lamb horns or marrow bones outside of the Lamb

Horn Business and the corporate entities created in connection therewith.

231.    As a direct and proximate result of the conduct described herein, Lin and

Encompass have suffered damages in an amount to be determined at trial but to include, without

limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of

all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish

skin or other fish-related products acquired and/or sold by the time judgment enters herein, and

presently estimated to be in excess of $10,000,000.

232.    It would be inequitable to permit Barlow, Fossa, Ltd., and/or IcelandicPLUS LLC

to retain the benefit of Lin's and Encompass's services as described above.

233.    Barlow, Fossa, Ltd., and IcelandicPLUS must disgorge and pay to Lin and

Encompass the foregoing amounts.

## COUNT IV
### Interference with Contractual Relations
### (Lin and Encompass against all Counterclaim-Defendants)

234.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if

fully stated herein.

235.    Lin and Encompass had contractual relationships with persons and entities in

Iceland developed both prior to and in connection with the Lamb Horn Business, including

without limitation Omar Mar Jonsson, Hanna Thorsdadottir, the Icelandic slaughterhouses that

participated in acquisition of lamb horns for the Lamb Horn Business, their executives and workers, and others.

236.    By virtue of their involvement in the Lamb Horn Business, all Counterclaim-Defendants knew of Lin and Encompass's contractual relationships.

237.    Counterclaim-Defendants individually and collectively intentionally interfered with Lin's and Encompass's contractual relations for an improper purpose and/or by improper means, including but not limited to working with Omar Mar Jonsson, Hanna Thorsdadottir, and Icelandic lamb horn providers and processors to acquire and sell Icelandic lamb horns without the knowledge and participation of Lin and Encompass and without providing the financial benefit to Lin and Encompass to which they are entitled.

238.    As a direct and proximate result of Counterclaim-Defendants' actions, Lin and Encompass have suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

## COUNT V
### Interference with Prospective Contractual Relations
### (Lin and Encompass against all Counterclaim-Defendants)

239.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

240.    Lin and Encompass had prospective contractual relationships with persons and entities in Iceland developed both prior to and during the Lamb Horn Business including without

limitation Omar Mar Jonsson, Hanna Thorsdadottir, and Icelandic fish skin providers and processors.

241.    By virtue of their participation in the Lamb Horn Business and Lin's and Encompass's disclosure to Barlow of Lin's idea for acquiring, processing and importing Icelandic fish skins as pet treats, Counterclaim-Defendants knew of Lin's and Encompass's prospective contractual relationships.

242.    By their actions described above, Counterclaim-Defendants have intentionally interfered with Lin's and Encompass's prospective contractual relationships, for an improper purpose and/or by improper means, including but not limited to working with Omar Mar Jonsson, Hanna Thorsdadottir, and Icelandic fish skin providers and processors to develop a business focused on acquiring, processing, and importing Icelandic fish skins as pet treats without the knowledge and participation of Lin and Encompass and without providing the financial benefit to Lin and Encompass to which they are entitled.

243.    As a direct and proximate result of Counterclaim-Defendants' actions, Lin and Encompass have suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all fish skins or other fish-related products acquired and/or sold by the time judgment enters herein, as well as all revenues received therefrom by the time judgment enters herein.

## COUNT VI
### Misappropriation of Trade Secrets, Common Law and M.G.L. c. 93, § 42
### (Lin and Encompass against All Counterclaim-Defendants)

244.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

245.     Lin's idea to develop the Lamb Horn Business, as well as the sources and methods of production of the lamb horns are trade secrets.

246.     Lin's idea to develop a business involving the acquisition, processing, importation and sale of Icelandic fish skins, as well as the sources and methods of production thereof are trade secrets.

247.     Lin has taken reasonable steps to preserve the secrecy of this confidential information.

248.     Counterclaim-Defendants obtained Lin's confidential information by way of fraud or deception with intent to convert that information to their own use.

249.     Counterclaim-Defendants had a duty not to disclose or to use Lin's trade secrets.

250.     In breach of their duty, Counterclaim-Defendants used their knowledge of Lin's trade secrets to benefit themselves to the detriment of Lin and Encompass.

251.     Counterclaim-Defendants are jointly and severally liable for these tortious activities, in which they each participated.

252.     As a direct and proximate result of their actions, Lin and Encompass have suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

## COUNT VII
### Breach of Fiduciary Duty (Lin against Barlow)

253.     Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

254.    Barlow, as a partner to Lin and as an officer of Fossa, Ltd. and IcelandicPLUS LLC, owed a fiduciary duty to Lin and to Fossa, Ltd. and IcelandicPLUS LLC.

