IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FOSSA LTD., ICELANDICPLUS LLC and STEVEN BARLOW,<br>　　　　　　Plaintiffs,<br>v.<br><br>I JIAN LIN and<br>ENCOMPASS COMMUNICATIONS, INC.,<br>　　　　　　Defendants,<br><hr>I JIAN LIN and<br>ENCOMPASS COMMUNICATIONS, INC.<br>　　　　　Counterclaim-Plaintiffs,<br>v.<br><br>FOSSA LTD., ICELANDICPLUS LLC, STEVEN BARLOW,<br>　　　　　Counterclaim-Defendants,<br>and<br><br>VALENTIN DAVID GURVITZ, ESQ.,<br>BOSTON LAW GROUP, P.C., and SONYA LIVSHITS<br>　　　　Additional Counterclaim-Defendants. | Case No. **1:16-cv-11914**<br><br>**LIN AND ENCOMPASS COMMUNICATIONS, INC.'S COMBINED OPPOSITION TO:**<br><br>(A)  **CONSOLIDATED MOTION TO DISMISS COUNTERCLAIMS AGAINST FOSSA LTD., ICELANDICPLUS, LLC, STEVEN BARLOW, AND SONYA LIVSHITS PURSUANT TO (1) M.G.L. c. 231, § 59h; (2) FED. R. CIV. P. 8(a); and (3) FED. R. CIV. P. 12(b)(6);**<br><br>(B) **VALENTIN GURVITS AND BOSTON LAW GROUP'S CONSOLIDATED MOTION TO DISMISS PURSUANT TO (1) M.G.L. c. 231, § 59H; (2) Fed. R. Civ. P. 8(a) and FED. R. CIV. P. 12(b)(6)**<br><br>**Leave to File Granted: March 8, 2017** |

Counterclaim-Plaintiffs I Jian Lin ("Lin") and Encompass Communications, Inc.

("Encompass") respectfully oppose the Motions to Dismiss filed by Counterclaim-Defendants

Fossa, Ltd., IcelandicPLUS LLC, Steven Barlow, and Sonya Livshits (collectively, the "Barlow

Defendants")[1] and by Counterclaim-Defendants Valentin Gurvits, Esq. and Boston Law Group,

---

[1] The deadline for the Barlow Defendants to answer or otherwise respond to the Counterclaims was February 1, 2017 at 6:00 p.m.  However, the Barlow Defendants did not file their motion until approximately 7:00 a.m. on February 2, 2017, 13 hours after the deadline. *See* Dkt. Nos. 29 and 30.  The Barlow Defendants did not seek a further extension from Lin and Encompass and did not move for an extension or seek leave to file an untimely brief.  The Barlow Defendants' motion should, therefore, be denied in its entirety.

1

P.C. (collectively, the "BLG Defendants").[2]  Because the two separate motions overlap and separate opposition briefs would entail significant duplication, Lin and Encompass are submitting a combined brief in opposition to both Motions to Dismiss.

## **INTRODUCTION**

The Counterclaims allege a deliberate and coordinated effort by the Counterclaim-Defendants to use their overwhelming financial and legal resources and control over all information to deprive Lin of the benefit of his original business idea and the substantial intellectual and physical work that he devoted to it, culminating in the abusive filing of a meritless Complaint to coerce Lin into giving up his rights.

To avoid having to answer the extensive factual allegations, the Counterclaim-Defendants move to dismiss every one of the Counterclaims.  The Court should deny the motions.  The Counterclaims are based on extensive, specific, and documented allegations that more than suffice to state valid claims against the Counterclaim-Defendants.

## **FACTS**

I Jian Lin is a creative branding and marketing professional with substantial experience creating successful branding and marketing programs for a variety of products and clients both in the U.S. and abroad.  He offers his services through his solely-owned company, Encompass Communications, Inc.  Beginning in 2008 and continuing thereafter, Lin and Encompass provided services to the government agencies of Iceland, various Icelandic Economic Development Agencies, and Icelandic businesses to develop new domestic and foreign market opportunities, particularly in the farming and meat production industries.  While working in

---

[2] We refer to the two motions as the "Barlow Defendants' Motion" and the "BLG Defendants' Motion."

Iceland, Lin developed a network of personal relationships and gained a deep understanding of the farming and meat production industries.  (Counterclaims ¶¶ 11-13.)

In March 2013, Lin encountered Steven Barlow in a café in Newton.  Lin had previously worked with Barlow, and Lin discussed with Barlow an Icelandic client that he was working for, Murr, ehf., which was trying to expand its pet food market to the U.S. and Canada but needed capital.  Barlow agreed to provide some funding for Murr, and entered into a consulting agreement directly with Murr, to which Lin was not a party.  Unfortunately, Murr ended up filing for bankruptcy, and the products that it had already shipped to the U.S. spoiled and largely had to be disposed of.  (Counterclaims ¶¶16-25.)

During the period Lin was working in Iceland, he observed that Icelandic sheep were different from sheep almost anywhere else because they have been isolated for thousands of years and because the lambs grow horns, which have been bred out of sheep in other parts of the world.  Lin noticed that Icelandic slaughterhouses responsible for the annual lamb slaughters discarded the horns as bio-waste.  Lin had the idea of taking the discarded horns, processing them, and importing them into the U.S. as pet treats.  (Counterclaims ¶¶26-28.)

After the Murr bankruptcy, Lin shared his idea for a lamb horn processing and importation business with Barlow, and convinced him to visit Iceland with Lin and his girlfriend. Barlow agreed to provide initial financing to evaluate the business, and quickly realized that Lin's idea had the potential to be very lucrative.  Lin and Barlow agreed that Barlow would provide financing for the business in exchange for 50% equity interest in the business, while Lin would own the other 50% equity interest and would contribute his idea, work, and sales and marketing expertise.  Lin and Barlow agreed that they would equally share the revenues from the business.  Barlow soon increased his investment substantially in order to lock up two years'

worth of lamb horn production in Iceland to prevent any competition.  As a result, Lin began

devoting nearly all of his time to his lamb horn business idea, developing the processes necessary

to collect, store, clean, process, sterilize, and finally to import the lamb horns into the U.S. for

sale.  (Counterclaims ¶¶29-39, 52.)

      When Barlow initially agreed to provide financial backing in connection with Murr, he

did so by having Lin charge his credit card and deposit the funds into Encompass's Primary

checking account.  Barlow would have Lin charge more than necessary and return large portions

of the amounts charged back to Barlow as cash for Barlow's personal use.  In August 2013,

Barlow asked Lin to open a new sub-account within Encompass's bank account (the Sub-

Account), so that rather than using his credit card, Barlow could transfer money directly into that

account to reimburse Lin for business expenses, which Barlow insisted first be paid out of Lin's

own funds subject to reimbursement.  Also at Barlow's request, Lin provided a debit card that

Barlow could use to withdraw funds directly from the Sub-Account.  Barlow began transferring

large sums of money into the Sub-Account through wire transfers and bank checks in amounts

significantly more than needed to reimburse Lin.  Barlow effectively turned Encompass's Sub-

Account into a personal slush fund to finance Barlow's own personal expenses and lifestyle.

(Counterclaims ¶¶107-112.)

      During 2014 and 2015, Lin devoted substantially all of his time to the mechanics of the

lamb horn business, while Barlow took care of the business aspects.  Barlow had an attorney,

Valentin Gurvits of Boston Law Group, P.C., who began providing legal advice to Barlow and to

Lin in connection with the selection of corporate locations and structures, and assisting Barlow

and Lin with setting up corporations in Iceland, Anguilla, and Delaware.  During this period, Lin

and Barlow held numerous meetings with Gurvits and BLG, but Lin entrusted Barlow and BLG

with the corporate issues.  Lin understood that Gurvits and BLG were the attorneys for the Lamb Horn Business, including the various corporate entities, and for Barlow and Lin in the capacities as co-owners of the Lamb Horn Business. (Counterclaims ¶¶ 69-73; Lin Aff. ¶23.)

In or about July 2015, Barlow unilaterally hired Sony Livshits, with whom he had a prior relationship, to provide accounting services to the corporate entities that Barlow and Gurvits had established.  Livshits immediately demanded full access to the Encompass Sub-Account. (Counterclaims ¶¶74-76.) Livshits also demanded that Lin provide his Social Security and U.S. Passport numbers to open one or more bank accounts in the U.S. and abroad, while refusing to provide any information about the business finances or the bank accounts to Lin.  (Counterclaims ¶102.)  In addition to Barlow, Livshits would make large deposits and withdrawals in and out of the Sub-Account without Lin's knowledge or involvement.  (Counterclaims ¶115-116.)

