IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FOSSA LTD., ICELANDICPLUS LLC and STEVEN BARLOW,<br>                Plaintiffs,<br>v.<br><br>I JIAN LIN and<br>ENCOMPASS COMMUNICATIONS, INC.,<br>                Defendants. | Case No. **1:16-cv-11914**<br><br>**DECLARATION OF I JIAN LIN IN OPPOSITION TO SPECIAL MOTIONS TO DISMISS COUNT XIV OF COUNTERLCLAIMS (ABUSE OF PROCESS) PURSUANT TO M.G.L. c. 231, §59H** |
| I JIAN LIN and<br>ENCOMPASS COMMUNICATIONS, INC.<br>                Counterclaim-Plaintiffs,<br>v.<br><br>FOSSA LTD., ICELANDICPLUS LLC, STEVEN BARLOW,<br>                Counterclaim-Defendants,<br>and<br><br>VALENTIN DAVID GURVITZ, ESQ., BOSTON LAW GROUP, P.C., and SONYA LIVSHITS<br>                Additional Counterclaim-Defendants. | |

I, I Jian Lin, depose and state as follows under penalty of perjury:

1.      My name is I Jian Lin.  I am over 18 years old, and I am one of the Defendants and Counterclaim-Plaintiffs in this matter, with Encompass Communications, Inc. ("Encompass"), a corporation that I own.  I make the following statements based upon my personal knowledge, unless otherwise stated.

2.      I make this Declaration in support of my and Encompass's opposition to the motions to dismiss the abuse of process counterclaim that I and Encompass filed in this matter.

1

3. I am a branding and marketing professional. I provide branding and marketing services to my clients through Encompass. Those clients have been both in the U.S. and abroad, including individuals and corporations in Iceland, and the Icelandic government agencies.

4. In the course of working in Iceland, I conceived of the initial idea of creating a business that would produce, import into the U.S. and Canada, and sell, the horns of slaughtered Icelandic lambs for use as dog treats (the "Lamb Horn Business").

5. I am the 50% co-owner of the two corporate plaintiffs in this case, Fossa Ltd. and IcelandicPLUS LLC, as well of various other entities that constitute the Lamb Horn Business.

6. The other 50% co-owner is Steven Barlow.

7. In 2013, I happened to run into Mr. Barlow, whom I had known previously, when he was meeting in a café with his then-lawyer, Valentin Gurvits, of Boston Law Group.

8. After Mr. Barlow and I worked on an earlier business opportunity, I asked Mr. Barlow to provide financial backing for the Lamb Horn Business because I firmly believed that the product was unique in the pet treat market and provided a substantial business opportunity, but I lacked the funds to invest in the development of the idea, including purchasing the lamb horns themselves, the machinery necessary to preserve, process, and transform them into a useable product, hiring personnel, importation, etc.

9. In exchange for Mr. Barlow's financial backing, I agreed to and in fact did devote very substantial amounts of time and mental and physical labor to develop and bring to fruition my idea, including developing the product concept, the product packaging and marketing campaigns, and reaching out to and meeting with various pet supply companies to present and promote my lamb horn dog treat idea. The lamb horn products received overwhelmingly positive reviews from every nearly every company with whom we met.

10. In exchange for providing financial backing for the venture, I offered and Mr. Barlow agreed to be a 50% co-owner in the Lamb Horn Business, with the understanding that he and I would share equally in the financial rewards of the business.

11. At the time that Mr. Barlow and I initially reached this agreement and for some time thereafter, there were no corporate entities. Because of Mr. Barlow's greater expertise in business formations and his desire to create several different corporations in different countries because he wanted to avoid any taxes, I simply left it to him and Mr. Gurvits to handle these technical and legal issues, while I focused entirely on the development of the Lamb Horn Business itself.

