UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN BARLOW, individually and derivatively on behalf of FOSSA LTD., FOSSA ENTERPRISES EHF, and ICELANDICPLUS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> I JIAN LIN and ENCOMPASS COMMUNICATIONS, INC., <br><br> Defendants/Counterclaim Plaintiffs, <br><br> v. <br><br> VALENTIN DAVID GURVITZ, ESQ., BOSTON LAW GROUP, P.C., SONYA LIVSHITS, STEVEN BARLOW, FOSSA LTD., and ICELANDIC PLUS, LLC, <br><br> Counterclaim Defendants. | C.A. No. 1:16-cv-11914-LTS |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

By this action, Plaintiff Steven Barlow ("Barlow") asserts direct and derivative claims against his business partner, Defendant I Jian Lin ("Lin"), for fraud, breach of fiduciary duty, conversion, and other tortious conduct that Lin perpetrated in connection with a business venture that Barlow and Lin ultimately pursued through four closely-held business entities. Barlow also seeks a declaratory judgment that all amounts that he has loaned to the business venture or otherwise expended for its benefit, which currently total more than $1 million dollars, are demand loans that Barlow is entitled to require the business venture to repay at any time.

Finally, Barlow asserts direct and derivative claims against Encompass Communications, Inc. ("Encompass") to recover all amounts that Encompass directly or indirectly received from Barlow and the business venture, respectively, that Encompass did not use to pay or reimburse legitimate business venture expenses.

## PARTIES

1. Plaintiff Barlow is a resident of Boston, Suffolk County, Massachusetts.

2. Defendant Lin is an individual who, on information and belief, resides at 9 Riverview Heights, Amesbury, Massachusetts.

3. Defendant Encompass Communications, Inc. d/b/a "BrandIntent" was, on information and belief, a Massachusetts corporation with a principle place of business at 18 Graf Road, Unit #26, Newburyport, Massachusetts ("BrandIntent").

4. On information and belief, BrandIntent was involuntarily dissolved by order of the Secretary of the Commonwealth of Massachusetts on June 30, 2017. On further information and belief, at all times relevant to this matter, Lin was the sole officer, director, employee and/or agent of BrandIntent.

## FACTS COMMON TO ALL COUNTS

5. Prior to March of 2013, Barlow was a semi-retired entrepreneur and business investor and Lin was a self-employed consultant who offered branding and marketing services through BrandIntent.

6. In or around the beginning of March 2013, Lin sought Barlow's advice about a situation with Murr ehf, an Icelandic pet food business.

7. According to Lin, Murr ehf owed him approximately $300,000 for consulting services that he had provided.

8. According to Lin, the consulting services that he had provided Murr ehf included (a) branding and marketing services; and (b) assisting Murr ehf in its effort to sell its pet food in the United States and other new markets through its U.S. subsidiary, Murr, Inc.

9. According to Lin, Murr ehf was experiencing financial difficulty, as a result of which Lin was concerned that Murr ehf would not pay him what he claimed to be owed.

10. Shortly thereafter, Murr ehf stopped funding the operation of Murr, Inc.

11. Murr ehf was ultimately the subject of an involuntary bankruptcy proceeding in Iceland, and did not, in connection with the bankruptcy proceeding or otherwise, pay Lin any of the $300,000 that Lin claimed to be owed.

12. When Murr ehf stopped funding the operation of Murr, Inc., Lin asked Barlow to provide "bridge loans" so that Lin could continue to operate Murr, Inc. long enough to sell the U.S. and Canada-based inventory of Murr pet food.

13. Barlow agreed to provide the requested bridge loans on the condition that any revenue from the sale of the Murr pet food would be used first to repay Barlow's loans and any other amounts that Barlow expended in connection with attempting to sell the Murr pet food, after which Barlow and Lin would split any proceeds equally.