255.    By his actions described above, Barlow breached his fiduciary duty to Lin, Fossa Ltd., and IcelandicPLUS LLC.

256.    In consideration of the facts described above, including but not limited to the fact that Barlow and Lin are 50% beneficial owners of Fossa, Ltd. and that on information and belief Barlow set himself up as the sole shareholder of record of IcelandicPLUS LLC, demand on the management of Fossa, Ltd. and IcelandicPLUS LLC would be futile.

257.    As a direct and proximate result of Barlow's breaches of fiduciary duty, Lin has suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000, for which Barlow is personally liable.

## COUNT VIII
### Embezzlement (Lin against Barlow and Livshits)

258.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

259.    As described above, Barlow and Livshits have dishonestly taken funds from the Sub-Account and from elsewhere, including without limitation the proceeds of the sale of lamb horns to PFX, Southeast Pet, Animal Supply, and other pet supply distributors, as to which Lin was the true owner of at least 50% as a 50% owner of the Lamb Horn Business.

260.    Without limitation, Barlow and Livshits have taken full control of the warehouse and storage containing the existing inventory of lamb horns and marrow bones with an estimated

value of in excess of $20,000,000, of which Lin is the true owner of at least 50% as a 50% owner of the Lamb Horn Business.

261.   Without limitation, Barlow and Livshits have sold all or some of the existing inventory of lamb horns of which Lin is the true owner of at least 50% as a 50% owner of the Lamb Horn Business, and have kept the proceeds of such sales for their own use.

262.   Barlow and Livshits have acted with the intent to deprive Lin of his rights to possess and use the inventory and proceeds thereof for Barlow's and Livshits's own use.

263.   As a direct and proximate result of Barlow's and Livshits's actions described above, Lin has suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business, 50% of all lamb horns, and marrow horns inventory existing or hereafter acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000, for which Barlow and Livshits are personally liable.

## COUNT IX
### Conversion (Lin and Encompass against Barlow, Fossa, Ltd., IcelandicPLUS LLC, and Livshits)

264.   Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

265.   By means of the actions described above, Barlow, Fossa, Ltd., IcelandicPLUS LLC, and Livshits have converted Lin's property, including funds and inventory, for their own use, intentionally and without Lin's consent.

266.   Without limitation, Barlow and Livshits have dishonestly taken funds from the Sub-Account and from elsewhere, including without limitation the proceeds of the sale of lamb horns to PFX, Southeast Pet, Animal Supply, and other pet supply distributors, as to which Lin was the true owner of at least 50% as a 50% owner of the Lamb Horn Business.

92

267.    Without limitation, Barlow and Livshits have taken full control of the warehouse containing the existing inventory of lamb horns and marrow bones with an estimated value of in excess of $20,000,000, of which Lin is the true owner of at least 50% as a 50% owner of the Lamb Horn Business.

268.    Without limitation, Barlow and Livshits have sold all or some of the existing inventory of lamb horns of which Lin is the true owner of at least 50% as a 50% owner of the Lamb Horn Business, and have kept the proceeds of such sales for their own use.

269.    Barlow and Livshits have acted with the intent to deprive Lin of his rights to possess and use the proceeds of sales of lamb horns, and the inventory and proceeds thereof for Barlow's and Livshits's own use.

270.    As a direct and proximate result of Barlow's and Livshits's actions described above, Lin has suffered damages in an amount to be determined at trial but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business, and 50% of all lamb horns and marrow horns inventory existing or hereafter acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000, for which Barlow and Livshits are personally liable.

## COUNT X
### Civil Conspiracy (Lin and Encompass against Barlow, Livshits, Gurvits, and BLG)

271.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

272.    Barlow, Livshits, Gurvits, and BLG have devised and engaged in a common design with each other and with other individuals and entities, including on information and belief Omar Mar Jonsson and others whose identities are known only to them at this time

(collectively, the "Co-Conspirators"), to deprive Lin of his rightful 50% ownership of the Lamb Horn Business, including the revenues therefrom and the inventory of lamb horns.

273.    Barlow, Livshits, Gurvits, and BLG have further devised and engaged in a common design with each other and with the other Co-Conspirators to deprive Lin of his rightful ownership share of any business involving the acquisition, processing, and sale of Icelandic fish skins.

274.    As described above, Barlow, Livshits, Gurvits, and BLG, as well as the other Co-Conspirators, have committed tortious and wrongful acts in furtherance of the common design of the Co-Conspirators to deprive Lin of his rightful share of any business involving the acquisition, processing, and sale of Icelandic fish skins.