In April 2015, Lin's years of hard work were about to pay off with the negotiation of the first major sale of the lamb horns to Pet Food Experts ("PFX").  The total value of the sale was to be in excess of $3,000,000, with an initial payment of $420,000.  Gurvits and BLG prepared the sales contract, which provided that the initial $420,000 would be paid in June 2015.  But rather than providing that the money would be deposited into the Sub-Account, where it could fund additional business expenses, the PFX sales contract provided for PFX to wire the $420,000 into BLG's IOLTA account.  (Counterclaims ¶¶53, 124-125.)

At this time, with the first major sale coming up, Barlow had Gurvits and BLG prepare an agreement between the corporate entities, Barlow, and Lin, that substantially changed the terms on which Lin and Barlow had agreed to operate.  Rather than both Barlow and Lin benefitting equally from their joint ownership of the Lamb Horn Business, this agreement (the "Adhesion Contract") provided that Barlow would recover all of the money he had invested, before Lin

would be permitted to receive any financial benefit from the business he had created. (Counterclaims ¶¶53-63.)  The Adhesion Contract effectively gave Barlow complete control over when, if ever, Lin would ever see any financial benefit from the business, by providing Barlow with a way to keep putting money into the business and reaping the rewards of the sales, without Lin receiving anything at all.  And in fact, Lin has never received any financial benefit from the business, while Barlow has received all of the benefits.

Gurvits and BLG prepared the Adhesion Contract and presented it to Lin for signature in violation of their obligations to the Lamb Horn Business entities and to Lin, for which they were legal counsel.  (Counterclaims ¶ 64.)  In preparing the Adhesion Contract, Gurvits and BLG acted against the interests of the Lamb Horn Business and Lin and exclusively promoted the interests of Barlow over the corporate entities and Lin.  (Counterclaims ¶ 64.)

In June 2015, PFX wired the initial $420,000 into BLG's IOLTA account.  Without Lin's knowledge, Gurvits and BLG moved the money from the IOLTA account into the Sub-Account in a series of 19 rapid wire transfers between June 13 and July 8, 2016.  Gurvits and BLG moved a total of $383,908.60 from the IOLTA account in large round sums ranging from $6,000 to $100,000.  (Counterclaims ¶127.) Around the same time, Livshits began transferring large sums out of the Sub-Account through wire transfers and bank checks.  Lin was never told where that money went.

Since the beginning of his venture with Barlow, Lin has still received absolutely no financial benefit.  Instead, Barlow and Livshits have taken over the entire Lamb Horn Business and have refused to provide any information to Lin about the corporate finances, lamb horn sales, or any other aspect of the business.

Beginning around July 2015, Gurvits and BLG began representing Lin's girlfriend in an unrelated litigation.  However, shortly after filing this lawsuit, Gurvits suddenly informed Lin's girlfriend that he and BLG would be withdrawing as counsel for her because of "conflicts of interest" that had arisen.  As it turned out, Gurvits and BLG's sudden withdrawal came on the eve of the final pre-trial conference in that matter.  When Lin's girlfriend objected to the withdrawal and asked what the "conflicts" were, Gurvits explained that the conflict was created by his decision to represent the Plaintiffs in this litigation against Lin.  (Counterclaims ¶ 162.) Lin alleges that this conduct by Gurvits and BLG violated the Rules of Professional Responsibility and was designed by Gurvits and Barlow to put pressure on Lin so that Barlow could take the entire Lamb Horn Business from him.  Judge Krupp of the Massachusetts Superior Court also took issue with Gurvits' and BLG's sudden withdrawal, which he said smacked of "client shopping," and indicated that he was going to make a report to the Board of Bar Overseers.  (Counterclaims ¶165.)

Since filing this lawsuit, Barlow and Livshits have completely cut Lin out of the Lamb Horn Business.  In addition, Barlow has continued to put money into the business rather than using its revenues to fund operations, so that Barlow can take all of the revenues for himself rather than providing Lin with his rightful share as a 50% co-owner of the business.  Despite numerous requests, Barlow and Livshits have refused to provide any information to Lin about the finances or about sales of lamb horns.

## ARGUMENT

### I.  The Court Should Deny Defendants' Anti-SLAPP Motion to Dismiss

#### A.  §59H Does Not Apply in Federal Court

Counterclaim-Defendants assert that "the First Circuit and this Court" have held "unequivocally that state anti-SLAPP statutes are applicable in cases brought in the federal court

pursuant to diversity jurisdiction." *See* BLG Memorandum at 8.[3]  Putting aside that this is not a diversity case (Notice of Removal, Dkt. No. 1 at 2), this is a misleading overstatement. The First Circuit in *Godin v. Schencks* held only that the *Maine* anti-SLAPP statute applied in federal diversity cases—it therefore did not "unequivocally reverse" the well-established rule that §59H (or any other state's statute) is procedural and inapplicable in federal court.  629 F.3d 79, 92 (1st Cir. 2010).  This Court's jurisprudence as to the impact of *Godin* on §59H is mixed,[4] and given that *Godin* addressed only the Maine statute and the Massachusetts SJC has repeatedly held that §59H created a "*procedural* mechanism," there is no reason for this Court to hold to the contrary. *See Wenger v. Aceto*, 883 N.E.2d 262, 266 (2008), and cases cited.

### B. The Abuse of Process Counterclaim is Not "Solely Based" on Petitioning Activity

Counterclaim-Defendants acknowledge they bear the initial threshold burden to show that the abuse of process counterclaim is "based on the petitioning activities *alone* and ha[s] *no substantial basis other than or in addition to*" those activities.  *Duracraft Corp. v. Holmes Prod. Corp.*, 427 Mass. 156, 167-68, 691 N.E.2d 935, 943 (1998) (emphasis added).  But they make no serious effort to reach the threshold.  Instead they baldly assert that "the Counterclaims do not attempt to disguise the fact that the Abuse of Process Claim is based solely on the protected petitioning activity of filing the underlying complaint."  (BLG Memo. at 10.)  This is almost farcically untrue.

---

[3] The Barlow Defendants incorporate by reference the legal arguments in the BLG Memorandum.  *See* Barlow Memorandum at 7.

[4] *Compare, e.g., Sullivan v. Flaherty*, No. 14-CV-14299-ADB, 2015 WL 1431151, at *5 (D. Mass. Mar. 27, 2015) (declining to reach the issue "given the legal uncertainty"), *with Steinmetz v. Coyle & Caron, Inc.*, No. 15-CV-13594-DJC, 2016 WL 4074135, at *3 (D. Mass. July 29, 2016) (extending *Godin* to §59H in diversity case), *appeal filed*, No. 16-1996 (1st Cir. Aug. 3, 2016), *and Bargantine v. Mechanics Co-op. Bank, No*. CIV.A. 13-11132-NMG, 2013 WL 6211845, at *3 (D. Mass. Nov. 26, 2013) (same) (unpublished opinion).

As extensively detailed in the Counterclaims, the filing of the Complaint is only one in a long series of abusive behaviors by both the Barlow Defendants and the BLG Defendants designed to impose severe financial and emotional pressure on Lin.  This abusive behavior includes the filing of the Complaint, but the abuse of process claim clearly has "substantial" bases "other than or in addition to" the filing, both prior to the Complaint and continuing to this day.