12. When Mr. Barlow and I agreed to our business arrangement, he initially provided money to fund the start-up costs of the Lamb Horn Business by providing his credit card and asking me to charge it to Encompass and deposit into Encompass' Primary checking account. He would routinely ask me to charge more than I had asked for and to provide him with cash that he would use for his own purposes. Eventually, Mr. Barlow asked that I set up a separate account within Encompass's bank account (the Sub-Account), so that he could deposit money directly into that account without incurring credit card fees and to make it easier for him to deposit money. I agreed to Mr. Barlow's request, and set up the Sub-Account. I provided access to that account to Mr. Barlow and, at his request, also provided a debit card that he could use to withdraw funds from that account. I did not, however, authorize Mr. Barlow to access to or obtain information about the Encompass Primary checking account. In fact, I never discussed that issue with Mr. Barlow or him ever requesting access to or information about that account. There was no reason for such access or information, since that was a pre-existing account that I used for Encompass's own business and to pay myself as the owner of that business.

13. After our initial trip to Iceland to explore the feasibility of my Lamb Horn Business idea, I started spending substantial amounts of time in Iceland and traveling back and forth between Iceland and the United States to set up all aspects of the business. During this period, I was working so hard and things were moving so quickly that I did not always pay very close attention to the financial details. In particular, I did not pay attention to the Sub-Account or what Barlow, and later Livshits were doing with it.

14. When Barlow asked me to set up the Sub-Account, he still insisted that I should pay any business expenses out of the Encompass Primary checking account (that is, out of my own and Encompass's funds) and then ask to be reimbursed for those expenses from money that Barlow would deposit into the Sub-Account. My only concern with the Sub-Account therefore was that, when I would ask Barlow and later Livshits to reimburse me for business expenses, the money would be in the Sub-Account so that I could transfer it into the Encompass Primary checking account to reimburse myself. Other than that, I paid little or no attention to the Sub-Account, and only discovered later that Barlow, with Livshits's assistance was moving large amounts of money in and out of the Sub-Account for Barlow's own purposes. I do not know where the money that Barlow deposited into the Sub-Account came from. When he withdrew money from that account, I do not know where it went, either. Barlow, with Livshits' assistance, treated the Sub-Account as a personal bank account and moved money in and out of that account as they wanted.

15. As I mentioned, Barlow insisted that I spend my own money to cover business expenses for the Lamb Horn Business and then seek reimbursement from Barlow. This put me in a very bad financial position, because while I was spending all of my time on the Lamb Horn Business, I was forced to put my usual branding and marketing business on hold. I became

completely dependent on Barlow and Livshits to reimburse business expenses so that I could pay my credit cards, including charges incurred for the Lamb Horn Business.

16. While I was trying to focus on building a brand new and very complex (and, frankly, a sometimes messy and bloody) international business and spending my own money up front to finance it, Barlow and Livshits started increasing the financial pressure on me by refusing to reimburse me for business expenses until I had provided what they deemed to be sufficient documentation of every expense and limiting the amount I could spend, while being very slow to reimburse. This put me in a very hard financial position because I was spending my own money up front and had to pay my credit cards and living expenses as well, without knowing if or when I would be reimbursed for the money I had spent for the Lamb Horn Business.

17. In addition, even though my girlfriend was working very hard with me to develop the business, including spending her own money to travel, Barlow and Livshits refused to reimburse her expenses, such as airfare and mileage.

18. Despite the financial pressure, I never transferred any money from the Sub-Account into the Encompass Primary checking account without first obtaining Barlow's and later Livshits's approval for the transfer. This became another way that Barlow and Livshits put pressure on me, by questioning my expenses and requiring information and documentation that I sometimes did not have time to put together because I was spending 24/7 on the business.

19. When I saw that the legal complaint against me was based on transactions in the Encompass Primary checking account, I was confused. To begin with, I did not understand how Mr. Barlow, Ms. Livshits, Mr. Gurvits and BLG had come to have information, including bank statements, for the Encompass Primary checking account. I had never authorized them to have

access to that account or to any information about it.  There was no reason for them to have authorization because that account existed long before the Lamb Horn Business, and except for the money that was transferred from the Sales account with Barlow's and Livshits' prior approval, contained Encompass's money from prior clients, and personal money, including money that I had borrowed from family to help me live while I worked to build the Lamb Horn Business.  I still have not been able to determine how they came to have bank statements for the Encompass Primary checking account.  The only thing that makes sense to me is that either they opened mail addressed to me, fraudulently accessed the information online, or they somehow tricked my bank, TD North, to give them the information.