14. Lin agreed to this condition, and Barlow provided bridge loans totaling approximately $91,000.

15. Ultimately, Lin told Barlow that he had been unable to sell any of the Murr pet food, that selling the Murr pet food was no longer feasible, and that it was necessary to dispose of the entire inventory of Murr pet food.

16. However, contrary to what he told Barlow, Lin had actually sold the Murr pet food to a purchaser in China and kept all of the proceeds.

3

Formation of the Pet Treat Business

17. In or around the summer of 2014, Barlow and Lin agreed to be fifty-fifty partners in a business venture that would manufacture dog treats using all-natural ingredients sourced from Iceland for sale in the United States, Canada, and other markets (the "Pet Treat Business").

18. Barlow and Lin agreed that in exchange for his fifty-percent (50%) interest in the Pet Treat Business Barlow would contribute: (a) a short-term loan in the amount of $50,000 that the Pet Treat Business would repay from its revenues on a first-priority basis; and (b) the benefit of his considerable business experience by making himself available to provide advice and by assisting the Pet Treat Business in structuring its business arrangements with, *inter alia*, distributors and suppliers.

19. Barlow and Lin agreed that in exchange for his fifty-percent (50%) interest in the Pet Treat Business Lin would contribute his full-time efforts toward building and operating the Pet Treat Business.

20. Barlow contributed everything that he had agreed in exchange for his fifty-percent interest in the Pet Treat Business, including a short-term loan in the amount of $50,000.

21. However, it soon became apparent to Barlow and Lin that the Pet Treat Business would require more start-up capital than Barlow's $50,000 loan.

22. As a result, Barlow agreed to make additional loans to the Pet Treat Business which Lin agreed the Pet Treat Business would repay from its revenues on the same first-priority basis as Barlow's original $50,000 loan.

23. Barlow and Lin formed four separate business entities through which to operate the Pet Treat Business: (a) Fossa Ltd.; (b) Fossa Enterprises ehf; (c) IcelandicPLUS, LLC; and (d) IcelandicPLUS ehf.

24.     On or around November 4, 2014, Barlow and Lin formed Fossa Ltd. as an Anguilla International Business Company with a registered office at Hannah Waver House, The Valley, Anguilla, British West Indies.

25.     On or around December 12, 2014, Barlow and Lin formed Fossa Enterprises ehf ("Fossa ehf") as a private limited company under the laws of Iceland with a registered office at Skipholti 10, 105 Reykjavík, Iceland.

26.     On or around September 28, 2015, Barlow and Lin formed IcelandicPLUS LLC as a Delaware limited liability company with a registered office at 16192 Coastal Highway, Lewes, Delaware.

27.     On or around September 16, 2015, Barlow and Lin formed IcelandicPLUS ehf as a private limited company under the laws of Iceland with a registered office at Smáratorg 3, 201 Kópavogur, Iceland.

Agreement Regarding the Distribution of Funds

28.     On or around April 5, 2015, by which time Barlow had loaned the Pet Treat Business more than $275,000, Barlow, Lin, Fossa Ltd., and Fossa ehf executed an Agreement Regarding the Distribution of Funds (the "Distribution Agreement").  A true and accurate copy of the Distribution Agreement is attached hereto as Exhibit A.

29.     The Distribution Agreement memorializes the agreement in effect at all times relevant to this matter between Barlow and Lin that the Pet Treat Business would repay all amounts that that the Pet Treat Business received or subsequently receives from Barlow or that Barlow otherwise expended or subsequently expends for its benefit (collectively, the "Barlow Loans") from its revenues on a first-priority basis.

30. The Distribution Agreement also provides that the Pet Treat Business will repay all amounts that that the Pet Treat Business received or subsequently receives from Lin or that Lin otherwise expended or subsequently expends for its benefit (the "Lin Loans") from its revenues on a second-priority basis, and all amounts that Barlow loaned, or otherwise expended, in connection with the Murr Venture (the "Murr Loans") on a third-priority basis.