275.    As a direct and proximate result of the actions of Barlow, Livshits, Gurvits, and BLG, as well as the other Co-Conspirators, Lin has been damages in an amount to be determined at trial, but to include, without limitation, 50% of all revenues received in connection with the Lamb Horn Business and 50% of all lamb horns, and marrow horns acquired and/or sold, as well as his rightful share of all fish skin or other fish-related products acquired and/or sold by the time judgment enters herein, and presently estimated to be in excess of $10,000,000.

## COUNT XI
### Accounting (Lin against All Counterclaim-Defendants)

276.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

277.    As described above, all Counterclaim-Defendants have committed fraud and/or have acted in concert to control and hide from Lin the nature and purpose of the various corporate entities and foreign and domestic bank accounts that they have collectively established in connection with the Lamb Horn Business, and to control and hide from Lin the proceeds of

sales of lamb horns, including without limitation revenues received from PFX, Souteast Pet, Animal Supply, Amazon.com, IcelandicPLUS.com, and other revenues received from the sale of lamb horns.

278.   Counterclaim-Defendants have concealed their wrongful acts from Lin.

279.   Lin is unable to ascertain the full extent of his damages without a full and complete accounting of the benefits that Counterclaim-Defendants have derived from their actions described above.

280.   Lin requires a full and complete accounting of Counterclaim-Defendants' assets and finances to determine their damages.

281.   Lin has no adequate remedy at law and is entitled to equitable relief in the form of a full and complete accounting by Counterclaim-Defendants.

## COUNT XII
### Civil RICO, 18 U.S.C. § 1962(c)
### (Lin and Encompass against Counterclaim-Defendants)

282.   Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully stated herein.

283.   Counterclaim-Defendants have acted in concert with each other and the other Co-Conspirators to violate 18 U.S.C. § 1962(c) through their actions described above, thereby directly and proximately damaging Lin and Encompass.

284.   Counterclaim-Defendants and the other Co-Conspirators have assisted, aided and abetted each other in the actions described above.

285.   The association of the Counterclaim-Defendants and the other Co-Conspirators constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  This enterprise was engaged in and affected interstate and foreign commerce.

286.     This enterprise was and is continuous, in that it has lasted for at least one year, has an ascertainable structure, and is distinct from the predicate offenses alleged herein.

287.     On information and belief, the role of Counterclaim-Defendants and each of the other Co-Conspirators is and was as follows:

a.   Barlow was the head of the Conspirators and is responsible for gaining access to Encompass's Sub-Account and Primary checking account records and using the Sub-Account to launder money from unknown sources for his own personal use and to hide funds, including proceeds from the Lamb Horn Business, from tax authorities and from his wife during his divorce proceedings.

b.   Barlow, Gurvits, BLG, and Livshits, were responsible for establishing various off-shore and domestic corporate entities and bank accounts with the intention of using those entities to obscure funds moving within and between those entities and to hide them from Lin and Encompass, tax authorities, and Barlow's wife during his divorce proceedings.

c.   Barlow is further responsible for directly or indirectly issuing threats to one or more persons in connection with his efforts to obtain lamb horns and fish skins without the participation and knowledge of Lin in order to benefit himself without sharing the proceeds thereof with Lin.

d.   Barlow is further responsible for directly or indirectly pursuing the Lamb Horn Business by acquiring or attempting to acquire additional lamb horns without the knowledge or participation of Lin and using means different from those established by Lin in establishing the Lamb Horn Business.

e.   Barlow is further responsible for misappropriating Lin's Lamb Horn and fish skin business ideas to benefit himself alone rather than Lin.

f.   Barlow was also responsible for obtaining access to Encompass's Sub-Account so that he could use it for his own personal purposes and to hide income from taxing authorities and from his wife during his divorce.

g.   Barlow was also responsible for directing Gurvits and BLG to prepare the Adhesion Contract, which Barlow forced Lin to sign by abusing his substantially stronger financial position and legal knowledge, and which forced Lin to agree to subordinate his right to receive the financial benefits of the Lamb Horn Business he had created so that Barlow could recover funds that by rights he could recover only from Murr, Ehf. pursuant to the Murr Consulting Agreement.  Barlow was also responsible for the Adhesion Contract's exclusion of Lin's right to receive any benefit for the original Lamb Horn Business idea and the services he provided to establish the Lamb Horn Business unless and until Barlow had received not only the money that he decided to invest in the Lamb Horn Business but also the funds that he legally could recover only from Murr, Ehf. pursuant to the Murr Consulting Agreement.