The SJC made clear in *Duracraft* that "'based on' does not mean 'in response to': although claims and related pleadings filed in court may be classified as petitioning activities, plaintiffs are not thereby immunized from counterclaims filed in response to the claim."  427 Mass. 156, 691 N.E.2d at 944, n.20.  Moreover, Massachusetts courts have made clear that §59H does not eliminate the tort of abuse of process.  *Keystone Freight Corp. v. Bartlett Consol., Inc.*, 77 Mass App. Ct. 304, 310, 930 N.E.2d 744, 749 (Mass. App. Ct. 2010) ("We must interpret and apply the anti-SLAPP statute and our case law in such a way as to continue to permit, where appropriate and consistent with the intent of §59H, claims of abuse of process as delineated by the Massachusetts common law."); *Benoit v. Frederickson*, 454 Mass. 148, 156-57, 908 N.E.2d 714 (2009)(Cordy, J., concurring)(interpreting §59H to abolish malicious prosecution or abuse of process "would … be constitutionally suspect.").[5]  This is particularly true where the process is not the sole conduct complained of, and where initiating process itself is "so coercive and

---

[5] *See also Matter of the Discipline of an Attorney*, 442 Mass. 660, 673, 815 N.E.2d 1072 (2004) ("[w]e recognize that, because the Massachusetts anti-SLAPP statute 'makes no provision for a plaintiff to show that its own claims are not frivolous,' ... the statute could be misused to allow motions for expedited dismissal of nonfrivolous claims in contravention of the Legislature's intent. To address this concern, we adopted a construction of the statute that would prevent dismissal of suits raising 'meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated' ").

promoting of ulterior advantage that it supports an abuse of process claim." *Adams v. Whitman*, 62 Mass. App. 850, 822 N.E.2d 727, 732-33 (2005).  As the *Adams* court stated:

> We read *Fabre v. Walton* [436 Mass. 517 (2002)], then, as a case where the court's focus on whether the plaintiff complained of any conduct other than the defendant's request for a protective order was a justifiable means of illustrating that the sole basis of the suit was the defendant's petitioning activity.  Placed in the continuum of cases outlined above, the circumstances in *Fabre* were not such that the initiation of process alone could support an abuse of process claim.  The Court thus noted that there was no other conduct complained of, in order to rule out the possibility that there was some nonpetitioning basis for the claim.

*Id.*  Similarly, the Appeals Court recently held that §59H did not preclude an abuse of process counterclaim where it was also based on prior "conduct separate and independent from the petitioning activity, in order to "preserve the right to bring claims for malicious prosecution and abuse of conduct." *Allied Waste Servs. of Mass., LLC v. Imperial Distrib., Inc.*, 90 Mass. App. Ct. 1105, 59 N.E.2d 455 at *2 and n.4 (2016)(Table).

Because the abuse of process counterclaim is decidedly *not* based exclusively on the simple issuance of process but instead relies on a detailed history of abusive conduct leading up to the abusive lawsuit and continuing thereafter to this day, Counterclaim-Defendants have not reached their threshold burden. *See Keystone Freight*, 77 Mass. App. Ct. at 314, 930 N.E.2d at 751 (threshold not met where independent conduct evidences ulterior motive for complaint).

### C. The Complaint Lacks Reasonable Factual Support or Arguable Basis in Law

Assuming *arguendo* that §59H applies and that Counterclaim-Defendants met their initial burden, Lin and Encompass have satisfied their burden of showing that the Complaint lacked reasonable factual support or arguable basis in law.

> i.  <u>To Avoid Violating the Seventh Amendment Right to a Jury Trial, the Court Must Require Only *Prima Facie* Evidence that the Complaint Lacks Any Reasonable Factual Support or Arguable Basis in Law, and Must Disregard the Affidavits in Support of the §59H Motion to Dismiss</u>

10

If Counterclaim-Defendants had met the threshold, the burden in state court would shift to Lin and Encompass to show by a "preponderance of the evidence" that the Complaint lacked any "reasonable factual support or arguable basis in law." *Fustolo v. Hollander*, 455 Mass. 861, 865, 920 N.E.2d 837, 840 (2010).[6]  However, in federal court, application of this standard violates the Seventh Amendment right to a jury trial.

Although some cases in this Court have extended *Godin* to apply to §59H, they did not address the constitutionality under the Seventh Amendment of imposing the "preponderance of the evidence" standard on non-movants.[7]  The First Circuit in *Godin* adverted to the problem: "[t]here may be a concern that [Maine's statute], to the extent it might be read to allow, contrary to [Fed. R. Civ. P. 56] a judge to resolve a disputed material issue of fact, it would then preclude a party from exercising its Seventh Amendment rights to a trial by jury." *Godin*, 629 F.3d at 90. *Godin* noted, however, that the Maine statute was still "relatively young" and there was no reason to think that Maine courts would apply it in an unconstitutional way. *Id.*

Two years later, the Maine SJC revisited the standard under the Maine statute. *Nader v. Maine Democratic Party*, 41 A.3d 551 (2012).  The court reversed the prior rule that the evidence must be construed "in the light most favorable to the moving party because the responding party bears the burden of proof when the statute applies."  The court held that this

---

[6] Though they initially recite the "preponderance" standard, Counterclaim-Defendants conclude by arguing that Lin and Encompass have not met their burden of proof "beyond a reasonable doubt." (BLG Memo. at 11.)  We assume this was a mistake.

[7] *Bargantine* addressed whether the second prong of the §59H analysis unconstitutionally infringed on the non-movant's own right to petition, but did not address the Seventh Amendment.  2013 WL 6211845, at *4-5.  In that context, the Court stated that there was no "constitutionally significant difference" between the Maine prima facie and the §59H preponderance of the evidence standards and that §59H did not violate the non-movant's petitioning rights.  However, not only was this statement made in evaluating the impact on the right to petition rather than the right to a jury trial, it was also *dictum*, because the Court noted that "plaintiff does not challenge the standard actually used in Massachusetts courts." *Id.* at *5.

standard infringed on the non-movant's constitutional petitioning rights and that since the statute

did not mandate that result, it must be construed "consistent with usual motion-to-dismiss

practice," to permit courts to infer the truth of the allegations in the complaint and any affidavits

presented in opposition to a special motion to dismiss, and to require the non-moving party to

show only "prima facie evidence" that the moving party's petitioning activity was devoid of any

factual basis or arguable basis in law.[8]

In *Hi-Tech Pharmaceuticals, Inc. v. Cohen*, 2016 WL 5334651 (D. Mass. Sept. 22,

2016), Judge Young noted that the First Circuit has not ruled on §59H's constitutionality

"whether on its face or as construed by the" SJC, but referred to *Godin*'s comments regarding the

constitutional issues under the Maine statute, pre-*Nader*. *Id.* at *3. Judge Young then directly

addressed the conflict between the "preponderance of the evidence" standard and the Seventh

Amendment jury trial right:

> Were this Court to require Hi-Tech to make more than a prima facie showing that
> [the] petitioning activities had no reasonable basis in fact or law, it would
> necessarily impinge on the parties' Seventh Amendment right to a jury trial,
> inasmuch as it would require this Court to make factual findings and credibility
> determinations that the Constitution reserves to a properly constituted jury of the
> people. … Accordingly, the Court rules that a plaintiff … need only make a prima
> facie showing that the defendant's petitioning conduct lacked a reasonable basis
> in law or fact.

*Id.* at *4-5.

As in *Nader*, the "preponderance of the evidence" standard is not mandated by §59H, but

is a creation of the SJC in *Baker v. Parsons*, 434 Mass. 543, 750 N.E.2d 953 (2001).  Thus, just

as in *Godin*, this Court should conclude that if faced with this issue, the Massachusetts SJC

---

[8] We note that here, the special motion was brought in response to counterclaims; therefore, under *Nader* the court would infer the truth of the factual allegations of the counterclaims and of any affidavits submitted in opposition to Counterclaim-Defendants' special motion to dismiss.

would follow its Maine cohort and conclude that the "preponderance of the evidence" standard unconstitutionally infringes on the non-movant's right to have a jury rather than the Court, determine the facts. As Judge Young held in *Hi-Tech*, "[t]he Supreme Judicial Court of Maine got it right." 2016 WL 5334651, at *4.[9]

The Court should also refuse to consider the affidavits that Counterclaim-Defendants have submitted in support of their special motion to dismiss. §59H permits consideration of affidavits, but that is appropriate only under the "reverse summary judgment standard" where the non-movant has the burden of showing the lack of any reasonable factual basis or arguable basis in law by a preponderance of the evidence. Since that standard is unconstitutional in federal court, there is no justification for considering those affidavits at all.[10] Although affidavits may be considered under Fed. R. Civ. P. 56, neither they nor anything else outside the pleadings may be considered under Rule 12(b)(6). Testing the affidavits in support of the §59H motion against opposing affidavits or the Counterclaims' factual allegations would require the Court to substitute its judgment for those of the jury:

> Indeed, to determine whether Hi-Tech has demonstrated, by a preponderance of the evidence, that [the] petitioning conduct lacked any reasonable basis in law or fact, this Court would have to decide which of the affidavits submitted by the parties … it believed. Such findings are reserved to the fact-finder and, absent the parties' waiver of their right to a trial by jury, are not properly within the Court's domain."