20. My next reaction was that I could not believe that they were accusing me of fraud because there were transactions in the Encompass Primary checking account that they thought were not for the Lamb Horn Business.  *Of course there were*!  As I mentioned, that account contained money from Encompass's clients and also money that I borrowed from my family in order to live while I tried to build the business.  For example, I borrowed $55,000 from my family between August 2014 and August 2015, and I had other income totaling $48,873.96 between May 2014 and June 2015, all of which was deposited into the Primary checking account.  Since I was not making any money from the Lamb Horn Business even after we sold over $400,000 worth of product to PFX, I was forced to spend the money in the Encompass Primary checking account to live.  When I read the Complaint and see that it is based completely on the allegations that some transactions in the Encompass Primary checking account were not Lamb Horn Business expenses, I think that this entire lawsuit is just another way of squeezing me and making me suffer so that I will give my half of the business to Barlow just to stop suffering.

21. Also, when PFX paid $420,000 for their first shipment of lamb horns in June 2015, I do not understand why that money was not deposited into the Sales account so that it could fund the ongoing business expenses. Instead, Barlow and Gurvits and BLG decided to hold that money in BLG's lawyer trust account, while Barlow continued to transfer money in and out of the Sub-Account from sources I don't know. So while I was being forced to spend my own money in the Encompass Primary checking account to continue funding the Lamb Horn Business and also just to live, Barlow was still putting money into the Sub-Account, and I was still having to get his and Livshits' approval before transferring any money from the Sub-Account into the Encompass Primary checking account to reimburse myself. That seems very unfair to me, because it means that when Barlow says in the complaint that a certain amount of his money was transferred from the Sub-Account into the Encompass primary checking account to reimburse business expenses in June and July 2015, that money should have been coming from the $420,000 that PFX had just paid but that was being kept by Gurvits and BLG in their own bank account. So Barlow gets to claim that he advanced funds to cover business expenses in June and July 2015, even though just before Barlow, Livshits, Gurvits and BLG decided to sue me, they all acted together to take that money from PFX and to move it in small amounts into the Sub-Account and then immediately withdraw it in the form of bank checks and wire transfers without ever telling me what they were doing, were the money was going, or why I was not getting any of it. The complaint says that Barlow and Livshits "discovered" that there was about $169,000 in transactions in the Encompass Primary checking account that they don't think were business related, but they've already taken $420,000, half of which is mine. So the $210,000 of the PFX money that corresponds to Barlow's 50% ownership more than covers the amount that they are claiming Barlow "advanced" to me in June and July 2015 alone.

22.     Before I started working on the Lamb Horn Business, I would usually make well over $100,000 per year as a branding and marketing professional but during the time that I was building the Lamb Horn Business, I neglected the branding and marketing business and both I and Encompass suffered financially.  As a result of this lawsuit and the extreme mental and physical problems I have been having, I have been unable to rebuild my prior branding and marketing business the way I hoped to.  Both I and Encompass have been financially damaged not just by the actions of Barlow, Livshits, Gurvits and BLG to take over the Lamb Horn Business that I created and to lock me out of it and take all of the money from sales of lamb horns (at least the $420,000 from PFX, although I believe that they have sold many more lamb horns to other buyers) and then to sue me in this lawsuit, but also in my inability to quickly reestablish the Encompass business and to make money that way.

23.     I understand that Gurvits and BLG say that they did not have an attorney relationship with me.  That is certainly not what I understood.  I understood that Mr. Gurvits and BLG were providing legal assistance to both me and to Mr. Barlow in connection with the Lamb Horn Business, including by assisting in the establishment of the various business entities, providing legal assistance in the negotiation of sales contracts, and providing other legal assistance.  Gurvits and BLG were the attorneys for the Lamb Horn Business of which I am a 50% co-owner, not Mr. Barlow's personal attorney looking out only for Mr. Barlow's interests. I had numerous meetings with Mr. Barlow and Mr. Gurvits, including meetings in Mr. Gurvits' office at BLG, and believed that he represented both me and Mr. Barlow, as well as the corporations they set up, in connection with the Lamb Horn Business.  Mr. Gurvits also assisted in preparing various documents and providing legal advice for the Lamb Horn Business, including drafting the sales contracts that we used when we sold products, for PFX and others.  I

also understood that Mr. Gurvits was providing his legal expertise to me and Mr. Barlow in connection with establishing the corporate entities, determining their legal structure and where to incorporate them, etc.  I left these issues to be decided primarily by Mr. Barlow and Mr. Gurvits based on their expertise in such matters, on the understanding that they were working with me and were taking steps that would ultimately benefit me, not just Mr. Barlow.