31. More specifically, the Distribution Agreement provides that Fossa Ltd and Fossa ehf must pay all of their revenues: (a) initially to Barlow, until they have repaid the total aggregate amount of the Barlow Loans; (b) then to Lin, until they have repaid the total aggregate amount of the Lin Loans; and (c) third, to Barlow, until they have reimbursed the full amount of the Murr Loans.  See Exhibit A, §§ 1-5.

32. The Distribution Agreement also provides that Barlow shall have a security interest in "all assets, accounts, fixtures, machinery, equipment, stock, intellectual property, accounts receivable and all other tangible and intangible property and assets of [Fossa Ltd. and Fossa Ehf], wherever located, now or in the future, including after acquired property and assets." See Exhibit A, § 7.

33. Prior to the execution of the Distribution Agreement, Barlow loaned or expended more than $275,000 for the benefit of the Pet Food Business in reliance upon Lin's agreement that the Pet Food Business would repay these amounts on a first-priority basis.

34. Following the execution of the Distribution Agreement, and in reliance upon its terms, Barlow loaned to the Pet Food Business or expended for its benefit additional amounts totaling more than $750,000.

35. At no time prior to the commencement of this lawsuit did Lin, Fossa Ltd., or Fossa ehf seek to rescind or revoke the Distribution Agreement, assert that the Distribution

Agreement or any of its provisions is unenforceable, or otherwise notify Barlow of any objection he or it might have to the Distribution Agreement.

Use of BrandIntent Primary Account

36.     Because Barlow and Lin did not form a business entity through which to operate the Pet Treat Business until November 4, 2014, prior to that time the Pet Treat Business was not able to open its own bank account.

37.     Even after the formation of Fossa Ltd. on November 4, 2014, and Fossa ehf on December 12, 2014, the Pet Treat Business was constrained in its ability to open a U.S. bank account because both Fossa Ltd. and Fossa ehf are non-U.S. business entities.

38.     As a result, during the period of time between approximately the summer of 2014 and July 31, 2015, Barlow and Lin used BrandIntent's primary bank account with TD Bank to pay or reimburse most of the expenses incurred by or for the benefit of the Pet Treat Business.

39.     Barlow and Lin agreed that Lin would request the transfer of funds into BrandIntent's primary account on an "as needed" basis by providing periodic accounts of Pet Treat Business expenses requiring imminent payment, as well as reimbursable expenses that Lin had incurred on behalf of the Pet Treat Business, in response to which Barlow would authorize a transfer of funds from the Barlow Loans or the Pet Treat Business revenues into BrandIntent's primary account to cover the Pet Treat Business expenses identified by Lin.

40.     However, despite representing in connection with each such request that the funds were necessary and would be used solely to pay or reimburse Pet Treat Business expenses, Lin used approximately $200,000 from the Barlow Loans and the Pet Treat Business revenues to pay his own personal expenses.

41. On August 1, 2014, the BrandIntent primary account had a beginning balance of $3,035.25.

42. Between August 1, 2014 and July 31, 2015, in response to Lin's various requests for amounts that he represented were necessary to pay or reimburse Pet Treat Business expenses, Barlow caused or authorized the electronic transfer of $431,034.40 in Barlow Loans and Pet Treat Business revenues into BrandIntent's primary account.

43. During this same period of time, BrandIntent's primary account also received a $2,743.96 wire transfer from Vaxtarsamningur Vestfjarða (an Icelandic joint ministry of Industry and Development) that rightfully belongs to Fossa ehf.

44. During this same period of time, BrandIntent's primary account received only $31,500 in total deposits that *may* not (but might) be from Barlow Loans or Pet Treat Business revenues.

45. On July 31, 2015, the ending balance of the BrandIntent primary bank account was $9,864, meaning that between August 1, 2014 and July 31, 2015, Lin caused $458,449.61 to be paid or otherwise transferred from BrandIntent's primary account, no less than $433,778.36 of which was from the Barlow Loans and Pet Treat Business revenues.