h.   Barlow, Gurvits, and BLG were responsible for drafting the Adhesion Contract, in violation of Barlow's fiduciary duties to Lin and to Fossa, Ltd. and IcelandicPLUS LLC, by forcing Lin, Fossa, Ltd. and IcelandicPLUS LLC to forego any income from the Lamb Horn Business until Barlow recovered

funds that by right he could only recover from Murr, Ehf. pursuant to the Murr Consulting Agreement.

i.   Gurvits and BLG were responsible for drafting the Adhesion Contract in violation of their ethical professional responsibilities and duties to Lin, Fossa, Ltd. and IcelandicPLUS LLC, all of which Gurvits and BLG legally represented in connection with the Lamb Horn Business.

j.   Livshits was responsible for assisting Barlow, Gurvits, and BLG in the foregoing activities, including without limitation by directly making deposits and withdrawals from the Sub-Account, including cash withdrawals that on information and belief were used in whole or in part for Barlow's own personal purposes.

k.   Livshits was also responsible for implementing burdensome requirements on Lin's efforts to obtain reimbursement for Lamb Horn Business expenses that he had paid using his own assets and credit cards and those of Encompass at Barlow's insistence subject to later reimbursement by Barlow according to procedures set up by Barlow and Livshits.

l.   Livshits was also responsible for obtaining Lin's personal information, including but not limited to his Social Security number and U.S. Passport number to enable her to open one or more bank accounts in Lin's name, but to which Lin was refused any information or access but to which Livshits and Barlow had access, including without limitation a bank account in Cyprus.

m.  Barlow and Livshits were also responsible for removing Lin's access to the bank account of Fossa Enterprises, Ehf. in Iceland and making that account accessible only by Barlow and Livshits.

n.  Livshits was also responsible for moving funds between the various corporate entities that made up the Lamb Horn Business at Barlow's direction and without the knowledge or consent of Lin, in order to further the purpose of the conspiracy and at Barlow's direction.

o.  Barlow, Gurvits, and BLG were responsible for directing PFX to deposit the funds from the PFX Sales Contract into BLG's IOLTA trust account to hide it from taxing authorities and from Barlow's wife during his divorce, and thereafter to transfer it into the Encompass Sub-Account whereupon Barlow and Livshits can and did withdraw those funds to be used for their own personal purposes.

p.  Gurvits and BLG were responsible for agreeing to receive the funds of the PFX Sales Contract and thereafter to deposit them in the Encompass Sub-Account so that Barlow and Livshits could access those funds directly without providing any portion thereof to Lin as 50% owner of the Lamb Horn Business.

q.  Barlow was responsible for attempting to lure the COO of PFX to become CEO of the Lamb Horn Business without the knowledge or consent of Lin by suggesting to the COO of PFX that Barlow would be able to provide him with an equity ownership interest in the Lamb Horn Business by forcing Lin to give up all or a portion of his ownership share.

r. Omar Mar Jonsson was the Icelandic manager of the Lamb Horn Business and has assisted Barlow in cutting Lin out of that business and in Barlow's efforts to obtain additional lamb horns without the knowledge and participation of Lin and to deprive Lin of the financial benefit thereof. Mr. Jonsson has also assisted Barlow in obtaining meetings with providers and processors of Icelandic fish skins and fish chips to misappropriate Lin's fish skin pet treat idea for Barlow's and Jonsson's personal benefit.

s. Livshits, Gurvits, BLG, and Jonsson were also responsible for hiding information from Lin and Encompass and for otherwise assisting Barlow in his design to deprive Lin of the financial benefit of the Lamb Horn Business and of Lin's ownership interest therein and the financial benefit of Lin's fish skin business idea.

288. Each of the Counterclaim-Defendants and the other Co-Conspirators are "persons" within the meaning of 18 U.S.C. § 1961(3), and each is separate from the enterprise described herein.

289. Each of the Counterclaim-Defendants and other Co-Conspirators had *scienter* of the nature and purpose of their activities and of the conspiracy as a whole.

290. Each of the Counterclaim-Defendants and other Co-Conspirators have participated in the conspiracy and have conspired with each other to participate in the affairs of the enterprise through a pattern of racketeering activity as set forth above and below, in violation of 18 U.S.C. § 1962(c):

<u>Wire Fraud (18 U.S.C. § 1343)</u>

291. The Counterclaim-Defendants and other Co-Conspirators devised a scheme to defraud Lin and Encompass and to obtain money and property by false pretenses, representations and promises, which they have transmitted or caused to be transmitted by means of wire communications in interstate and foreign commerce for the purpose of executing the scheme.