*Hi-Tech*, 2016 WL 5334651, at *4.[11]

---

[9] In *Lynch v. Christie*, which was decided prior to the Maine SJC's announcement of the new standard in *Nader*, the Maine federal court also held that "a fact-finding role could raise serious constitutional right-to-jury trial issues in federal court." 815 F. Supp. 2d 341, 348 (D. Me. 2011).

[10] Lin has necessarily provided his own Affidavit in opposition to the §59H motion.

[11] For the same reasons, the Court should deny the BLG Defendants' Rule 12(b)(6) Motion to Dismiss the abuse of process counterclaim under the *Noerr-Pennington* doctrine. (BLG Defendants' Memo. at 20.) Where the doctrine applies, the court must consider whether the lawsuit is a "sham," which includes when it is both objectively baseless in that no reasonable

This approach is consistent with §59H's aim of preventing meritless suits from "imposing significant litigation costs and [thereby] chilling protected speech." *Hi-Tech Pharm.*, 2016 WL 5334651, at *5. Granting the §59H special motions would not meaningfully affect litigation costs, because it applies only to a single Count (XIV) of the Counterclaims. Dismissing the abuse of process claim would therefore have little if any effect on the cost of the litigation. Indeed, a dismissed abuse of process claim could be revived later as a lawsuit for malicious prosecution if Lin and Encompass prevail here. It is more efficient to maintain it in this lawsuit.

As shown below, Lin and Encompass easily make a *prima facie* showing that the Complaint lacks a reasonable basis in fact or law. *Hi-Tech*, 2016 WL 5334651, at *5.

ii.   The Complaint is Devoid of Reasonable Factual Support

In their §59H motion Counterclaim-Defendants abandon the Complaint they filed in favor of a vague recharacterization of it. They do so for an obvious reason: the actual Complaint is devoid of any reasonable factual basis because it focuses on the wrong bank account and the specific transactions that are alleged in the Complaint provide no factual support for the claims. That they find it necessary to recharacterize the Complaint emphasizes its abusive nature.[12]

The Barlow Defendants assert that Lin and Encompass "completely miscomprehend the basis of" Barlow's claims (Barlow Memo. at 6), and the BLG Defendants in turn state that

---

litigant could expect success on the merits, and where it is subjectively motivated by bad faith. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61-61 (1993). In other words, it is very similar to an abuse of process. This is also a question for a jury, not a Judge: "During the jury trial, Cohen will have the full benefits of the *Noerr-Pennington* doctrine." *Hi-Tech Pharm.*, 2016 WL 5334651, at *6. The *Pennington* case itself was remanded because of improper jury instructions. 381 US at 671-72.

[12]   It is no excuse that the Barlow Defendants' original counsel (the BLG Defendants) withdrew immediately after filing the Complaint. Current counsel may wish a different Complaint had been filed, but in evaluating the abuse of process counterclaim, the Court must consider the one that actually was.

"boiled down to their most basic aspect," the Complaint alleges that "Defendants committed fraud and misused funds provided by Barlow for Fossa-related expenses."  (BLG Memo. at 11.) This is empty verbiage, except in reference to the *specific* transactions in the Primary checking account that the Complaint relies upon to show the alleged fraud.[13]

As discussed above, the Court cannot consider the affidavits without substituting itself for a jury.  But that aside, the affidavits do not help.  The Barlow Affidavit says nothing of any relevance to the factual basis for the Complaint.  In ¶¶7-8, Barlow states that he asked Livshits to enter the Primary checking account statements into Quickbooks, and that Livshits "discovered" that Lin had allegedly misappropriated Fossa funds estimated at $100,000.  This is not a proper statement for Barlow's affidavit, because he does not make it on personal knowledge.  Barlow's affidavit sheds no light on either that question or any other factual basis for the Complaint—he does not even mention a single allegedly fraudulent transaction.  The Court should disregard Barlow's Affidavit.  *See, e.g. Stanton Indus., Inc. v. Columbus Mills, Inc.*, 4 Mass. App. Ct. 793, 794, 344 N.E.2d 199 (1976)(court must disregard affidavit from witness not competent to testify to assertions in affidavit).

The Livshits Affidavit fares no better.  Livshits says that Barlow hired her for personal reasons, then later—unilaterally and without the consent of the 50% co-owner, Lin (*i.e.*, she was working for Barlow personally here too)—to work for him in connection with Fossa and later IcelandicPLUS LLC and IcelandicPLUS ehf.  Livshits Aff. ¶6.  She then says that she entered the Sub-Account and Primary checking account statements into Quickbooks and "discovered" that "almost all of the funds paid out of the Encompass primary account . . . were Fossa business

---

[13] Indeed, absent the recitation of the allegedly fraudulent transactions, the Complaint would fail to meet the Rule 9(b) specificity requirement.

funds" that were transferred from the Sub-Account to the Primary account.  She does not say

how she "discovered" this.[14]  All she says is that she found some transactions in the Primary

checking account that she concluded were Fossa business expenses, others that she could not

determine, and others that she concluded were not.  But this is hardly surprising because the

Primary checking account existed before Lin's involvement with Barlow and money from other

sources, including Lin's family, was deposited in that account, a total of $103,873.96 between

August 2014 and August 2015.  (Lin Aff. at 20.)

   Ultimately, Livshits concluded that about $116,000 of the transactions in Encompass's

Primary checking account were not Lamb Horn Business expenses, while about $53,000 may or

may not have been legitimate.  Livshits Aff. ¶10.  This adds nothing, so there is no reason even

to consider it; it simply mimics ¶¶ 48-49 of the Complaint.

   But the Complaint does shed light on Livshits' analysis.  The Complaint alleges that

"Plaintiffs" reimbursed Lin for approximately $458,000 in Fossa business expenses.[15]

Complaint ¶ 45.  It then alleges that "Plaintiffs" have calculated that "only approximately

$289,000 of that $458,000 was spent by Defendants on *clear and reasonable* purposes related to

Fossa's business." Complaint ¶46 (emphasis added).  Taken at face value, therefore, the

Complaint alleges not fraud, but a *potential* disagreement as to whether the transactions reflected

use of Barlow's money, were business expenses, or whether those expenses were "reasonable."

---

[14] Nor does she explain how she obtained the Primary checking account statements to begin with, because Lin never authorized her or Barlow to access the account statements for Encompass's business account and there would be no reason for them to do so.  (*See* Lin Aff. ¶19.)

[15] The use of "Plaintiffs" here is odd, because Fossa Ltd. and IcelandicPLUS LLC did not reimburse Lin for a penny of the money he spent building the Lamb Horn Business; all of the $420,000 that PFX paid went directly to Barlow.  The reference to "Plaintiffs" emphasizes that Barlow considers the corporations to be alter egos of himself rather than entities jointly-owned by Barlow and Lin.

The Complaint, larded up as it is with wild allegations of conspiracy, is such a gross overreach that it is impossible to conclude that it is anything but a blatant effort to use Barlow's overwhelming resources to crush Lin and force him to abandon his share of the business he created just as it finally began to make money.

The Complaint then sets out a series of very specific transactions in the Encompass Primary checking account that allegedly were not for the Lamb Horn Business, and attaches as Exhibit 20 a spreadsheet purporting to provide more detail.  (Complaint ¶¶50-51 and Exh. 20.) Missing is any explanation of how transactions in the Primary checking account that existed before Barlow's involvement or the creation of the Sub-Account to launder Barlow's money establish fraudulent misuse of funds that Barlow deposited into the Sub-Account.

Taken at face value, Exhibit 20 alleges that in June and July 2015, a total of $111,260.27 was transferred from the Sub-Account to the Primary checking account, of which a total of $88,518.88 was concededly used for legitimate business expenses and a total of $26,955.65 was allegedly "clearly personal."[16] (Exh. 20 at 25 and 28.)