24. I did not authorize Mr. Gurvits and BLG to file a lawsuit on behalf of either of the corporate plaintiffs in this case.  Since I am a 50% co-owner, I do not understand how they could have claimed to be representing those corporations in filing this lawsuit against me.

25. My girlfriend, Hadley Pollet, is a fashion designer with her own company, Hadley Pollet LLC.  During the period I was working in Iceland and developing the Lamb Horn Business, Hadley was with me every step of the way and was instrumental to the development of the Lamb Horn Business, working by my side in everything from the dirty work of visiting Icelandic slaughterhouses, building relationships, physically handling and processing the lamb horns, and marketing the finished products to pet supply companies in the US and Canada, including PFX and Animal Supply.  It was a direct result of her and my joint efforts that we were able to open the doors to PFX, Animal Supply, and other companies, and to make the initial sale of the product to PFX.

26. As I mentioned above, although I was most focused on developing the process for transforming the lamb horns into pet treats, carrying out that process, acquiring the raw materials and the machinery necessary to process them, and doing the marketing and promotional work that ultimately led to at least $420,000 in sales, I knew that Mr. Gurvits and BLG were helping Mr. Barlow to structure the corporate entities.  Since I and my girlfriend had come to know and trust Mr. Gurvits and BLG (mistakenly, as it turns out), when a lawsuit was filed against Hadley

and Hadley Pollet LLC, she naturally turned to Mr. Gurvits and BLG for advice and legal representation.

27. Mr. Gurvits and BLG represented Hadley Pollet and Hadley Pollet LLC for more than a year in that litigation. However, immediately after Mr. Gurvits and BLG filed this lawsuit against me and Encompass, they informed Hadley Pollet and her company that they were going to move to withdraw because they had just discovered a supposed conflict of interest. As Mr. Gurvits later explained, the conflict was that he had just filed this lawsuit against me and Encompass. When my girlfriend objected to his suddenly leaving her without counsel in the case, as it turns out, on the eve of the final pre-trial hearing, Mr. Gurvits and BLG moved to withdraw anyway. My understanding is that the Middlesex Superior Court Judge was very upset with Mr. Gurvits and believed he had engaged in very unethical behavior by choosing to file a lawsuit against me that he knew would cause him to claim a conflict of interest so that he could not continue representing Hadley and her company. I also understand that the Judge told Mr. Gurvits that he was going to report him to the Board of Bar Overseers, although I do not know whether he did that.

28. It seems clear to me that Mr. Gurvits and BLG's decision to withdraw as counsel in representing my girlfriend and her company was designed and intended by Mr. Gurvits and BLG and Barlow to be a way of increasing the pressure they were exerting on me and my company by filing this lawsuit. I believe that both their filing this lawsuit against me and their decision to have Mr. Gurvits and BLG withdraw as counsel for my girlfriend were designed and intended to make it as difficult as possible for me to withstand the financial pressure and to insist on my rights as a 50% co-owner of the Lamb Horn Business. Mr. Gurvits' and BLG's decision to stop representing my girlfriend and her company and to blame me for their decision greatly

increased my already high stress levels, and I believe contributed to the anxiety, depression, and the serious medical problems that I have suffered since this lawsuit began. After being sued, I suffered strokes, high blood pressure, fainting, and heart trouble and was in and out of the hospital several times and under treatment for extreme anxiety attacks and depression.

Dated:  March 9, 2017

I, I Jian Lin, declare under the pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief.

/s/ I Jian Lin
I Jian Lin

### Certificate of Service

I certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 9, 2017.

/s/ Mitchell J. Matorin