46. On or around July 31, 2105, Lin told Barlow that he had cancer and had immediate plans to travel to China where he would seek treatment.

47. Lin told Barlow that as a result of his condition, he was no longer able to participate in the Pet Treat Business, and asked Barlow to buy out his interest in the Pet Treat Business for $250,000 so that Lin would be able to support himself while receiving treatment for his cancer.

48. In response, Barlow offered Lin a personal loan that would allow Lin to support himself while receiving treatment for his cancer without having to sell his interest in the Pet Treat Business.

49. Lin thanked Barlow, but declined his offer, and Barlow wished Lin luck in his treatment.

50. On information and belief, Lin's representation to Barlow that he had cancer and planned to travel to China to receive treatment was knowingly false when made.

51. On information, and belief, Lin claimed that he had cancer and planned to imminently travel to China for treatment in order to quietly abandon the Pet Treat Business so that he could pursue a competing business owned solely by Lin and his girlfriend, Hadley Pollett, and in order to induce Barlow to purchase his shares for $250,000.

52. Lin and Pollett had already begun to establish their competing business during trips to Iceland that Lin and Pollett claimed were for the benefit of the Pet Treat Business and for which the Pet Treat Business paid.

53. At the same time that Lin and Pollett were establishing their competing business, they simultaneously sought to destroy the Pet Treat Business by misappropriating funds for their own benefit funds that Lin was supposed to use to pay Pet Treat Business suppliers, vendors, and consultants in Iceland, and then telling those suppliers, vendors and was refusing to provide the necessary funds.

54. On information and belief, Lin planned to fund his and Pollett's competing business with the $250,000 that he hoped Barlow might pay him for his interest in the Pet Treat Business.

9

Lin Misappropriates Iceland Grant Money

55. On or about June 1, 2015, the Icelandic development agency Vaxtasamningur Vestfjarda deposited $2,743.96 into BrandIntent's bank account.

56. On information and belief, this was a grant for Fossa ehf.

57. Lin never informed Barlow of the deposit of this amount in the BrandIntent primary account, and misappropriated those funds by using them for non-Pet Treat Business purposes.

Lin Attempts to Usurp Pet Treat Business Opportunities

58. One of the important business contacts of the Pet Treat Business in Iceland was an individual by the name of Shiran K. Þórisson ("Mr. Þórisson").

59. Lin developed a business relationship with Mr. Þórisson on behalf of the Pet Treat Business on trips funded by the Barlow Loans and Pet Treat Business revenues.

60. In July of 2015, Lin began working with Mr. Þórisson to bring a venture capitalist named Gordon Shaw ("Mr. Shaw") to Iceland as part of an attempt to misappropriate business opportunities of the Pet Treat Business.

61. On July 28, 2015, Lin sent Mr. Þórisson an email stating that Mr. Shaw "really wants to see what I am up to and what interests me in Iceland but mostly he is investing in me and my vision here," indicating that he would not be meeting with Mr. Shaw on behalf of the Pet Treat Business.

62. Notwithstanding this fact, Lin caused the Pet Treat Business to pay for his entire trip to Iceland to meet with Mr. Shaw.

63. Then, in December of 2015, Lin and his family travelled to Iceland on what Lin described in his December 14, 2015 email to Mr. Þórisson as "a stealth trip so we will not be telling anyone."

64. Lin did not inform Barlow of this trip, but did cause the Pet Treat Business to pay for it.

65. On information and belief, Lin used this and other trips paid for by the Pet Treat Business to attempt to usurp Pet Treat Business opportunities.

66. In December of 2015, Lin provided Mr. Þórisson with a key to the apartment that the Pet Treat Business rented in Iceland solely for its own business purposes.

67. Lin provided Mr. Þórisson with a key so that he could make personal use of the apartment, without telling Barlow or accounting for such use.