292. The Counterclaim-Defendants and other Co-Conspirators have engaged in predicate acts of wire fraud in violation of 18 U.S.C. § 1343 by sending emails, texts, engaging in telephone calls, sending wire transfers and other forms of financial transmissions over the wires in interstate and foreign commerce. These predicate acts include, but are not limited to, the following:

    a. Barlow directed Lin to set up the Sub-Account within Encompass's bank account at TD Bank as described above, purportedly for the purpose of making it easier to reimburse Lin for Lamb Horn Business expenses, but in reality for the purpose of enabling Barlow to make large deposits into the Sub-Account from unknown sources, including but not limited to ATM deposits, bank check deposits, cash deposits, and wire transfers, in furtherance of Barlow's desire to use those funds for his own purposes while avoiding scrutiny from taxation authorities and from his wife during the divorce.

    b. Barlow directed Gurvits and BLG to receive at least $420,000.00 from PFX into BLG's IOLTA trust account rather than into an account properly set up for the Lamb Horn Business, for the purpose of avoiding scrutiny from tax authorities, hiding the income from his wife during his divorce proceedings, and maintaining control over those funds and depriving Lin of his right to receive 50% of them as a 50% owner of the Lamb Horn Business.

c. Barlow directed Gurvits and BLG to wire transfer most of the proceeds of the PFX sale from BLG's IOLTA trust account to the Encompass Sub-Account by means of a series of wire transactions so that Barlow and Livshits could withdraw those funds from the Encompass Sub-Account for their own purposes while hiding them from tax authorities and from Barlow's wife during his divorce.

d. Barlow and Livshits deposited and withdrew funds from the Sub-Account, including but not limited to the PFX sales proceeds, by means of wire transfers, ATM transactions, and cash or Official Check transactions that were then transferred elsewhere by means of the interstate and foreign wires.

e. Barlow, Livshits, Gurvits, and BLG sent numerous emails and had various telephone calls that were designed to further the aims of the conspiracy, including those described above.

293. The Counterclaim-Defendants and each of the other Co-Conspirators knew, intended, and foresaw that the wire communications would be used in furtherance of the racketeering scheme and that those wire communications were essential to the furtherance of the scheme.

Monetary Transactions in Property Derived from Specified Unlawful Activity
18 U.S.C. § 1957

294. Counterclaim-Defendants and the other Co-Conspirators have knowingly engaged in monetary transactions involving property with a value in excess of $10,000, knowing that the property was derived through wire fraud in violation of 18 U.S.C. § 1343.

295. As described above and as further shown in the Sub-Account bank statements attached as **Exhibit 18** hereto, Counterclaim-Defendants engaged in hundreds if not thousands of

monetary transactions in violation of 18 U.S.C. § 1957, through the improper, unauthorized, and illegal use of the Sub-Account.

Money Laundering, 18 U.S.C. § 1956

296.   The Counterclaim-Defendants and other Co-Conspirators knew that the financial transactions in which they were engaging represented proceeds of unlawful activity and conducted such transactions with the intent of promoting wire fraud activities in violation of 18 U.S.C. § 1343 and knowing that the transactions were designed in whole or in part to conceal or disguise the nature, location, ownership, or control of the wire fraud in violation of 18 U.S.C § 1343.

297.   The Counterclaim-Defendants and other Co-Conspirators engaged in hundreds, if not thousands, of illegal monetary transactions in violation of 18 U.S.C. § 1956 as described below and as further shown in Sub-Account bank statements attached as **Exhibit 18** hereto.

Identity Fraud, 18 U.S.C. § 1028(a)(7)

298.   The Counterclaim-Defendants, including specifically but without limitation Barlow and Livshits, deliberately obtained Lin's Social Security number and U.S. Passport number for the purpose of setting up one or more foreign or domestic bank accounts in Lin's name while simultaneously refusing to provide him access to or information about those accounts or the transactions within them.  Specifically but without limitation, they obtained Lin's Social Security number and U.S. Passport number and other personal information and used them to open one or more bank accounts in Cyprus to which Lin was deprived of information and access.

299.   Lin's Social Security number and U.S. Passport number are each "means of identification" as defined in 18 U.S.C. § 1028(d)(7).

103

300.   Barlow and Livshits possessed, transferred, and used Lin's identification information with the intent to commit, or to aid or abet, or in connection with unlawful activity that constitutes a violation of Federal law or that constitutes a felony under state or local law, including but not limited to activity associated with the wire fraud, monetary transactions, and money laundering crimes discussed above.

### Theft of Trade Secrets, 18 U.S.C. § 1832

301.   The methods of acquiring and producing lamb horns for the Lamb Horn Business is a trade secret related to a product used in interstate or foreign commerce.