What Exhibit 20 does not show—and what neither the Complaint nor the Barlow or Livshits Affidavit even mentions—is that on June 12, 2015, PFX paid $420,000 for an initial shipment of lamb horns that was deposited not into either the Sub-Account or the Primary checking account but into BLG's IOLTA Account, where it remained until the BLG Defendants and Livshits actively helped Barlow launder it through the Encompass Sub-Account and out again in a series of bank checks and wire transfers.  (Counterclaims ¶¶ 125-127.)  Those funds easily would have covered the total conceded business expenses for June/July 2015 had Barlow

---

[16] Exhibit 20 also characterizes $4,738.34 in June/July 2015 transactions as "unable to determine."  Needless to say, "unable to determine" is not a reasonable factual basis for alleging fraud, etc.

not taken them.  Improperly holding the PFX payment in BLG's IOLTA Account and then funneling it to Barlow instead of using it to reimburse Lin the June and July conceded business expenses, allowed Barlow to claim that $88,518.88 of "his" money had been used for Lamb Horn Business expenses in June/July.  In reality, none of "Barlow's" money was so used because Livshits and the BLG Defendants helped him take the entire $420,000 PFX payment for himself.  Thus, of the $116,137.07 in Primary account transactions that the Complaint and Livshits Affidavit allege to have been fraudulent, there is no reasonable factual basis for concluding that more than half of that amount ($88,518.88) was ever "advanced" to Lin to begin with.[17]

That leaves $335,300.54 of the PFX payment that the BLG Defendants and Livshits assisted Barlow in taking.  Obviously, that more than covers the remaining $27,618.19 of the $116,000 in allegedly fraudulent transactions.  Again, because Barlow took that entire $335,300.54 for himself, there is no reasonable factual basis for alleging that Barlow ever advanced that $27,618.19 to Lin to begin with.

To summarize, based only on the allegation that some of the transactions in Encompass's pre-existing Primary checking account were not Lamb Horn Business expenses while many others were, the Complaint alleges that Lin "defrauded" (and various synonyms) Barlow of $116,137.07.  But Barlow, with Livshits' and the BLG Defendants' assistance, took a total of $420,000 that rightfully should have been used to pay the $88,518.88 in conceded business expenses for June/July 2015, with the remaining $335,300.54 being greater than an order of magnitude more than necessary to cover the other $27,618.69 in allegedly fraudulent

---

[17] As for the total of $53,414.01 that they allege "could not reliably be characterized as either legitimate Fossa business expenses or Mr. Lin's personal expenses based upon the information available to the Fossa business" (Livshits Aff. ¶10), this provides no reasonable factual basis for alleging fraud or anything else improper.

transactions.  Lin and Encompass have, therefore, unquestionably met their burden of establishing a *prima facie* case that the Complaint lacks a reasonable basis in fact.

iii.    <u>The Complaint Lacks Any Arguable Basis in Law</u>

Even if there were some factual basis for the Complaint, it is absolutely clear that it lacks any arguable basis in law.

a. The Complaint Could Not Be Filed in Massachusetts and Cannot<br>Assert Claims Based on Massachusetts or Federal Law

Though it does not refer to it explicitly, the Complaint is premised on the existence (and enforceability) of the Adhesion Contract that the BLG Defendants prepared on Barlow's behalf. That this is true is evident from paragraph 35 of the Complaint ("Lin and Barlow agreed that any of Fossa's revenues shall first be used to pay back Barlow's loans both to Fossa and the Murr project before making any other distributions") and from the fact that the $116,000 in alleged fraud utterly ignores the $420,000 that PFX paid for its initial purchase of lamb horns.

The reason that the Complaint omits reference to the Adhesion Contract and does not attach this document that is foundational to the Complaint is simple, and again emphasizes the abusive nature of this lawsuit.  The Adhesion Contract contained a mandatory exclusive forum selection and choice of law clause:

> 10.   **Applicable Law, Venue and Jurisdiction**.  This Agreement shall be governed by and construed in accordance with the laws of Anguilla.  Any suit, action or proceeding arising with respect to this Agreement shall be brought in the courts located in Anguilla.  Each of the parties hereto hereby submit and consent to the exclusive jurisdiction of such courts for the purposes of any suit, action or proceeding and hereby irrevocably waives any objection to such venue on the basis of lack of personal jurisdiction or inconvenient forum.

*See* Counterclaims Exh. 3 at 3, ¶10.

Both the Barlow Defendants and the BLG Defendants knew this, since the BLG Defendants had prepared the Adhesion Contract at Barlow's direction and presented it to Lin for signature as a *fait accompli*, long after Barlow had started to provide funding for Lin's business

19

idea, and after it had become clear that the business was coming to fruition and that PFX would soon agree purchase a substantial amount of lamb horns with an initial payment of $420,000.

Thus, both the Barlow Defendants and the BLG Defendants knew, prior to filing the Complaint, that they had no "good ground" (Mass. Civ. P. 11(a)) for filing the Complaint in Massachusetts Superior Court.

Both the Barlow Defendants and the BLG Defendants also knew that they had no "good ground" for asserting a single one of the Counts of the Complaint, each of which is based either on Massachusetts statutory or common law or on federal law.

The Complaint has no legal basis in the absence of the Adhesion Contract because as 50% co-owners of the Lamb Horn Business, Barlow and Lin are each entitled to 50% of the revenues therefrom.  That is exactly how Lin and Barlow originally agreed to proceed when they first went into business together.  (Lin. Aff. ¶10.)  It certainly would have made no sense for Lin to agree that *all* revenues should go to Barlow until he had been paid back everything he had invested and then the revenues should be split.

> b. Barlow Lacks Standing to Cause Either Fossa or IcelandicPLUS
> to Assert Claims Against Lin and Encompass

Since Barlow and the BLG Defendants were responsible for determining the corporate structures and locations for the business entities that make up the Lamb Horn Business, Barlow and BLG certainly knew that they had no power to cause either Fossa or IcelandicPLUS to file a lawsuit.  All shares of Fossa are owned by Mr. John Benjamin as Nominee for Barlow and Lin as 50% co-owners of Fossa, and Mr. Benjamin is the sole Director of Fossa.  *See* Counterclaims, Exh. 7.  There is no evidence that Mr. Benjamin authorized naming Fossa as a plaintiff, and neither Barlow nor Lin had the power unilaterally to instruct him to do so.  Similarly, IcelandicPLUS LLC is, at least according to Barlow, since we have seen no corporate

documentation showing it, a Delaware LLC 50% co-owned by Barlow and Lin.  Barlow

therefore has no power to cause IcelandicPLUS LLC to file a lawsuit against Lin.

       c. Neither Fossa, Ltd. nor IcelandicPLUS LLC is Registered to Do
         Business in Massachusetts

  A foreign corporation transacting business in Massachusetts is required to register with

the Secretary of State.  M.G.L. c. 156D §15.01(a).  Absent such registration, a foreign

corporation "shall not maintain a proceeding in any court in the commonwealth."  *Id.* §15.02(a).

Thus, there was no arguable basis in law for either Fossa, Ltd. or IcelandicPLUS LLC to file the

Complaint in the Massachusetts Superior Court.

  **D.** **Lin and Encompass Have Suffered Actual Injury as a Result of the Filing of
    the Complaint**

  Finally, there is no doubt that Lin and Encompass have provided *prima facie* evidence

that they have suffered actual injury as a direct result of the filing of the Complaint.  *See* Lin Aff.

¶28.  This is not a difficult burden to meet.  *See, e.g.*, *P.J. Keating Co. v. Roads Corp.*, No.

062135B, 2008 WL 2745178, at *7 (Mass. Super. June 17, 2008)(incurring costs and alleging

"damage" are sufficient); *Salvo v. Ottoway Newspapers, Inc.*, No. 972123C, 1998 WL

34060940, at *4 (Mass. Super. May 13, 1998) (physical and mental suffering, including anxiety,

constitute actual injury).  Moreover, Lin and Encompass have had to hire an attorney to represent

them in this proceeding, which is sufficient in itself to establish actual injury. *Van Liew v.

Stansfield*, 474 Mass. 31, 40, 47 N.E.3d 411, 419 (2016).

## II.  **The Court Should Deny the Rule 12(b)(6) Motions to Dismiss**[18]

To survive the motions to dismiss under Rule 12(b)(6), the Counterclaims must allege sufficient facts to "allow[] the court to draw the reasonable inference" that the Counterclaim-Defendants are liable for the alleged misconduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court's inquiry is limited to the facts alleged in the counterclaims, incorporated into the pleadings, or susceptible to judicial notice.  *In re Colonial Mortg. Bankers Corp.*, 324 F.3d. 12, 15 (1st Cir. 2003).  The Court must assume the truth of the factual allegations and draw all reasonable inferences in Lin and Encompass's favor.  *Genzyme Corp. v. Fed. Ins. Co.*, 622 F.3d 62, 68 (1st Cir. 2010).