Lin Attempts to Usurp Fish Skin Opportunity

68. In or around the fall of 2014, Barlow and Lin began discussing and developing a plan to expand the product offering of the Pet Treat Business to include fish skins and other fish products in addition to its original offering of treats made from lamb horns.

69. Barlow and the Pet Treat Business spent time, energy, and funds attempting to add fish skins and other fish products.

70. Lin developed relationships and opportunities on behalf of the Pet Treat Business and then sought to use those relationships and usurp those opportunities for his own benefit and to the detriment of the Pet Treat Business.

71. On December 30, 2015, Mr. Þórisson sent Lin an email at his Fossa Ltd. email address attaching documents identifying Fossa as the entity working on the fish skins project.

72. Lin sent Mr. Þórisson an email in response indicating that "it was a BrandIntent project and not a Fossa project."

73. Shortly thereafter, Lin executed documents in connection with the project in his own name and in BrandIntent's name in furtherance of his attempt to usurp the opportunity from Fossa.

74. Upon information and belief, Lin personally received $32,590 in connection with his misappropriation of the fish skins opportunity belonging to the Pet Treat Business.

75. Lin fraudulently concealed this transaction from Barlow.

## COUNT I - Breach of Fiduciary Duty
### (Against Lin)

76. Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

77. Lin, as a partner to Barlow and as an officer, director, and shareholder of the entities comprising the Pet Treat Business owed a fiduciary duty to Plaintiff.

78. Lin breached his fiduciary duty by engaging in the acts and omissions set forth herein.

79. In consideration of the above facts and circumstances, to the extent that demand would be required, demand on the management of entities of the Pet Treat Business would be futile.

80. Plaintiff has suffered direct harm and damages from Lin's breaches of fiduciary duties for which Lin is personally liable.

## COUNT II - BREACH OF CONTRACT
(Against Lin)

81. Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

82. Barlow and Lin made several agreements between themselves regarding their relationships and business opportunities.

83. Without limitation, Barlow and Lin agreed that any activities relating to Murr would be a joint project between them and that any revenues from that project would first go to paying back Barlow's loans.

84. Without limitation, Barlow, Lin, Fossa Ltd., and Fossa ehf agreed that Barlow's loans would be used only for Pet Treat Business purposes and not for Lin's personal purposes or other purposes.

85. Without limitation, Barlow, Lin, and the Pet Treat Business agreed that all business opportunities in Iceland, including any business opportunity relating to fish skins, would be a Pet Treat Business opportunity.

86. Without limitation, Barlow, Lin and the Pet Treat Business agreed that Lin would not take any action that would cause damage the assets, business, or goodwill of the Pet Treat Business.

87. Barlow and the entities of the Pet Treat Business have all complied with their respective obligations under the agreements between the parties.

88. Lin has breached the agreements between the parties, including, without limitation, by his acts set forth herein.

89. Barlow and the Pet Treat Business have suffered direct harm and damages resulting from Lin's breaches of the agreements, for which Lin is liable.

## COUNT III - Unjust Enrichment
(Against Defendants)

90. Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

91. By engaging in the acts and omissions set forth herein, Defendants have received benefits to which Plaintiff is entitled.

92. Under the circumstances described herein, it would be inequitable for Defendants to retain such benefits without payment for their value to Plaintiff.

93. Defendants have been unjustly enriched by Plaintiff and equity and good conscience require Defendants to make restitution to Plaintiff for the benefits that Defendants have inequitably retained from Plaintiff.

## COUNT IV - Fraudulent Misrepresentation
(Against Defendants)

94. Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

95. Defendants made numerous misrepresentations to Plaintiff with the intention that Plaintiff would rely upon them.

96. Without limitation, Lin represented to Barlow that he would use any revenues from selling the Murr pet food first pay back Barlow's loans and then he would share the profits equally with Barlow.

97. Without limitation, Defendants represented to Plaintiff that they would use Barlow's loans in Fossa only for Fossa business purposes and not for any personal or other purposes.