302.   Counterclaim-Defendants, and the other Co-Conspirators, intended to convert that trade secret to the economic benefit of them rather than to the owners of that trade secret, including Lin, Fossa, Ltd., and IcelandicPLUS LLC and knew that the offense would injure the owner thereof.

303.   Counterclaim-Defendants and the other Co-Conspirators without authorization appropriated and obtained the information by fraud, artifice, or deception.

304.   Counterclaim-Defendants and the other Co-Conspirators conspired with each other to commit the act of appropriating the information and each committed acts in furtherance of the conspiracy.

### Pattern of Racketeering Activity

305.   The above described actions had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinct characteristics rather than being isolated events.  The pattern of racketeering activity engaged in by Counterclaim-Defendants and the other Co-Conspirators as described above constituted a scheme executed over a period of time from 2014 through the present and continuing hereafter.

306.    Counterclaim-Defendants and the other Co-Conspirators individually participated in the scheme.

307.    Each of Counterclaim-Defendants' and the other Co-Conspirator's roles in the scheme was essential to the racketeering scheme as a whole.

308.    The full extent of the scheme and of the role played by each of Counterclaim-Defendants and the other Co-Conspirators is presently unknown and evidence thereof is presently within their exclusive possession and knowledge.

309.    As a direct and proximate result of Counterclaim-Defendants' and the other Co-Conspirators' violation of 18 U.S.C. § 1962(c), Lin and Encompass have been injured in their business and property in an amount to be determined at trial.

310.    Lin and Encompass are entitled to recover treble damages, plus interests, costs, and attorney fees as a consequence of the violations of 18 U.S.C. § 1962(c).

## COUNT XIII
### RICO Conspiracy, 18 U.S.C. § 1962(d)
### Lin and Encompass against Barlow, Gurvits, BLG, and Livshits

311.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully-stated herein.

312.    Counterclaim-Defendants Barow, Gurvits, BLG, and Livshits, and the other Co-Conspirators conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1963(d), by knowingly agreeing to and conspiring to conduct or participate, directly or indirectly, in the affairs of the enterprise through the pattern of racketeering activity described above.  The volume and frequency of the transactions described above and the continuance of the scheme could not have occurred for more than two years and on a continuing basis without the consent and

knowing participation of Counterclaim-Defendants Barlow, Gurvits, BLG, and Livshits and the other Co-Conspirators.

313.    Counterclaim-Defendants Barlow, Gurvits, BLG, and Livshits and the other Co-Conspirators agreed to and conspired with each other in the commission of the predicate acts described above, knowing them to be in furtherance of a pattern of racketeering activity.

314.    As part of and in furtherance of the conspiracy, each of Counterclaim-Defendants Barlow, Gurvits, BLG and Livshits agreed to and committed at least two predicate acts of racketeering, as described above.

315.    None of the Counterclaim-Defendants or other Co-Conspirators has withdrawn or otherwise disassociated themselves from the conspiracy.

316.    As a direct and proximate result of the violation of 18 U.S.C. § 1962(d), Lin and Encompass have been injured in their business and property in an amount to be determined at trial.

317.    Lin and Encompass are entitled to treble damages plus interest, costs, and attorney fees for the violations of 18 U.S.C. § 1962(d).

### COUNT XIV
Abuse of Process (Lin and Encompass against Barlow, Gurvits, and BLG)

318.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if fully-stated herein.

319.    Barlow, Gurvits, and BLG used process in this matter for an ulterior purpose of forcing Lin out of the Lamb Horn Business and obtaining Lin's ownership interest in it, resulting in damages to Lin and Encompass.  These damages include among other things their attorney fees and costs in this litigation, as well as the losses associated with being cut out of the Lamb Horn Business since this lawsuit was filed.

320.     Barlow, Gurvits, and BLG knew, or should have known, that the factual basis for their claims was frivolous from the outset.  Specifically, but without limitation, each of them had actual knowledge that the bank statements upon which all of their claims purport to be based were not the Sub-Account into which any funds were deposited by Barlow, Gurvits, or BLG, but rather were Encompass' Primary checking account, to which none of Barlow, Gurvits, or BLG had any legal access.  On information and belief, Barlow, Gurvits, and BLG obtained the partial copies of Encompass's Primary checking account statement illegally, on information and belief including by opening mail that was addressed to Encompass and/or Lin and that was located at the warehouse containing the lamb horn inventory, where Lin spent many days working to clean, pack, and ship lamb horns.

321.     Although redacted in the form attached as Exhibits to the Complaint, Barlow, Gurvits, and BLG could clearly see the account numbers for the Encompass Primary checking account.