### A.  Count I Meets the Rule 9(b) Particularity Requirement

Barlow does no more than assert that Count I fails to satisfy the Rule 9(b) particularity requirement, but does not specify how it fails.  The goal of Rule 9(b) is to ensure that defendants are "warned adequately concerning the particular statements that constituted the alleged fraud so they could prepare their defense" *Friedman v. Jablonski*, 371 Mass. 482, 488 (1976), as well as to preclude the use of a groundless claim of fraud as a pretext to discovery or as a "strike suit" and to safeguard defendants from frivolous claims that might damage their reputations.  *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir. 1987).  Thus, the person making the statement must be identified, as well as the content of the statement described, and "the period during which" the statement was made.  *Friedman*, 271 Mass. at 488.

Certainly, each of the alleged false statements are identified as to the individual (Barlow) who made the statement and the content of the statement.  (Counterclaims ¶¶ 193-201.)

---

[18] Lin and Encompass hereby withdraw Counts IV(2) (Interference with Contractual Relations), V(2) (Interference with Prospective Contractual Relations), and VI (Misappropriation of Trade Secrets).

The Counterclaims also specify the general time period of the statements, which is all that is required.  The Lamb Horn Business relationship began in mid-2014 and the Complaint was filed in September 2016, which provides adequate time boundaries.  *See, e.g.*, *Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass. App. Ct. 747, 764, 792 N.E.2d 1031, 1044 (2003) ("summer of 1995"); *Evans v. Lorillard tobacco Co.*, No. CIV. A. 04-2840A, 2007 WL 796175, at *13 (Mass. Super. Feb. 7, 2007) (sufficient to allege that statements were made while plaintiff was a teenager, which identified a six-year period during which statements were made).

But several specific dates are also identified.  For example, the Counterclaims allege that in or around August 2013, Barlow instructed Lin to set up the Sub-Account, so that it would be easier for Barlow to transfer money to be used to reimburse Lin for expenses, after first requiring Lin to pay those expenses out of his own funds. (Counterclaims ¶¶107, 196-197.)  The Counterclaims allege that at a meeting on November 30, 2015, Barlow assured Lin that Livshits would produce complete financial documentation by the end of the year, that Lin owned 50% of everything (which necessarily would include the revenues from the business), and that the company was worth $10,000,000 based on inventory alone.  (Counterclaims ¶¶ 147, 193-195). They also allege that Barlow represented to Lin in an email dated August 25, 2015 that Lin would begin receiving his share of the financial benefits of the business by approximately the end of 2015, as soon as the first shipment was made to PFX, and that "all we need to do is ship 100K of horns."  (Counterclaims ¶¶42, 199, Exh. 6.)  Yet, Lin received nothing.

The Counterclaims further allege several statements made by Barlow in a meeting with Lin on June 6, 2015, during which Barlow again assured Lin that he would soon begin benefiting financially, and that this statement was false and made with the intent that Lin would rely on it, because Barlow had already determined to force Lin out of the business by filing this lawsuit.

(Counterclaims ¶¶ 182-183.)  The Counterclaims also allege that during this meeting, Barlow agreed not to pursue the Lamb Horn Business without Lin, or any other pet food ideas that Lin had developed, including fish skins, and that these statements were also false because almost immediately afterward, Barlow traveled to Iceland in order to acquire fish skins and a factory, and Barlow has taken over the Lamb Horn Business in Iceland and changed the production facilities to deny Lin access.  (Counterclaims ¶¶ 182-183, 175-176, 200-201.)

The Counterclaims allege that each of the statements were false and made with the intention of inducing Lin and Encompass to rely on them to continue providing their services to the Lamb Horn Business, and that Lin and Encompass reasonably relied on those statements to continue working on developing the business, producing marketing and promotional materials and actively working to build sales, and that they were damaged thereby.  (Counterclaims ¶¶ 203-205.)

The Counterclaims manifestly satisfy the particularity requirement of Rule 9(b), by providing adequate warning to Barlow as to content of the statements and the period in which they were made.

### B.  Counts II and III State Claims for Breach of Oral Contract and the Covenant of Good Faith and Fair Dealing

The Counterclaims allege that Lin and Barlow agreed that, in consideration for Barlow's investment to reimburse the costs of testing, developing, and creating the Lamb Horn Business, Lin and Encompass would provide their original idea, their personal relationships, experience, knowledge, their creative, marketing, sales, and promotional skills, and their physical and mental labor, with both Barlow and Lin benefiting equally from their joint ownership of the business. Barlow and Lin also agreed that Barlow would not pursue the Lamb Horn Business without Lin

and would not pursue Lin's idea of using fish skins as dog treats until Lin had started receiving the financial benefits to which he was entitled. (Counterclaims ¶¶207-208.)

Barlow suggests that he fully satisfied the contract by making Lin a 50% owner of the Lamb Horn Business *on paper* and by reimbursing Lin's out-of-pocket business expenses, and that the contract was "necessarily extinguished" upon the formation of those entities. (Barlow Defendants' Memo at 9.)  But the contract was not just for the "formation" of corporate entities, it was that each would benefit equally from the joint ownership.  Instead, Lin relied in good faith on his agreement with Barlow and committed substantial time, effort, labor, and creative services to the business, but Barlow has used his effective control over the corporate entities and all of the finances and financial information to ensure that only he benefits from the business and that Lin receives nothing.  The Counterclaims state a claim for both breach of contract and breach of the covenant of good faith and fair dealing.

### C.  Count IV States a Claim for Violation of M.G.L. c. 93A Against Barlow and the BLG Defendants

This is not simply an intra-corporate dispute, as Barlow and the BLG Defendants contend.  To begin with, the Counterclaims allege that the BLG Defendants provided legal services to both Barlow and Lin as co-owners of the Lamb Horn Business, and to the corporate entities that they co-owned.  Therefore, the BLG Defendants had a commercial relationship with Lin and Encompass as well as with Barlow individually and in his capacity as a co-owner and with the corporate entities.[19]

---

[19] The BLG Defendants quote the "Waiver of Conflict" clause in the Adhesion Contract as establishing that they "were not representing either individual in drafting the agreement."  (BLG Memo. at 4.)  The clause is not only entirely self-serving and part of an unenforceable adhesion contract, it is also nonsensical, inasmuch as it states that "[e]ach of the Parties hereby confirm[s] that the Attorneys did not and do not represent any of them in connection with the preparation of this Agreement and that the Attorneys did not advise any of them regarding the contents, purpose or suitability of this Agreement or the underlying business transaction."  The Parties are Barlow,

Moreover, the Counterclaims allege in detail Barlow's use of Encompass's bank account for his own purposes in addition to using it for the Lamb Horn Business. Encompass is a separate corporate entity from the Lamb Horn Business corporations. Accordingly, the dispute is not just between Barlow and Lin as co-owners of the Lamb Horn Business. Encompass made its bank account available to Barlow at Barlow's request and Barlow used it to move money from and to unknown accounts, putting Encompass in legal jeopardy and potentially making Encompass liable for taxes on the amounts that Barlow deposited. This mis-use of Encompass's corporate bank account is an unfair business practice. Moreover, Barlow obtained Lin's services for the Lamb Horn Business, to the detriment of Encompass's needs, thereby interfering with Encompass's business. Barlow's conduct has harmed Encompass by forcing Lin to spend all his time working for a business from which he has obtained no benefit. The resulting health problems have prevented Lin from rebuilding Encompass's business. (Lin Aff. ¶ 22.)

The Counterclaims further allege that the BLG Defendants moved money from BLG's IOLTA account into Encompass's Sub-Account in order to assist Barlow in taking for himself all of the money received from PFX, while laundering it through Encompass's account. BLG's transfer of money into Encompass's bank account was a business transaction and violated c. 93A.