98. Without limitation, Lin represented to Plaintiff that the business activities he was engaging in in Iceland and elsewhere were for the benefit of the Pet Treat Business, and not for his own personal benefit or the benefits of others, including BrandIntent.

99. Without limitation, Defendants represented to Barlow and the Pet Treat Business that the expenses they requested reimbursements for were for Fossa's business purposes only and not for any other purposes.

100. Defendants' representations were false and Defendants knew them to be false when they made them or they made recklessly without knowledge of their truthfulness.

101. Defendants made the false representations with the intent that Plaintiff would rely on them.

102. Plaintiff justifiably relied on the false representations, including by, without limitation, investing further funds in the Pet Treat Business, making payments to Defendants and permitting Defendants to continue to expend Plaintiff's funds.

103. As a direct result, Plaintiff has suffered harm and damages for which Defendants are liable.

## COUNT V - CONVERSION
(Against Defendants)

104. Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

105. By engaging in the acts and omissions set forth herein, Defendants have converted Plaintiff's property, including funds and other property, for their own use, intentionally and without consent.

106. Without limitation, Lin entered the warehouse of Fossa Ltd. and took Fossa Ltd.'s items and property.

107.   Defendants' actions and omissions have caused direct damages and harm to Plaintiff for which Defendants liable.

COUNT VI - Civil Conspiracy
(Against Defendants)

108.   Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

109.   Defendants devised and engaged in a common design with other parties, including, on information and belief, other employees and contractors of Fossa and BrandIntent (including, without limitation, Mr. Þórisson) and Lin's children and other parties whose identities are only known to Defendants at this time (collectively, the "Conspirators"), one or more of whom, on information and belief, reside in Iceland, to commit wrongful acts.

110.   As described herein, Defendants committed tortuous and other wrongful acts in furtherance of the common design of the Conspirators.

111.   Without limitation, Defendants and the other Conspirators engaged in acts and omissions in a common design to misappropriate funds and other property from Plaintiff.

112.   This conspiracy has caused direct harm and damages to Plaintiff for which Defendants are liable.

COUNT VII - ACCOUNTING
(Against Defendants)

113.   Plaintiff repeats, re-alleges and incorporates each and every allegation listed in the preceding paragraphs as if set forth herein.

114.   As set forth in detail herein, Defendants have committed fraud and other illicit acts against Plaintiff.

115.   As part of the fraud and other illicit acts, Defendants have concealed their wrongful acts from Plaintiff.

116.   Plaintiff is unable to ascertain the full extent of their damages without a full and complete accounting of the benefits Defendants have derived from Plaintiff.

117.   Plaintiff requires a full and complete accounting of Defendants' assets and finances to determine their damages.

118.   Plaintiff does not have an adequate remedy at law and is entitled to equitable relief in the form of an accounting by Defendants.

WHEREFORE, Plaintiff prays that this honorable court will award the following:

A.   Enter judgment for Plaintiff on all Counts of the Complaint;

B.   Award Plaintiff damages and losses as determined at trial, including, without limitation, actual damages, consequential damages, punitive damages, attorneys' fees, multiple damages, interest and costs as provided by law;

C.   An order for Defendants to provide a full accounting of their assets and finances from January 2013 through the present, or for such period as the Court may direct; and

D.   Grant Plaintiff such other relief as the Court deems just.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES**

        Respectfully submitted,

        FOSSA LTD., ICELANDICPLUS, LLC,
        and STEVEN BARLOW

        By their attorney,

        */s/ Thomas M. Ciampa*
        Thomas M. Ciampa (BBO# 566898)
        Ciampa Fray-Witzer, LLP
        20 Park Plaza, Suite 505
        Boston, MA 02116
        Tel: (617) 426-0000
        Fax: (617) 423-4855
        tom@CFWLegal.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 28, 2017.

        */s/ Thomas M. Ciampa*