322.     Through their extensive numbers of direct deposits and withdrawals from the Sub-Account, and their possession of deposit and withdrawal slips for the Sub-Account, Barlow, Gurvits and BLG were intimately familiar with the account number for the Sub-Account.

323.     Moreover, a cursory review of the partial bank statements of the Primary checking account attached as Exhibits to the Complaint – even without the account numbers having been redacted – clearly and unambiguously shows that the Exhibits to the Complaint are not statements from the Sub-Account.  Purely by way of example, each of the debit card transactions shown on the partial bank statements from the Primary checking account that are attached as Exhibits to the Complaint show the debit card number associated with each of the debit card transactions.  Yet, none of the debit card numbers matches the debit card (or any of the

107

replacement debit cards) that Barlow was given and that he used over time.  Therefore, Barlow, Gurvits, and BLG knew, or should have known, that none of the transactions were from the Sub-Account.

324.    Moreover, Barlow used his debit card connected to the Sub-Account on a near-daily basis, yet not a single one of his transactions appears on the partial bank account statements for Encompass's Primary Checking account attached as Exhibits to the Complaint.

325.    Similarly, none of the ATM deposits, large cash withdrawals, wire transfer deposits and withdrawals, or the series of wire transfers from BLG's IOLTA trust account to the Sub-Account appears on the partial bank account statements for Encompass's Primary checking account.

326.    Therefore, Barlow, Gurvits, and BLG knew or should have known that the partial bank account statements that they illegally obtained were not the Sub-Account statements and had no factual or legal relevance to any claim asserted in the Complaint.

327.    The same is true with respect to the allegations concerning the American Express charges shown on Exhibit 1 to the Complaint, which Plaintiffs indicate were "loans" to Lin and Encompass in connection with Murr, when Barlow knew that very substantial portions of those deposits were used by Barlow for his own personal expenses.

328.    Moreover, Gurvits and BLG in particular had a duty under Rule 11 to do a reasonable investigation prior to filing the Complaint in this action.  It is obvious from the fact that they made a series of highly offensive and inflammatory allegations and legal claims based on alleged facts that they knew or should have known and easily could have determined to be false, that they conducted little if any factual investigation before filing the Complaint.

329.     Barlow, Gurvits, and BLG therefore unquestionably knew or certainly should have known that the factual allegations about the partial bank statements attached as Exhibits to the Complaint were both false and irrelevant to the allegations of the Complaint and to the legal claims asserted therein.

330.     Generally and without limitation, Barlow, Gurvits, and BLG knew or should have known that how and when Lin and Encompass spent money within the Primary checking account was irrelevant to the question of how they used the money that was initially spent by them in furtherance of the Lamb Horn Business and then was reimbursed by transfers from the Sub-Account after approval by Barlow and/or Livshits.

331.     Generally and without limitation, Barlow, Gurvits, and BLG knew or should have known that the fact that there were non-Lamb Horn related expenditures disclosed on the Primary checking account statements to which they illegally gained access provided absolutely no legal or factual basis for concluding that Lin or Encompass had committed any of the claims asserted against them.  Specifically but without limitation, the fact that certain debit charges were made in Iceland while during the same time other debit charges were made within the United States has no relevance whatsoever to the scurrilous allegations of the Complaint because Barlow, Gurvits, and BLG knew that Barlow had insisted that Lin first spend his own or Encompass's funds or use his personal or Encompass's debit/credit card subject to later approved reimbursements from the Sub-Account

332.     The fact that Barlow, Gurvits, and BLG rushed to file their Complaint (and to withdraw as counsel from Gurvits's and BLG's prior representation of Pollet in the *McGillian* matter) on the eve of a potentially major deal involving the sale of lamb horns to Animal Supply and further anticipated sales to PFX and to Southeast, and after Barlow offered Lin's ownership

share to the COO of PFX and failed to obtain Lin's ownership share through an equity-backed

"loan" to assist Lin in his financial difficulties emphasizes the abusive nature of this litigation.

## COUNT XV
### Copyright Injunction 17 U.S.C. § 502
### (Lin and Encompass against Barlow, Fossa, Ltd. and IcelandicPLUS LLC)

333.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if

fully-stated herein.

334.    Lin and Encompass created all of the promotional, marketing, sales, and highly

innovative packaging materials for the Lamb Horn Business (collectively, the "Copyrighted

Materials").  As such, Lin and Encompass own all copyright in the Copyrighted Materials.

335.    Barlow, Fossa, Ltd., and IcelandicPLUS LLC have been and are continuing to use

the Copyrighted Materials in connection with the sale of lamb horns.

336.    Lin has never been compensated in any way for the use of the Copyrighted

Materials by Barlow, Fossa, Ltd. and IcelandicPLUS LLC.