The Barlow and BLG Defendants' abuse of process by filing a lawsuit against Lin and Encompass in an effort to force Lin to give up his business interest also constitutes a violation of

---

Lin, Fossa Ltd., and Fossa Enterprises ehf. (IcelandicPLUS LLC did not yet exist.) So if the Parties confirm that the BLG Defendants did not represent any of them or advise any of them—then why did they prepare the Adhesion Contract to begin with? They certainly did not do it on a lark. To the contrary, they did it on Barlow's instruction, to serve Barlow's interests. The "waiver of conflict clause" actually demonstrates that the BLG Defendants did, in fact, have an attorney client relationship not only with Barlow but also with Lin; otherwise, there would be no conflict that required waiver.

c. 93A: "The misuse of legal process to obtain a commercial advantage has long been recognized as a violation of Chapter 93A." *N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC*, 491 F. Supp. 2d 111, 131–32 (D. Mass. 2007); *Fafard Real Estate & Dev. Corp.*, 345 F.Supp.2d 147, 154 (D. Mass. 2004); *Wyler v. Bonnell Motors, Inc.*, 35 Mass.App.Ct. 563, 567, 624 N.E.2d 116 (1993). The costs of defending against the abusive lawsuit constitute loss of money or property within the meaning of the statute. *Tech Plus, Inc. v. *132 Ansel*, 59 Mass.App.Ct. 12, 21, 793 N.E.2d 1256, 1264 (2003).

### D. The Complaint States a Claim for Unjust Enrichment Against Barlow, Fossa, Ltd. and IcelandicPLUS LLC (Count III(2))

The Barlow Defendants' argument for dismissing the unjust enrichment counterclaim is inscrutable. They appear to believe that Lin has been adequately compensated for his original idea, his Icelandic contacts, his product development work, his hard physical and mental labor, and his creative, promotional and marketing services, simply by being made a paper co-owner of corporate entities that Barlow set up to serve his own interests. (Barlow Defendants' Memo. at 11.) This is the entirety of their argument.

The argument is ludicrous. To begin with, it has not been established that Lin is in fact a 50% owner of IcelandicPLUS LLC, as the Delaware incorporation documents do not disclose anything about ownership. But more to the point, Lin clearly did not donate his idea and hard work and creative services to Barlow, Fossa, and IcelandicPLUS out of a sense of charity. He did it with the understanding that he was a 50% co-owner and would receive 50% of the *revenues* from the business. Barlow set up the corporate entities and installed his own accountant specifically to avoid Lin having any way of exercising any control over the business or even to know what was being done. Instead, Barlow has taken all of the revenues and Lin has received precisely nothing. The Barlow Defendants knew that Lin anticipated being

compensated by receiving 50% of the revenues, and it would be unjust and inequitable to continue permitting Barlow to receive all of the benefit.

### E.  Count VII States a Claim for Breach of Fiduciary Duty Against Barlow

Barlow argues that there can be no breach of fiduciary claim against him relative to Fossa, Ltd., because Lin is not a Fossa stockholder, but rather a beneficial stockholder, with the actual stock being held by the nominee John Benjamin.  (Barlow Memo. at 14.)  As an initial matter, we note that this argument applies equally to the breach of fiduciary duty claim that the Barlow Defendants assert against Lin.  (Complaint Count I.)  In the Complaint, Barlow asserts that Lin, "as a partner to Barlow and as an officer of Fossa, owed a fiduciary duty to Plaintiffs." (Complaint ¶ 105.)  Barlow should be estopped from denying that he owes a fiduciary duty to Lin.

Moreover, the beneficial ownership of the Fossa shares is beneficial only in name. Despite the nominal stock ownership by John Benjamin, the corporation is entirely controlled by Barlow and Lin as equal beneficial owners of the stock (in reality, Barlow has exercised complete control without any input from or information provided to Lin).  Under the corporate By-laws of Fossa, John Benjamin cannot do anything as the actual shareholder without the beneficial shareholders.  Nor can he act in his capacity as the sole Director of the corporation without Barlow and Lin.  Effectively, therefore, Barlow and Lin are the real stockholders and real Directors of Fossa. Therefore, Barlow owes a fiduciary duty to Lin.

Barlow's argument that Anguillan law imposes no fiduciary duty *among stockholders* is beside the point.  (Barlow Defendants' Memo. at 14.)  Anguillan common law and the Anguillan International Business Companies Act impose a fiduciary duty on Directors of Anguillan business corporations.  That fiduciary duty includes the obligation to act in honesty and good

faith.  *See* International Financial Law Review, *Anguilla* (Oct. 1, 2005) at 2-3, available at

http://www.iflr.com/Article/1984717/Anguilla.html (last visited March 9, 2017).

In Delaware, directors and officers of a corporation owe the corporation and its

shareholders the duty of loyalty and the duty to act in good faith.  The duty of loyalty "mandates

that the best interest of the corporation and its shareholders takes precedence over any interest

possessed by a director, officer, or controlling shareholder and not shared by the stockholders

generally."  *In re Fedders N. Am., Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009).  To state a

legally sufficient claim for breach of the duty of loyalty, a party must allege facts showing that a

self-interested transaction occurred that was unfair to that party.  *Id.* at 540.

Barlow does not deny that he owes a fiduciary duty to Lin.  (Barlow Memo. at 14.)

Instead, he mischaracterizes the basis for Lin's breach of fiduciary duty claim. Lin does not

claim breach of fiduciary duty based solely on the failure to provide information regarding the

status and financial condition of the company, or the failure to make a "distribution from

IcelandicPLUS, LLC."  Rather, the breach of fiduciary duty is based on all of Barlow's conduct

that has resulted in Barlow taking all of the benefit of the business that Lin created while

providing no benefit to Lin, in Barlow's complete domination of all of the corporate entities and

all information about them, and Barlow's use of the corporate entities to further his own interests

rather than to respect the interests of Barlow's 50% co-owner Lin.  Barlow has repeatedly put his

own self-interest above the interests of the corporation and of Lin, in breach of his fiduciary

duties.

### F.  Count VIII States a Claim for Embezzlement Against Barlow and Livshits

Count VIII of the Counterclaims asserts a claim for embezzlement against Barlow and

Livshits.  Barlow and Livshits argue that this Count fails to state a claim because there is no civil

cause of action for embezzlement under Massachusetts law.  Yet, Count V of the Complaint

asserts a claim for embezzlement against Lin and Encompass.  If Barlow and Livshits are correct that there is no such civil remedy, then the Court should also *sua sponte* dismiss Count V of the Complaint.  Moreover, in such case, the Court should conclude that the Complaint had no reasonable basis in fact or arguable basis in law for purposes of §59H.

### G.  Count IX States a Claim for Conversion

The Counterclaims allege that the Barlow Defendants have exercised dominion over and taken for their own purposes both money and the existing inventory of lamb horns, with the intent to deprive Lin of his rights to the proceeds of the sales of lamb horns and to the horns in inventory.

Conversion may be shown where a person exercises dominion over the personal property of another without right, thereby depriving the rightful owner of its use and enjoyment.  "Money may be the subject of conversion."  *In re Hilson*, 448 Mass. 603, 611, 863 N.E.2d 483, 491 (2007).  The Complaint alleges that the Barlow Defendants have wrongfully taken all of the revenue of the Lamb Horn Business, including the $420,000 received from PFX, by directing it into the BLG Defendants' IOLTA account, and then instructing the BLG Defendants to deposit it into the Sub-Account, whereupon Barlow and Livshits personally removed the money and moved it through bank checks and wire transfers into accounts controlled by Barlow and Livshits.  They have thereby deprived Lin of his own rights in that money.  The mere fact that Barlow and Livshits do not believe that Lin is entitled to any financial benefit as co-owner of the Lamb Horn Business does not defeat the conversion claim.

Lin has repeatedly and over an extended period of time made demand for payment of his share of the revenues of the Lamb Horn Business, and Barlow and Livshits changed the locks on the warehouse containing the inventory and have entirely cut Lin out of the business.  There is a justifiable inference that a demand to turn over the inventory and cash would have been futile.

Accordingly, the Counterclaims state a claim for conversion. *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016); *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 452 (S.D.N.Y. 2014); *Surplec, Inc. v. Maine Pub. Serv. Co.*, 501 F. Supp. 2d 195, 196 (D. Me. 2007).

### H.  Count X States a Claim for Civil Conspiracy Against the Barlow and BLG Defendants

The Counterclaims are replete with details as to the roles of each of the Defendants in the conspiracy and the specific acts (not just statements) that each of the Defendants took in furtherance thereof.  They allege, for example, that Barlow and the BLG Defendants established the corporate structures to serve Barlow's interests, that Barlow and the BLG Defendants coerced Lin into signing the Adhesion Contract to deprive him of the money that he otherwise would have received as 50% co-owner of the Lamb Horn Business, that Barlow and Livshits and the BLG Defendants conspired to hold the PFX funds in BLG's IOLTA account and then to move it in a series of specified transactions into the Sub-Account, and that Barlow and Livshits engaged in a series of transactions through bank checks and wire transfers to remove the money from the Sub-Account and direct it to bank accounts controlled directly by Barlow and Livshits.