337.    Barlow, Fossa, Ltd. and IcelandicPLUS LLC have been and continue to infringe

Lin's and Encompass's copyright in the Copyrighted Materials.

338.    Lin and Encompass are entitled to a preliminary and permanent injunction on

such terms at the Court may deem appropriate to prevent or restrain the infringement of Lin's

and Encompass's copyrights in the Copyrighted Materials.

## COUNT XVI
### Declaratory Judgment, 28 U.S.C. § 2201

339.    Counterclaim-Plaintiffs incorporate by reference the preceding paragraphs as if

fully-stated herein.

340.    There is an actual controversy within this Court's jurisdiction with respect to the ownership of Fossa, Ltd., IcelandicPLUS LLC, and the Lamb Horn Business generally, as between Barlow and Lin.

341.    Lin is entitled to a declaratory judgment that he is a 50% owner of Fossa, Ltd., IcelandicPLUS LLC and any other corporate entity established in connection with the Lamb Horn Business, including without limitation Fossa Enterprises, Ehf. and IcelandicPlus, Ehf. and that he is entitled to no less than 50% of the revenues therefrom.

### REQUESTED RELIEF

WHEREFORE, Defendants and Counterclaim-Plaintiffs request the Court to make the following award:

A.  Enter judgment for Defendants on all Counts of the Complaint;

B.  Enter judgment for Counterclaim-Plaintiffs on all Counts of the Counterclaims;

C.  Award Counterclaim-Plaintiffs their damages and losses as determined at trial, including without limitation, actual damages, consequential damages, and punitive damages;

D.  Award Counterclaim-Plaintiffs treble damages, or at least double damages on all Counts eligible, including without limitation M.G.L. c. 93A, § 11 and M.G.L. c. 93, § 42.

E.  Order Counterclaim-Defendants Fossa, Ltd., and IcelandicPLUS LLC to provide a full accounting of their assets and finances from the date of their incorporation to the present;

F.  Order Counterclaim-Defendants Barlow and Livshits to provide a full accounting of all assets and finances relating in any way to the Lamb Horn Business or from any business related to Icelandic fish skins from January 1, 2014 to the present;

G.  Order Gurvits and BLG to provide a full and complete accounting of all revenues received in connection with the Lamb Horn Business, including without limitation any funds received from PFX, Southeast Pet Supply, Animal Supply Co., Amazon.com, Icelandicplus.com, or any other distributor or retailer of lamb horns or marrow bones;

H.  Order all Counterclaim-Defendants to provide a complete accounting of any and all foreign or domestic bank accounts associated with the Lamb Horn Business or with any corporate entity associated with the Lamb Horn Business, including without limitation any bank account that they have opened with the use of any of Lin's or Encompass's personal information including Social Security number and/or U.S. Passport number and/or name.

I.  Order Barlow and Livshits to provide a complete accounting of the source of all deposits into the Sub-Account and the recipients of all funds withdrawn from the Sub-Account;

J.  Award Counterclaim-Plaintiffs compensatory damages, treble damages, attorney fees, and costs, pursuant to 18 U.S.C. § 1962;

K.  Order that all damages, attorney fees and costs be awarded jointly and severally against all Defendants;

L.  Enter a preliminary and permanent injunction barring any of Counterclaim-Defendants from using any of the marketing, sales, promotional, or packaging designed by Lin and Encompass or any reasonable facsimile thereof;

M.  Enter a Declaratory Judgment confirming Lin's 50% ownership share of the Lamb Horn Business, including without limitation Fossa, Ltd., IcelandicPLUS LLC, Fossa Enterprises, Ehf., and IcelandicPLUS, Ehf, and all assets of and revenues ever received by either of them, and order the distribution to Lin of 50% of the revenues received and 50% of all inventory to Lin;

N.  Grant such other and further relief as the Court deems just.

## JURY DEMAND

Defendants and Counterclaim-Plaintiffs demand a jury trial of all issues so triable.

Dated: November 28, 2016

Respectfully submitted,

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO#649304)
Matorin Law Office, LLC
18 Grove Street, Suite 5
Wellesley, MA 02482
T: (781) 453-0100
F: (888) 628-6746
E: mmatorin@matorinlaw.com

*Counsel for Defendants and Counterclaim-Plaintiffs I Jian Lin and Encompass Communications, Inc.*

## <u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 28, 2016, as shown below:

Thomas M. Ciampa
Ciampa Fray-Witzer, LLP
20 Park Plaza, Suite 505
Boston, MA 02116


<u>/s/ Mitchell J. Matorin</u>