These allegations, among others, are sufficiently detailed to satisfy Rule 9(b), for the reasons previously discussed *infra* Sec. II.A.  The allegations of the Counterclaims detail the dates and the specific actions that each party took, and are more than enough to adequately warn the Counterclaim-Defendants of the nature of the claims against them.

### I.  Count XI States a Claim for Accounting

The Barlow Defendants argue that Lin lacks standing to demand an accounting from Fossa because he is not a stockholder of Fossa. As previously discussed, Lin owns and controls Fossa on paper despite being, along with Barlow, a beneficial owner of the stock in that

company.[20]  As for the claim against IcelandicPLUS, 6 Del. C. § 18-305 does not apply where

IcelandicPLUS filed suit in Massachusetts court and itself demanded an accounting, and Lin has

counterclaimed for an accounting.  It would make no sense to permit the Barlow Defendants to

demand an accounting from Lin, but to dismiss Lin's counterclaims for an accounting.

### J.   Counts XII and XIII State Claims for Civil RICO and RICO Conspiracy

The Counterclaim-Defendants acknowledge that they are alleged to have committed

multiple acts of wire fraud: (a) that they received $420,000 from PFX and improperly diverted it

to BLG's IOLTA account and held it there; (b) that they engaged in a series of transactions

(specifically identified in the Counterclaims by date, amount and accounts) that transferred that

money into the Sub-Account at Barlow's and Livshits's direction; and that (c) they sent

numerous emails and had telephone calls designed to further the conspiracy.  (BLG Defendants'

Memo. at 24; Barlow Defendants' Memo. at 18 (incorporating by reference BLG Defendants'

legal arguments as to Counts XII and XIII.)

The BLG Defendants argument for dismissal of the RICO and RICO Conspiracy

counterclaims focuses exclusively on the alleged failure to sufficiently specify "any of the emails

and telephone calls" that comprise the BLG Parties' predicate criminal acts.  (BLG Memo. at

25.)  Thus, the BLG Defendants concede that the Counterclaims sufficiently assert claims for

RICO and RICO Conspiracy based on the various identified financial transactions.  Since there

were multiple instances of these financial transactions, the alleged failure to sufficiently identify

"emails and telephone calls" would be no reason to dismiss Counts XII and XIII as a whole.

---

[20] Moreover, Barlow himself has asserted a claim for an accounting against Lin and Encompass,
despite the fact that Barlow is not a stockholder of Encompass. (Complaint Count VIII.)

Regardless, there is no basis for dismissing these counts as they relate to the emails and telephone calls either.  Lin did not participate in these communications, and has no means of knowing exactly when the BLG and Barlow Defendants communicated with each other about the conspiracy.  Lin has described the scheme to defraud and identified numerous predicate acts of wire fraud.  Absent discovery, Lin has no way of establishing emails or telephone calls between the Counterclaim-Defendants pertaining to the conspiracy:

> Where there are multiple defendants, as here, and where the plaintiff was not directly involved in the alleged transaction, the burden on the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable.

*New England Data Servs., Inc. v. Becher*, 829 F.2d 286,291 (1st Cir. 1987).

As for the Barlow Defendants, they make no argument on this Count other than to incorporate by reference the arguments made by the BLG Defendants.  (Barlow Memo. at 17.) The Barlow Defendants therefore make no arguments with respect to the other predicate acts alleged against them:  monetary transactions in property derived from specified unlawful activity, 18 U.S.C. § 1957 (Counterclaim ¶¶294-295); money laundering, 18 U.S.C. §1956 (Counterclaims ¶¶ 296-297); identity fraud, 18 U.S.C. §1028(a)(7) (Counterclaims ¶¶298-300); and theft of trade secrets, 18 U.S.C. §1832 (Counterclaims ¶¶ 301-304).  Because they have made no argument with respect to the predicate crimes, they concede that the Counterclaims state a claim for RICO and RICO conspiracy based on those predicate acts.

### K.  Count XV States a Claim for Copyright Injunction Under 17 U.S.C. §502

The Barlow Defendants' argument for dismissal of Count XV is that despite not having ever received any payment for their work or receiving a penny of the revenues from the Lamb

Horn Business, the mere fact that Lin is a 50% beneficial owner of the Lamb Horn Business is sufficient compensation.  This is sophistry.  Lin is a 50% co-owner of the Lamb Horn Business, including each of the corporate entities, but the Lamb Horn Business existed prior to the incorporation of the corporations and is an overarching term used to describe the entire business, not the individual corporations.

There is no Lamb Horn Business without Lin.  It was his concept, his development, his work, and his creative branding and marketing expertise.  Lin did not "receive" a 50% beneficial interest in exchange for his concept and his efforts.  To the contrary, Lin agreed to give Barlow 50% equity in the business in exchange for Barlow's funding.  Barlow was nothing more than the money man.  Barlow's choice of corporate structures, which resulted in Lin being a beneficial owner of 50% of the Fossa stock does not substitute for actually compensating Lin and Encompass for his creative work, to which he and Encompass own the copyrights.  Nor is there any written assignment of the copyrights.  *See* 17 U.S.C. § 204 (copyright assignment must be in writing signed by the owner of the rights conveyed).

Because the Barlow Defendants have never compensated Lin and Encompass in any fashion for their copyrighted sales, marketing and promotional materials, they are infringing the copyrights and Lin and Encompass are entitled to an immediate injunction.

### L.  Count XVI States a Claim for Declaratory Judgment under 28 U.S.C. §2201

There is an actual controversy over both the existence of Lin's 50% ownership of the Lamb Horn Business, and over the meaning of that 50% ownership.  Lin has no information as to the corporate ownership of IcelandicPLUS LLC because the Delaware Certificate of Incorporation provides no information.  There is no evidence of who owns IcelandicPLUS LLC or who the members of that LLC are.

Moroever, there is an actual controversy over the meaning of "50% owner." Lin has requested a declaratory judgment not only that he is a 50% owner of the corporate entities, but of the Lamb Horn Business as a whole, and that he is entitled to 50% of the assets and the revenues of the Lamb Horn Business. The Barlow Defendants assertion that "as a matter of law and common sense, that interest does not, under any circumstances, entitled him to 'no less than 50% of all of the revenues therefrom'" is self-serving and lacks any authority.

Lin agreed to give Barlow a 50% equity interest in the Lamb Horn Business, before Barlow set up any of the corporate entities. Therefore, Barlow's making Lin a beneficial owner of 50% of the Fossa stock and setting up other corporate entities whose structure and ownership has not been established does not change the fact that Barlow and Lin agreed to be 50/50 equity owners. As a 50% equity owner, it is self-evident that Lin has a co-equal right to information about the corporations, and to share in the revenues of the corporations. *Paulsen v. C.I.R.*, 469 U.S. 131, 131 (1985).

### III. To the Extent that Any of the Court May Determine that Any of the Counterclaims Violate Fed. R. Civ. P. 8(a), or the Particularity Requirement of Rule 9(b), the Court Should Give Lin and Encompass the Opportunity to Amend to Cure the Deficiency

Lin and Encompass disagree that any of the Counterclaims are excessively long or redundant such as to violate Rule 8(a). However, the Parties agree that, to the extent that the Court determines that any of the Counterclaims are deficient under Fed. R. Civ. P. 8(a), Lin and Encompass should be given the opportunity to replead. *See* BLG Defendants' Memo. at 27; Barlow Defendants' Memo. at 19 (incorporating BLG Defendants' arguments).

## CONCLUSION

For the foregoing reasons, Lin and Encompass respectfully request that the Court deny the Motion to Dismiss filed by Counterclaim-Defendants Fossa Ltd., IcelandicPLUS, LLC, Steven Barlow, and Sonya Livshits.

Dated: March 9, 2017

Respectfully submitted,

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO#649304)
Matorin Law Office, LLC
18 Grove Street, Suite 5
Wellesley, MA 02482
T:  (781) 453-0100
F:  (888) 628-6746
E:  mmatorin@matorinlaw.com

*Counsel for Defendants and Counterclaim-Plaintiffs I Jian Lin and Encompass Communications, Inc.*

## Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 9, 2017.

/s/ Mitchell J. Matorin